1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF MARYLAND

3

   UNITED STATES OF AMERICA  )
4                            )
        vs.                  )
5                            )        Case Number 8:19-cr-00027-GJH
   BURUDI JARADE FAISON,     )        and 8:18-cr-00607-GJH
6                            )
             Defendant.      )
7   _____)

8

           TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING
9             BEFORE THE HONORABLE GEORGE JARROD HAZEL
            FRIDAY, JANUARY 10, 2020; 10:30 A.M.
10                  GREENBELT, MARYLAND

11

   FOR THE GOVERNMENT:
12
        Elizabeth G. Wright, Assistant United States Attorney
13      Gary M. Morgan, Jr., Assistant United States Attorney
        UNITED STATES ATTORNEY'S OFFICE
14      6406 Ivy Lane, Suite 800
        Greenbelt, MD  20770
15
   FOR THE DEFENDANT:
16
        Pro Se
17
   FOR THE DEFENDANT AS STANDBY COUNSEL:
18
        Douglas R. Miller, Assistant Federal Public Defender
19      Paresh S. Patel, Assistant Federal Public Defender
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
20      6411 Ivy Lane, Suite 710
        Greenbelt, MD  20770
21
        Proceedings recorded by mechanical stenography; transcript
22  produced by computer-aided transcription.

23

24                     CINDY S. DAVIS, RPR
                   FEDERAL OFFICIAL COURT REPORTER
25                  6500 CHERRYWOOD LANE, SUITE 200
                      GREENBELT, MD  20770

```
 1                          I N D E X
```

 2    GOVERNMENT WITNESSES:                            P A G E

 3    Christopher Szakolczai

 4         By Ms. Wright for the Government              9
           By the Defendant                            25
 5
      Matthew Leonard
 6
           By Mr. Morgan for the Government            29
 7         By the Defendant                            35
           By the Court                                35
 8         By the Defendant                            39

 9    Jamie Rohsner

10         By Ms. Wright for the Government            40
           By the Defendant                            55
11
      DETERMINATION OF 4B1.2 (ATTEMPT):
12
           Argument by Mr. Patel for the Defense             66
13         Argument by Ms. Wright for the Government         81
           Rebuttal Argument by Mr. Patel for the Defense    93
14         Further Argument by the Defendant                 93
           Further Argument by Mr. Patel for the Defense     96
15         Rebuttal Argument by Ms. Wright for the Government 97

16    DETERMINATION OF ADVISORY GUIDELINE RANGE:

17         Argument by Ms. Wright for the Government        99
           Argument by the Defendant                       123
18         The Court's Ruling                              137

19    ALLOCUTIONS:

20         By Ms. Wright for the Government            148
           By the Defendant                           164
21         By Probation Officer Griffin               176

22    Sentence                                        175

```
23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2          (Call to order of the Court.)

 3          THE COURT:  Good morning.  You may be seated.  The

 4  government may call the case.

 5          MS. WRIGHT:  Good morning, Your Honor.  We are here

 6  for two matters entitled United States of America versus Burudi

 7  Jarade Faison.  The first is a sentencing hearing in criminal

 8  number GJH-19-27.  The second is a hearing upon alleged

 9  violations of supervised release in criminal number GJH-18-607.

10          I am Elizabeth Wright, and with me is Michael Morgan, on

11  behalf of the United States, and we are joined at counsel table

12  by ATF Special Agent Jamie Rohsner.

13          THE COURT:  Good morning to you all.  And I do see we

14  have Mr. Faison representing himself.  He's joined by

15  Mr. Miller, who is his standby counsel, and I do recognize

16  Mr. Patel, the appellate guru of the Federal Defender's Office.

17  So I appreciate all of their appearances here today.

18          I'll note, because -- well, I'll note this.  At the end

19  of every jury trial, I always go back and talk to the jurors

20  and, at the end of every one -- and I don't know how many I've

21  had at this point -- I invite the jurors to return for

22  sentencing to see the process as it plays out, and I do want to

23  acknowledge that for the very first time, someone has taken me

24  up on that.  And so I just wanted to recognize that as well.

25          So with that, however, we will begin.
</pre>

1        On October 11, 2019, the defendant appeared before the

2   Court for trial and, at the conclusion of that proceeding, was

3   found guilty on Count One, felon in possession of firearms and

4   ammunition; was found not guilty on Count Two, felon in

5   possession of ammunition.  Upon a finding of guilt, the Court

6   ordered preparation of a presentencing report, and we scheduled

7   sentencing for today.

8        As Ms. Wright remarked, we do also have the supervised

9   release petitions.  As I understand it, the supervised release

10  violations were this case; is that accurate?

11        MS. WRIGHT:  Yes, they stemmed from the precise

12  offense conduct, Your Honor.

13        THE COURT:  And so we'll -- I guess as we go, we'll

14  see how we want to handle that, in what order we take that up.

15        But in terms of what I have received and reviewed in

16  preparing for sentencing, I, of course, did receive the

17  presentencing report; I received the sentencing memorandum of

18  the government, which had a number of attachments; I received a

19  sentencing memorandum from the defendant; and then I also

20  received a letter from the defendant; I received a brief from

21  the Federal Defender's Office as *amicus curiae;* and then I did

22  receive -- and I had the name and address of the juror

23  redacted, but I did provide to the parties the letter that I

24  received from one of the jurors in this case.

25        Is there anything else that I should have received but

1  haven't mentioned?

2         MS. WRIGHT:  Your Honor, the government did file a

3  response brief on Wednesday as well, replying to Mr. Faison's

4  sentencing memorandum.  And we did have a courtesy copy sent to

5  chambers, as well as filing it on ECF.

6         THE COURT:  I've been in Baltimore all week, so it

7  might not have made it to me.  I might have to take a moment

8  and look at that.

9         MS. WRIGHT:  Of course, Your Honor.

10         THE COURT:  The last thing I have here -- I'm looking

11  at the docket.  I have your sentencing memorandum, if that's

12  what you're referring to, which does -- I mean, your sentencing

13  memorandum is 30-something pages and does address those issues.

14  Is that what you're referring to?

15         MS. WRIGHT:  No, Your Honor.  On the 8th -- it's at

16  ECF number 112 -- we filed a response to the defendant's

17  sentencing memorandum and which also addressed Mr. Patel's

18  proposed *amicus* argument.  I do have a hard copy if I can hand

19  that up to the Court.

20         THE COURT:  Sure.  Just directly to me is fine.

21     I do apologize.  I haven't seen this, so I'm going to

22  need to take 20 minutes and go back and read this.  I usually

23  physically check the docket, is the last thing I do, before I

24  come out here to make sure, but I did not do that this morning,

25  and I have not seen this.  Like I said, I've been in Baltimore,

1 so if something came to chambers, I just didn't see it.

2 So I'll have to take a 20-minute recess -- I apologize to

3 those who are waiting.  It might take less than that, so if you

4 stay nearby -- it's 13 pages, so it's not like it's something I

5 can't digest relatively quickly.  So I'll be back soon.

6 (Recess from 10:40 a.m. to 10:55 a.m.)

7 THE COURT:  Good morning again.  We are back.  I do

8 apologize for that.  As I had indicated, I had been preparing

9 for the sentencing earlier in the week, and I've been in trial,

10 and so I guess a couple of materials came in since we had first

11 assembled the materials, so I didn't see that.  So I do

12 apologize for that.  But I now have had the opportunity to read

13 the government's additional filing.

14 I also should note that we received letters in support of

15 Mr. Faison.

16 Anything else that I should have received but have not

17 mentioned?

18 MS. WRIGHT:  Not from the government.  Thank you,

19 Your Honor.

20 THE COURT:  Anything else from Mr. Faison that I

21 haven't mentioned?

22 THE DEFENDANT:  No, sir.

23 THE COURT:  So there are a variety of guideline

24 issues that I think are at play, and my understanding is the

25 government has some witnesses that I guess go to some or all of

1  them.

2       Just to list what I know we have to discuss, there's the

3  issue of whether or not his base offense level is a 20 or a 22,

4  which is primarily a legal argument dealing with whether or not

5  the attempt -- his prior attempt conviction counts for the

6  purposes of the guidelines, whether that counts as a controlled

7  substance offense or not.

8       There's the obstruction-of-justice enhancement, which we

9  should probably discuss.

10      There's also the four-level enhancement, which I think is

11 worth discussing, whether or not that applies here related to

12 this having been in furtherance of another felony offense.

13      Then Mr. Faison has raised 5K2.10, as a departure request

14 based on the victim's conduct, and 5K2.12 based on coercion.

15      Are there any other issues -- I'll start first with

16 Mr. Faison -- other than those that I have listed that you

17 think are at issue as it relates to the guideline calculation?

18           MR. MILLER:  No, Your Honor.

19           THE COURT:  Did I cover everything?

20           MR. MILLER:  Yes.

21           THE COURT:  Ms. Wright, is there anything that I

22 haven't covered?

23           MS. WRIGHT:  Your Honor, I believe Mr. Faison's

24 objections pertain to several other factors.  I didn't actually

25 catch if the Court mentioned the question of the firearm being

1  stolen and other things in that regard, but the evidence that

2  the government intends to put forward will address some of

3  those points.  So I think these are the only ones that are in

4  dispute at this point.

5          THE COURT:  Very well.  Mr. Faison, did you have an

6  opportunity to read the presentencing report?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Ms. Wright, did you have an opportunity

9  to read the presentencing report?

10         MS. WRIGHT:  Yes.  Thank you, Your Honor.

11         THE COURT:  Other than things I've already listed,

12  any additional objections?

13         MS. WRIGHT:  No.  Thank you, Your Honor.

14         THE COURT:  And I understand you do have some

15  witnesses you wanted to call.

16         MS. WRIGHT:  Yes, Your Honor.

17         THE COURT:  Whenever you're ready.

18         MS. WRIGHT:  Thank you, Your Honor.  The government

19  will call ATF Special Agent Christopher Szakolczai.

20         THE COURT:  Very well.

21         THE COURTROOM DEPUTY:  Please step forward to the

22  witness stand.

23         THE WITNESS:  Yes, ma'am.

24         THE COURTROOM DEPUTY:  Remain standing and raise your

25  right hand.

1          (Government witness **CHRISTOPHER SZAKOLCZA**I sworn.)

2          THE COURTROOM DEPUTY:  You may be seated, sir.  Speak

3    clearly into the microphone, please state your name and spell

4    your name for the record.

5          THE WITNESS:  My name is Christopher Szakolczai.  The

6    last name is spelled S-Z-A-K-O-L-C-Z-A-I.

7          THE COURTROOM DEPUTY:  Thank you.

8          THE COURT:  I'm sorry, pronounce that again.

9          THE WITNESS:  Szakolczai.

10          THE COURT:  I shouldn't chuckle as I ask you to

11    pronounce it.

12          THE WITNESS:  If you drop the z's, it makes a little

13    more sense.  A little more sense.  It's all relative, I guess.

14          THE COURT:  Thank you.  I appreciate it.

15          **DIRECT EXAMINATION BY MS. WRIGHT FOR THE GOVERNMENT**

16    BY MS. WRIGHT:

17    Q.    Good morning, sir.

18    **A.    Good morning.**

19    Q.    So how are you employed?

20    **A.    I am employed by the Bureau of Alcohol, Tobacco,**

21    **Firearms, and Explosives as a special agent.**

22    Q.    And how long have you served in that position?

23    **A.    Three years and number of days now.**

24    Q.    And did you work in law enforcement before joining ATF?

25    **A.    Yes, ma'am.**

1  Q.    Can you briefly describe how long that was and what time

2  of work you were doing?

3  **A.    I was a Baltimore City police officer for roughly five**

4  **years.  I worked in numerous capacities, including patrol and**

5  **then the plain clothes narcotics/street crimes unit.**

6  Q.    And among other training, did you receive firearms

7  training as part of your work in Baltimore?

8  **A.    Yes, I received firearms training in Baltimore and also**

9  **with ATF.**

10  Q.    And did you also receive training regarding controlled

11  substances?

12  **A.    Yes, I received numerous hours of training between**

13  **Baltimore, ATF, and then FLETC, and also experience from more**

14  **experienced officers and so on and so forth through my career.**

15  Q.    And have you ever previously been qualified as a drug

16  expert, for instance, in any criminal cases?

17  **A.    Yes.  So in my time in Baltimore, I was deemed an expert**

18  **in the district and circuit courts of Baltimore in reference**

19  **to -- I want to try and get this right -- the packaging and**

20  **distribution of street-level narcotics, along with some other**

21  **aspects I can't remember fully.**

22  Q.    And, generally, from your training and experience, have

23  you received information regarding identifying controlled

24  substances and the indicia of, for instance, distribution and

25  manufacturing of controlled substances?

1  **A.      Yes, ma'am.**

2  Q.      And have those controlled substances that you've become

3  familiar with included cocaine and cocaine base?

4  **A.      Yes, ma'am.**

5  Q.      And have you also had occasion to learn about PCP?

6  **A.      Yes.**

7  Q.      And during the course of your work for ATF, have you been

8  involved in drug investigations?

9  **A.      Yes, I have.**

10  Q.      Also during your time with ATF, have you learned about

11  silencers?

12  **A.      Yes, I have.**

13  Q.      Can you briefly describe how you have come to learn about

14  those?

15  **A.      During the academy, we had the ability to fire a number**

16  **of weapons.  They're called NFA weapons, so full automatic**

17  **weapons, but some have silencers on them.  Along with research**

18  **that I've done myself on my own time, and I've also had the**

19  **opportunity to speak to -- I guess you can them experts within**

20  **ATF, in reference to silencers and so on and forth, about the**

21  **way they work, the components of a silencer, and so on and so**

22  **forth.**

23  Q.      And is it fair to say that you have particularly taken

24  advantage of opportunities to have that type of conversation?

25  **A.      Yes, ma'am.**

1    Q.    Have you received any experience or information, during

2    the course of your employment, regarding the manufacture or

3    building of silencers?

4    **A.    More so it was private research that was done in building**

5    **homemade silencers.  So, for example, people -- building a**

6    **silencer isn't inherently illegal by itself.  So there's ways**

7    **to build it at home, and there's information that's on the**

8    **internet and so on and so forth.**

9    Q.    Okay.  So from your personal research, is it fair to say

10   you have reviewed some of the information on the internet and

11   seen how individuals are building and working with silencers?

12   **A.    Yes, exactly.**

13   Q.    Thank you.  Now, during the course of your duties with

14   the ATF, is it correct that you were present at the execution

15   of a search warrant at the defendant's residence on September

16   5, 2018?

17   **A.    Yes, ma'am.**

18   Q.    And is it fair to say that you testified regarding that

19   presence at trial in this case as well?

20   **A.    Yes, ma'am.**

21   Q.    And just to have it fresh in people's minds, what was

22   your role during the execution of that search warrant?

23   **A.    I searched Mr. Faison's room.**

24   Q.    And was anyone else searching that room with you?

25   **A.    Yes, ma'am; Special Agent Rohsner.**

1    MS. WRIGHT:  Your Honor, if I may, I'll show the

2  witness a packet of photographs that I've marked as

3  Government's Exhibit 1 for purposes of this hearing and see if

4  he recognizes this.

5  BY MS. WRIGHT:

6  Q.    Do you recognize those?

7  **A.    I do.**

8  Q.    And is it fair to say those are generally pictures from

9  the search warrant execution?

10  **A.    Yes, ma'am.**

11    MS. WRIGHT:  Your Honor, the government would move

12  the admission of that packet of photographs as Government's

13  Exhibit 1.

14    THE COURT:  Sure.

15    MS. WRIGHT:  Thank you.  And I'll retrieve those from

16  the witness in order to display some of those.

17  BY MS. WRIGHT:

18  Q.    Now, to get the Court situated, if we may, just going

19  through the pages in this packet in order, so starting with

20  page 1, what is the Court looking at here?

21  **A.    This is the front door -- or the bedroom door to**

22  **Mr. Faison's room.**

23  Q.    And looking at page 2.

24  **A.    So this would be the bed that we saw in the initial**

25  **photograph in Mr. Faison's room.**

1   Q.    And I'd like to draw your attention to, I guess, a

2   closer-up photograph.  Is it fair to say that's what the third

3   page of this is?

4   **A.    Yes, ma'am.**

5   Q.    I'm sorry, I didn't hear the answer.

6   **A.    Yes, ma'am.  Yes, this is the close up of the previous**

7   **photograph.**

8   Q.    Okay.  And as you described at trial as well, did you

9   have occasion to look through some of the packet of papers that

10  were on the defendant's bed?

11  **A.    I did.**

12  Q.    Okay.  And I'll pass up what was previously submitted as

13  exhibit E to the government's sentencing memorandum and also

14  show the fourth page of the packet of photos.  So on the fourth

15  page, can you describe what you're showing for the photographer

16  there?

17  **A.    So this was in the pile of paperwork that was located on**

18  **the bed.  This is a U.S. Court of Appeals document with**

19  **Mr. Faison's name on it.**

20  Q.    And then for exhibit E, which I'll show you, once you get

21  that, can you take a look at this and say where you found it

22  and what interest it posed you as a member of law enforcement.

23  **A.    So these are -- this is a document that was located -- or**

24  **documents that were located on Mr. Faison's bed, below the**

25  **paperwork.  If we can go back one picture maybe, I can show you**

1  kind of where it was.  Yes, so they were all located in this

2  area, in this stack of papers or documents or books.  I don't

3  know what you would like to call them, but that's what these

4  pages are.

5  Q.    All right, and was there -- could you describe for the

6  Court what, if anything, had drawn your attention to those

7  particular pieces of paper?

8  A.    Sure.  There was a number of mentions of, for example,

9  hydroponics grow lights.  It seemed like things that had to do

10 with drug paraphernalia.

11      And then on the other page there was -- on a piece of

12 lined paper it says "cocaine purity testers."  And then over to

13 the right of that, there was actually a thing that said

14 "silencer parts," which that was the main piece that drew my

15 attention.

16 Q.    And were there other items on the bed that drew your

17 particular attention, as well as an ATF agent?

18 A.    Yeah, so we saw the -- well, I saw the paperwork that

19 said silencer parts, and then -- so then I -- again, obviously

20 looking more at the tubes over here.  So in this photograph you

21 can see what look like a bunch of flashlights.  So this would

22 be, like, referred to as, like, just a regular flashlight.  You

23 might see, like, a D cell battery flashlight or, like, a

24 Maglight flashlight, or it might be this one.  They're

25 flashlight tubes.

And then within the photograph as well, you can see these items up here.  These items are -- they're sold as -- there's multiple ways of selling them.  So making a silencer at home, there are kits, there are proper kits you can buy.  A lot of the homemade ones come with these things, which are silencer precursors.  So these are sold as hidden tubes or solvent traps or something of that nature, but what they're actually turned into, they actually become the baffle of the silencer.

So the way, like, a silencer will work is that these baffles, when they're converted and drilled through, will fit into these flashlight tubes, and then these end caps will get screwed onto to it, and then that could be fitted to the firearm, and that then becomes your silencer.

To test it, I actually took the baffles from up here and actually fit them into the flashlight tube and found that they fit.  It wasn't giggling around.  It was actually designed to fit into that flashlight tube.

Q.   And so based on what you were saying there in your manipulation of the items there, did you have a conclusion based on your training and experience?

A.   Yeah, so just based upon my knowledge of people building homemade silencers, it was the precursors to that.  It was the attempt -- or it was in production, you can say, or there was an attempt or -- what's the word I'm looking for here?  There was the idea of trying to build a silencer.

1    Q.    And were there any other items that you remember seeing

2    in the bedroom that were also consistent with that idea?

3    **A.    Yes.  So there were tools that were located below the**

4    **bed.  I know there was, like, a Dremel kit or some sort of,**

5    **like, kit for various attachments that you can put onto a**

6    **Dremel or, like, a drill, along with -- I think there was a**

7    **corded drill, which would be required to complete these -- I**

8    **can't remember the exact way these are sold online, but if you**

9    **drilled these through, the holes, you have to actually drill**

10   **that through to actually have the bullet pass through.  So**

11   **you'd have to drill it to make it an actual baffle, so on and**

12   **so forth.**

13   Q.    I'll show, also, what is the second to last page in the

14   package of photos.  Can you describe for the Court what is

15   being shown here?

16   **A.    Yeah.  So this is my beautiful shoe, and then next to it**

17   **is actually -- this is your attachments and whatnot.  So for**

18   **your Dremel tool or your rotary tool or what have you.  And**

19   **then it looks like this is the -- like a corded drill, if I**

20   **remember correctly.**

21        **And then on top of that, there seems to be, like, a**

22   **toothbrush right here that, from my experience of, like, having**

23   **done -- like, having had owned firearms and cleaning my gun, I**

24   **use a toothbrush just like this.  A lot of times it gets really**

25   **dirty, just like the bristles seem to be really dirty there,**

1  but that's just what I gathered from the photograph.

2          Also, next to my foot is another baffle.  It's not a

3  baffle yet.  I can't say that.  It is the precursor to wanting

4  to build a silencer or it is the idea of -- that piece is

5  required for the silencer.  That was the exact same piece that

6  would have been found on the bed as well, that fit into the

7  tube.

8  Q.    All right, thank you, sir.  From your review and

9  manipulation of these, in your training and experience, what

10  separated these from being considered silencers?

11  A.    So, again, the baffles have to be drilled through.  I'll

12  just draw it over here.  If you look at, like, the baffle, it's

13  circular.  They were solid on top.  But even on the website, I

14  think -- like, there's ways -- they actually mark the holes for

15  you.  So they'll give you, like, a center punch hole so you can

16  align the drill bit.  When you drill it through to actually

17  have the bullet pass through, you're actually creating the

18  baffle.  Before that, you just have a piece of metal that is

19  not going to be adequate for the silencer.  However, that

20  piece, again, is imperative for the silencer.  That's how the

21  silencer actually functions.

22  Q.    Did you have occasion -- any occasion to look at internet

23  search history downloaded from the tablet that was used from

24  the defendant's bed in this case?

25  A.    Yes, I did.

1          MS. WRIGHT:  If I may, Your Honor, I'll approach and

2    show the witness what I've marked as Government's Exhibit 2.

3          THE COURT:  Sure.

4    BY MS. WRIGHT:

5    Q.    Do you recognize that document?

6    **A.    Yes, this is the search history for the tablet that was**

7    **located in the room.  You can see searches such as --**

8          MS. WRIGHT:  And before you comment on what's on it,

9    Your Honor, we move the admission of that set of -- that

10   printout, the set of pages from the tablet download.

11         THE COURT:  Very well.

12   BY MS. WRIGHT:

13   Q.    Sir, could you describe what you're looking at, what you

14   are seeing on those pages that was of interest?

15   **A.    Yeah, so this is the search history from the tablet.  You**

16   **see things such as "silencershop.com," along with NTC Trading**

17   **Company.  When I actually searched for NTC Trading Company, I**

18   **found that exact baffle on there and sold as a -- it might**

19   **actually be right here.  Yeah, it's a "D Cell Super**

20   **Combo-Battery End Adapter, Light Bulb End Cap," so on and so**

21   **forth, and then it's also -- so that would be -- so the tubes**

22   **were D cell battery tubes, and these were sold as pieces for**

23   **that.  On the web site they say that -- well, as I just**

24   **mentioned before was that they actually have the baffle, and it**

25   **has a center punch, so you know where to drill for the**

1   actual -- to make it a baffle.  I think they're sold as hidden

2   compartments, is what they call them.  Just like, a lot of

3   times, solvent traps are sold as cleaning supplies for weapons,

4   but, really, they can be converted into a silencer.

5   Q.   All right, and is there -- I guess highlighting, flagging

6   some of the items of interest from that search appearing on

7   your copy of the exhibit, what is sort of the approximate date

8   range of the pages that you're looking at?

9   A.   Looks like the initial search on this first page is

10  4-17-2018, and the last one is 8-17-2018.

11  Q.   I will recover that document from you.  Just to let the

12  Court view it, looking at the first page of that, I guess some

13  of the references highlighted include the website --

14  A.   You can't see it, but I think one of them --

15  Q.   Silencershop.com --

16  A.   Yeah, silencershop.com.  And I think on the third page it

17  was -- yeah, you'll see NTC Trading Company.

18           THE COURT:  You'll need to zoom it in if you want us

19  to actually be able to see it.

20  BY MS. WRIGHT:

21  Q.   There we go.  Thank you.

22  A.   So, yeah, you'll see NTC Trading Company, and then you'll

23  see things like -- if you move this up a little.  There you go.

24  You'll see things like D cell titanium solvent trap kit, thread

25  protector, so on and so forth.  Another big popular thing is

1  **freeze-out plugs for automobiles.  You can drill holes through**

2  **them and make silencers out of them too.**

3  Q.     Thank you, sir.  Now, did you recover any evidence of

4  suspected controlled substances in the defendant's room?

5  **A.     Yes.  I was with Special Agent Rohsner, and I witnessed**

6  **the recovery of a backpack that had items in it.**

7  Q.     Okay.  And before we talk about the backpack, I'll

8  actually turn your attention to a couple of other photos.

9  Keeping your attention on the photograph that was the second to

10  last page in the packet, was there anything relevant to, in

11  your mind, controlled substances in that photograph?

12  **A.     Are you referring to the drawer?**

13  Q.     No, I believe it should show up as the one with your foot

14  under the bed?

15  **A.     Oh, I'm sorry.  I see what you're saying.  So it's not a**

16  **very good photograph, unfortunately.  You can't really see it**

17  **very well, but there is actually a number of vials, right here,**

18  **or plastic tubes of some sort that contained suspected PCP that**

19  **I located as well.**

20  Q.     Okay, and what was your -- the basis for your suspicion

21  or belief that this was PCP?

22  **A.     Just the packaging of them, so on and so forth, and then,**

23  **again, the way they're packaged in the individual vials**

24  **underneath the bed.**

25  Q.     Okay.  Was there any odor that gave you any indication of

1  what controlled substance it might be?

2  **A.     There was definitely an odor.  Plus, they were -- the**

3  **thing that threw me off, they were packaged in plastic, as**

4  **opposed to glass, which is regularly noticed.  Plastic is not**

5  **the proper way to package them because PCP will actually eat**

6  **through plastic, so.**

7  Q.     Do you remember approximately how many, I guess,

8  individual packages there were?

9  **A.     I want to say less than 10, like six or seven maybe.  I**

10 **can't remember the exact number.**

11          THE COURT:  I'm sorry, you said -- say that again,

12 please.

13          THE WITNESS:  It's less than 10.  I want to say six

14 or seven, but I can't remember the exact number.

15          THE COURT:  Are you saying six serving sizes or --

16          THE WITNESS:  Oh.  So the vials are -- sorry for the

17 court reporter -- about yay big.  I don't know how you would

18 explain it.  They were smaller.  They weren't, like, ounce

19 bottles.  Ounce bottles are, obviously, much bigger, and they

20 would be bigger in this photograph, but they weren't that size.

21 So I can't tell you the exact weight or the exact fluid

22 measurement on them, unfortunately.  Sorry.

23 BY MS. WRIGHT:

24 Q.     And turning to page 5 of the packet of photographs, do

25 you recognize what we're looking at there?

1  **A.     I do.  This is the dresser -- top, left dresser drawer.**

2  **In the photograph you can see -- I recognize -- or I found this**

3  **pill bottle along with Pyrex.**

4  Q.     Okay, and why did you take note of that?

5  **A.     It just seemed to have residue, which I suspected to be**

6  **CDS residue.  Pyrex is a common way to cook up crack cocaine,**

7  **so on and so forth.  I would say heat resistant or Pyrex is**

8  **meant to be exposed to heat, so that's just a common tool that**

9  **I've seen used in many, many, many search warrants when it**

10 **comes to crack cocaine and so on and so forth.**

11 Q.     And was there -- based on your search, do you recall

12 anything specifically linked to the defendant that was also in

13 that drawer?

14 **A.     Yeah, I think the pill bottle had a name on it, if I**

15 **remember correctly, but I'm kind of fuzzy on that.  Sorry.**

16 Q.     Then turning to the backpack that you referred to, I'll

17 show you a set of photos which are the next pages in the packet

18 of photos, and can you describe what we're looking, I guess, on

19 the first of these four backpack photos?  What are we looking

20 at?

21 **A.     It's another Pyrex or another glass container or -- not a**

22 **graduated cylinder but another glass object that seemed to have**

23 **CDS residue on it.**

24 Q.     And the next page?

25 **A.     And then this is the close-up of it.  Again, this is the**

1  glass item, another glass item with, like, a blue plastic lid.

2  You're seeing just indications of CDS paraphernalia and so on

3  and so forth, for cooking and making drugs.

4  Q.    And which drugs would be consistent with making --

5  A.    So from my experience, this would be crack cocaine.  You

6  have to cook it.  Obviously, the glass is for that.

7  Q.    And the following page, do you recognize what was in

8  there?

9  A.    I think this is going to be like a baking soda box or box

10 of baking soda, which is commonly used as a cutting agent or as

11 a way to help make crack cocaine.  And then you have your

12 strainer and whatnot.  So it's actually, again, CDS

13 paraphernalia.

14 Q.    And then, finally, elsewhere in the residence -- I'll

15 show you, I guess, the last photograph, but is it fair to say

16 that you found inositol powder as well?

17 A.    Yeah, I wrote -- I may not have been the first person to

18 find it, but I definitely did notice this inositol, another

19 cutting agent for crack cocaine and another agent used to make

20 crack cocaine.  It's a common drug-cutting agent.

21 Q.    Okay, and do you recall where you saw that in the

22 residence?

23 A.    So this was on the porch, in, like, the corner, on the

24 actual windowsill of the porch or on the screened-in porch's

25 sill; I'll say that.

1    Q.    Thank you, sir.  I have no further questions at this

2    time.

3              THE COURT:  Cross-examination, Mr. Faison?

4              **CROSS-EXAMINATION BY THE DEFENDANT**

5    BY THE DEFENDANT:

6    Q.    Were you there for the search of the entire basement?

7    **A.    I was in your room for the basement.  I wasn't there for**

8    **every single room, if that makes sense.**

9    Q.    Do you know if any other items were found in the

10   basement?

11   **A.    I do know that other items were found.  I don't know**

12   **exactly what was found.**

13             THE DEFENDANT:  Just one minute, Your Honor.  I'm

14   trying to find the particular --

15             THE COURT:  Sure, do what you need to do.

16             THE DEFENDANT:  Your Honor, I'll be showing BF 102.

17   It's a picture from the search.

18   BY THE DEFENDANT:

19   Q.    Sir, can you describe what you see in this picture?

20   **A.    I've seen this picture before.  To me it would be -- it**

21   **looks like items that are commonly packaged for CDS**

22   **distribution on the street or street-level distribution.  You**

23   **can see the individual vials and so on and so forth.**

24   Q.    When you last saw this picture, do you remember where

25   they told you this picture was taken from?

1   **A.     I don't.  I know it was from another room, I will say**

2   **that.  It's not from your room.  I don't remember exactly which**

3   **room it came from though.**

4   Q.    And the items that you see in this picture, are they

5   reminiscent of the things that were found in the other bedroom?

6   **A.     They do look similar, yes.**

7   Q.    And would you consider this to be a bulk or a portion of

8   some?

9   **A.     This is a larger portion, yes.**

10   Q.    So in your experience, if this was found in one area,

11   would it be possible that the majority of this came from a

12   separate section, other than what you found in the bedroom?

13   **A.     I'm not a hundred percent sure I understand your**

14   **question.  Sorry.**

15   Q.    When you do searches and you find a bulk, would you

16   determine that a smaller amount that you found came from that

17   bulk?

18   **A.     I think I see -- okay, I think I see what you're saying.**

19   **If you're asking if I believe the vials underneath your bed**

20   **came from here, I can't say for sure.  I can say that they are**

21   **packaged similarly, and they had similar substance inside of**

22   **them, but that's all I can determine.  I can't say that they**

23   **came from here because yours had a plastic bag as well, so.**

24                THE DEFENDANT:  No other questions.  Thank you.

25                THE COURT:  Just to follow up on that, but you are

1   saying that what was found in his room is consistent with what

2   was found in this picture.

3          THE WITNESS:  Yes.  So these vials that you see here

4   are around the same size.  So that's probably a better picture

5   for Your Honor to understand, like, the items that were found

6   underneath the bed, like the vial.  So it --

7          THE COURT:  I'm sorry, I didn't mean to interrupt

8   you.

9          THE WITNESS:  No, no.  Sorry.

10         THE COURT:  So you certainly can't exclude the

11  possibility that what came from his room originated from --

12         THE WITNESS:  Oh, no, exactly.  I can't say where it

13  came from for sure, but I can say that these items are packaged

14  similarly, looks to be the same substances inside of them.

15         THE COURT:  And you don't know where this came from,

16  other than it was somewhere other than his bedroom.

17         THE WITNESS:  I know it was somewhere in another

18  room.  I don't remember which one it was, but this wasn't the

19  room I searched.

20         THE COURT:  And there's more here than what was found

21  in his room.

22         THE WITNESS:  Oh, yes.

23         THE COURT:  Okay.  Anything else, Mr. Faison, before

24  I turn it back to the government?

25         THE DEFENDANT:  No further questions.

1                   THE COURT:  Redirect?

2                   MS. WRIGHT:  None.  Thank you, Your Honor.

3                   THE COURT:  All right, sir, thank you so much for

4    your testimony.

5                   THE WITNESS:  Thank you.

6                   THE COURT:  The next government witness.

7                   MR. MORGAN:  Your Honor, the government calls Matthew

8    Leonard.

9                   THE DEFENDANT:  Your Honor, just one thing.

10                  THE COURT:  Sure.

11                  THE DEFENDANT:  I want to correct the record.  I

12   believe I gave you the wrong number.  The number is BF 0192.

13                  THE COURT:  BF?

14                  THE DEFENDANT:  0192.

15                  THE COURT:  All right.  And that will allow us to

16   identify it because you haven't printed out a copy for us.  It

17   will be Defense 1 for the purposes of this hearing.  At some

18   point, Mr. Miller, I'd ask that you get us a copy of that for

19   the record.

20                  THE COURTROOM DEPUTY:  Please step forward to the

21   witness stand, remain standing, and raise your right hand.

22          (Government witness **MATTHEW LEONARD** sworn.)

23                  THE COURTROOM DEPUTY:  You may be seated, sir.  Speak

24   clearly into the microphone, please state your name and spell

25   your name for the record.

1          THE WITNESS:  Matthew J. Leonard, L-E-O-N-A-R-D.

2          THE COURTROOM DEPUTY:  Thank you.

3     **DIRECT EXAMINATION BY MR. MORGAN FOR THE GOVERNMENT**

4     BY MR. MORGAN:

5     Q.    Good morning, sir.

6     **A.    Good morning.**

7     Q.    How are you employed?

8     **A.    I'm a special agent with the Bureau of Alcohol, Tobacco,**

9     **Firearms, and Explosives.**

10    Q.    And how long have you been in that position?

11    **A.    Since September of 2014.**

12    Q.    And before your years as an ATF special agent, what did

13    you do?

14    **A.    I was a firefighter in the District of Columbia.**

15    Q.    Briefly, what's your educational background?

16    **A.    I have a masters degree in management from Hopkins and a**

17    **bachelor's degrees in fire science from University of Maryland.**

18    Q.    And you testified at the trial in this case?

19    **A.    Yes.**

20    Q.    And you testified about your training?

21    **A.    Yes.**

22    Q.    And can you briefly describe some of the training that

23    you had?

24    **A.    I have the basic criminal investigator training program**

25    **from FLETC, the Federal Law Enforcement Training Center, and**

1  **then special agent basic training from ATF, as well as several**

2  **advanced trainings specific to firearms.**

3  Q.    And have you had training in how those firearms work?

4  **A.    Yes.**

5  Q.    And how they're manufactured?

6  **A.    Yes.**

7  Q.    And how they're sold?

8  **A.    Yes.**

9  Q.    And have you had training also in homemade weapons?

10  **A.    Yes.**

11  Q.    And about training in how to trace stolen weapons?

12  **A.    Yes.**

13  Q.    Turning your attention to this case, you had a chance to

14  examine two firearms in this case, an AR-type pistol and a .45

15  Kimber 1911 pistol; is that correct?

16  **A.    Yes.**

17  Q.    And you testified with regards to both of those weapons

18  at trial; is that correct?

19  **A.    That's correct.**

20  Q.    So turning your attention to the Kimber 1911 pistol, were

21  you able to examine that prior to trial?

22  **A.    Yes.**

23  Q.    And what did you learn about that gun as far as make and

24  model?

25  **A.    That it was a semiautomatic pistol, chambered in .45 ACP,**

1    manufactured in Yonkers, New York.

2    Q.    So does the ATF trace stolen firearms?

3    A.    All firearms that are recovered and brought through the

4    ATF are traced if it's possible to do a trace.

5    Q.    And why does the ATF do that?

6    A.    So, typically, when a firearm is recovered, it was either

7    taken from somebody that wasn't supposed to have it, or it

8    entered into an illicit marketplace, and we trace the firearms

9    to determine the actual ownership pathway back to where it was

10   manufactured.  So it helps us further investigations, but it

11   also helps us to determine whether we might have to return a

12   firearm to an innocent owner, if it was taken from them, or if

13   the firearm was just possessed in an illicit manner and where

14   that firearm came from and how it could have gotten into that

15   position.

16   Q.    And is a person who is prohibited from purchasing a

17   firearm able to purchase through a standard federal firearms

18   licensed dealer?

19   A.    No.  People that are prohibited from -- or people that

20   are found guilty of a crime punishable by more than a year in

21   prison are prohibited from possessing firearms, and, therefore,

22   they would not pass the national incident background check that

23   would -- or instant background check that would show up on the

24   record that they were prohibited.  So then a transfer -- or an

25   FFL transfer would not take place.

1   Q.   So do those individuals procure weapons by other means?

2   **A.   Yeah --**

3   Q.   And how do they do that?

4   **A.   So firearms enter an illicit market through straw**

5   **purchasers, where someone would go to a gun store and**

6   **essentially purchase a firearm and misrepresent that they were**

7   **going to buy it for themselves but, in turn, would be**

8   **transferring it to somebody else illegally.  Firearms can be**

9   **stolen from individuals or from gun stores, and they enter the**

10  **market that way.  And then firearms can also be manufactured in**

11  **like a homemade capacity.**

12  Q.   And was a trace conducted on the Kimber 1911 pistol?

13  **A.   Yes.**

14  Q.   And what, if anything, did you learn about the history of

15  that firearm?

16  **A.   It followed up on my research showing that it was**

17  **manufactured in the State of New York, but also that, in the**

18  **course of that firearm's life and travel, it had been stolen**

19  **from a gun store in Virginia in 2008.**

20          MR. MORGAN:  Your Honor, may I approach with

21  Government's Exhibit 3?

22          THE COURT:  Sure.  I assume that's been cleared for

23  safety?

24          MR. MORGAN:  It's cleared and made safe, Your Honor.

25  BY MR. MORGAN:

1  Q.    Sir, I've shown you Government's Exhibit 3.  Do you

2  recognize that?

3  **A.    Yes.**

4  Q.    What is it?

5  **A.    This is a AR-type pistol.**

6  Q.    Have you seen that before today?

7  **A.    I have.**

8  Q.    When did you see it approximately?

9  **A.    I examined this prior to trial, and then I examined it**

10  **prior to that for an initial report.**

11  Q.    And is this the firearm that you testified about in

12  trial?

13  **A.    Yes.**

14  Q.    And what is that firearm?

15  **A.    So it's an AR-type pistol with next to no markings on it.**

16  **It's a homemade pistol, basically, or a homemade firearm.  And**

17  **by next to no markings, I mean it has an indicator for the**

18  **selector switch saying "fire" and "safe," but, otherwise,**

19  **there's no manufacturer's markings on it.  There's forge**

20  **markings on it, indicating where the blanks were manufactured,**

21  **but the firearm itself doesn't have any actual markings to**

22  **indicate who made it, where it was made, or a serial number.**

23  Q.    Just for clarification, when you say blanks, what is

24  that?

25  **A.    So for homemade firearms, the lower receiver in this**

1  **case, which would be the lower part of this weapon here, would**

2  **have a pocket of aluminum that's full.  And then to manufacture**

3  **it, someone would have to mill out aluminum from inside this**

4  **casing to be able to put the trigger parts kit in.**

5  Q.    So that part had a forge mark on it.

6  **A.    Yeah, I did find a forge mark on it.**

7  Q.    And do you know if this AR-type pistol meets the

8  definition of a firearm under federal law?

9  **A.    Yes.  This firearm was test fired.  It does expel a**

10  **projectile by the action of an explosive, so it does meet the**

11  **definition of a firearm.**

12  Q.    And so were you able to determine anything about where

13  that was manufactured?

14  **A.    No.  Short of the two forge markings that are on it that**

15  **show that the blanks were made -- the upper receiver and the**

16  **lower receiver blank were made in Virginia.  We were not able**

17  **to determine where the lower receiver turned into an actual**

18  **functioning receiver.**

19  Q.    Turning your attention to the magazine.  Did you have a

20  chance to examine the magazine during your review of this

21  weapon?

22  **A.    Yes.**

23  Q.    And please describe this magazine to the Court.

24  **A.    It's manufactured by a company called Magpul.  It's a**

25  **polymer magazine or a plastic magazine, and it has a 30-round**

1  **capacity.**

2  Q.    Thank you.  No further questions.  Thank you.

3       MR. MORGAN:  May I retrieve the exhibit?

4       THE COURT:  You may.  Mr. Faison.

5              **CROSS-EXAMINATION BY THE DEFENDANT**

6  BY THE DEFENDANT:

7  Q.    Sir, have you been trained in recognizing whether or not

8  an item falls under being manufactured in another state?

9  **A.    In terms of firearms?  Yes.  I had interstate nexus**

10 **training.**

11 Q.    In your training, what is required for an interstate

12 nexus connection?

13 **A.    Effectively, a firearm is manufactured in one place, and**

14 **then it would travel across state lines to another place.**

15 Q.    Was the particular firearm that you just looked at, was

16 it manufactured, as far as you could tell, by any particular

17 company?

18 **A.    No.  The actual defined portion of the firearm itself, we**

19 **were not able to determine where it turned into a firearm.**

20 Q.    And, therefore, it has no interstate nexus connection.

21 **A.    Correct.**

22       THE DEFENDANT:  No further questions.

23              **QUESTIONING BY THE COURT**

24       THE COURT:  I'm sorry, sir, I got confused about

25 something, and so I apologize.  I might have to take you back

1   through things you've already talked about.

2          You talked about a firearm being stolen, correct?

3                  THE WITNESS:  Yes, sir.

4                  THE COURT:  And then a firearm that was manufactured

5   in the home -- or a firearm that was manufactured, I guess, by

6   someone other than a licensed manufacturer.

7                  THE WITNESS:  Yes, sir.

8                  THE COURT:  And this is where I just got confused.

9   Were you talking about two separate firearms or parts of the

10  same firearm?

11                 THE WITNESS:  Yes, sir.  The first firearm we were

12  talking about is not here.  It's a semiautomatic pistol.  That

13  is also a semiautomatic pistol, but it's a separate firearm.

14                 THE COURT:  Okay.  I just got confused.  I thought

15  that's what you meant, but I wanted to make sure.  So you were

16  talking about the two separate firearms that the defendant had.

17                 THE WITNESS:  Yes, sir.

18                 THE COURT:  Regarding the stolen firearm, was there

19  any evidence that Mr. Faison stole the firearm?

20                 THE WITNESS:  I'm not aware of any evidence.

21                 THE COURT:  Was there any evidence that you're aware

22  of that Mr. Faison was aware that the firearm was stolen?

23                 THE WITNESS:  I'm not aware of that either.

24                 THE COURT:  I think you said this already, but as a

25  felon, he's not allowed to have a firearm, correct?

1                    THE WITNESS:  Correct.

2                    THE COURT:  And so -- I mean, he's obviously -- he's,

3    as I'm sure you're aware, already been convicted of being a

4    felon in possession of a firearm, right?  Like, he's already

5    facing punishment for that.

6                    THE WITNESS:  Yes, Your Honor.

7                    THE COURT:  As a felon, by definition, he would have

8    had to have received the firearm from some illicit source,

9    right?

10                   THE WITNESS:  Correct.  Especially in Maryland,

11   where --

12                   THE COURT:  He can't walk into a store and get one.

13                   THE WITNESS:  Correct.  In Maryland, firearms

14   transfers have to happen either at an FFL or at a state police

15   barracks.

16                   THE COURT:  So by definition, any felon in possession

17   of a firearm got it from some illicit source.  Would you agree

18   with that?

19                   THE WITNESS:  Correct.

20                   THE COURT:  Whether it's a straw purchase, a stolen

21   firearm, or something that had been manufactured somewhere

22   else.  If he's a felon, he got it from an illegal source,

23   right?

24                   THE WITNESS:  Yes, sir.

25                   THE COURT:  And that's going to be true of every

1   felon.

2          THE WITNESS:  Yes.

3          THE COURT:  So anybody who is convicted of being a

4   felon in possession of a firearm got it from some illicit

5   source, correct?

6          THE WITNESS:  Yes.

7          THE COURT:  And they may not know whether or not the

8   original source was a straw purchase, a stolen firearm, or had

9   been manufactured in someone's house.  Would you agree with

10  that?

11         THE WITNESS:  Correct.  Especially with pistols,

12  because in every state pistols have to be transferred through a

13  legal process.  So you can do a person-to-person transaction,

14  but for pistols, you still -- because you have to be 21 to

15  possess them, most state laws require that you identify that

16  that person is legally allowed to possess that firearm before

17  you transfer it to them.

18         THE COURT:  So in terms of determining his behavior,

19  we don't know whether he knew if it came from a straw purchase

20  originally, it had been stolen originally, or someone made it

21  in their house.  There's no way that he knows which of those

22  things happened that put the gun into the illicit market.

23  Would you agree with that?

24         THE WITNESS:  Correct.

25         THE COURT:  As to the gun that -- the other one, the

1    one that you said was homemade, was there evidence that he was

2    the one that did that?

3              THE WITNESS:  I'm not aware of any evidence of that.

4              THE COURT:  All right.  Redirect.

5              MR. MORGAN:  May I have the Court's indulgence?

6        Nothing further.  Thank you.

7              THE DEFENDANT:  Your Honor, if I may, I just have two

8    questions based on what you brought --

9              THE COURT:  Was it based -- in follow up to my

10   questions?

11             THE DEFENDANT:  Yes.

12             THE COURT:   Okay.

13                   **RECROSS-EXAMINATION BY THE DEFENDANT**

14   BY THE DEFENDANT:

15   Q.   Do you remember the date that they said the Kimber was

16   stolen?

17   **A.     No, not the exact date.**

18   Q.   As far as purchasing a firearm, is it legal for two

19   individuals to make that transaction without going through a

20   police department or some other type of official --

21   **A.     Not in the State of Maryland.  Not for a pistol, no.**

22             THE DEFENDANT:  No further questions.

23             THE COURT:  I'll give the government a chance at

24   redirect.

25             MR. MORGAN:  Nothing.  Thank you.

1          THE COURT:  Very well.  Sir, thank you for your

2     testimony.  You are excused.

3          The government's next witness.

4          MS. WRIGHT:  Thank you, Your Honor.  The government

5     calls Special Agent Rohsner.

6          THE COURT:  Very well.

7          THE COURTROOM DEPUTY:  Please step forward to the

8     witness stand, remain standing, and raise your right hand.

9          (Government witness **JAMIE ROHSNER** sworn.)

10          THE COURTROOM DEPUTY:  You may be seated.  Speak

11     clearly into the microphone, please state your name, and spell

12     your name for the record.

13          THE WITNESS:  Sure.  My name is special agent Jamie

14     Rohsner.  First name is J-A-M-I-E.  Last name is R-O-H-S-N-E-R.

15          THE COURTROOM DEPUTY:  Thank you.

16     **DIRECT EXAMINATION BY MS. WRIGHT FOR THE GOVERNMENT**

17     BY MS. WRIGHT:

18     Q.    Good morning, ma'am.

19     **A.    Good morning, ma'am.**

20     Q.    How long have you been a special agent with ATF?

21     **A.    I've been a special agent with ATF since April of 2017.**

22     Q.    And as a reminder for folks, did you work in law

23     enforcement before joining ATF at all?

24     **A.    I did.  I worked for the Montgomery County Police**

25     **Department.**

1    Q.    And how long did you work for Montgomery County?

2    **A.    Approximately two years.**

3    Q.    Have you received training as part of your work,

4    including on firearms and controlled substances?

5    **A.    I have.**

6    Q.    And has the controlled substance training included

7    training regarding identifying indicia of distribution and

8    manufacturing of controlled substances?

9    **A.    Yes, ma'am.**

10   Q.    Have you been involved in both drug and gun

11   investigations as part of your duties with ATF?

12   **A.    Yes, ma'am.**

13   Q.    And were you present for the execution of the search

14   warrant at the defendant's home on December 5, 2018?

15   **A.    I was.**

16   Q.    And it's correct that you testified about that at trial

17   in some additional detail as well?

18   **A.    That's correct.**

19   Q.    Now, in addition to the items that you discussed in your

20   trial testimony, did you identify or help identify anything in

21   the defendant's room that you understood as indicative of

22   distribution, or possession with intent to distribute

23   controlled substances, based on your training and experience?

24   **A.    I did, yes.**

25   Q.    And could you describe briefly what those types of things

1  were for the Court?

2  **A.    Sure.  I found a scale on the dresser, which is commonly**

3  **used by individuals who are distributing narcotics, to weigh**

4  **their drugs and make sure that they're getting the correct**

5  **price for what they're providing.**

6  Q.    And were you involved at all in the search of the

7  backpack -- locating or search of the backpack that Special

8  Agent Szakolczai described?

9  **A.    Yes.**

10  Q.    And was there anything of interest to you in that

11  backpack?

12  **A.    Yes.  There were various items that are used for the**

13  **production of crack cocaine.  There was residue on Pyrex and**

14  **another brownish-color bowl.  There were also different sifting**

15  **materials and a milk frother, which could absolutely be used by**

16  **a drug distributor to produce crack cocaine.**

17  Q.    And were some batteries, I guess, seized that also

18  appeared to have residue from in the residence?

19  **A.    Right, there were two batteries that were found to have**

20  **narcotic residue on them.  They were also found from the**

21  **residence and, in the packaging, which I recently reviewed,**

22  **there were instructions for a milk frother -- that's a hard**

23  **thing to say -- and, again, I had testified that the milk**

24  **frother was recovered in Mr. Faison's room.**

25  Q.    And where, as best you recall, approximately, did you

1  locate that backpack?

2  **A.     In Mr. Faison's room.**

3         MS. WRIGHT:  I will show -- first is two pages that

4  have been marked for identification as Government's Exhibit 4

5  to see if Ms. Rohsner recognizes those, if I may?

6         THE COURT:  Sure.

7  BY MS. WRIGHT:

8  Q.   And do you recognize those as photographs taken from the

9  search of Mr. Faison's room?

10 **A.     I do.**

11        MS. WRIGHT:  Your Honor, may we have the admission of

12 Government's Exhibit 4, please?

13        THE COURT:  Sure.

14 BY MS. WRIGHT:

15 Q.   Looking at the first page of those photographs, can you

16 please describe for the Court where we're looking and what

17 we're looking at?

18 **A.     Sure.  So this black box-type object with AWS on top is a**

19 **digital scale, which is commonly used by drug distributors, as**

20 **I previously mentioned.  It's also placed on top of a Fred's**

21 **range information handout paper, and I had previously testified**

22 **during the trial that there was a bag from Fred's Outdoors and**

23 **a receipt.  So this appears to be the same logo from that**

24 **material.  I would understand range information to represent a**

25 **shooting range.**

1    Q.    And then the second page photograph, what is this?

2    **A.    This is the dresser that we -- where that scale was**

3    **found.**

4    Q.    Thank you.

5          MS. WRIGHT:  Your Honor, if I may, I'll hand Special

6    Agent Rohsner -- just to avoid going back and forth so much,

7    for which I apologize -- what I've marked as Government's

8    Exhibit 5 through 9 for her to take a look at, and we'll talk

9    about each of those.

10          THE COURT:  If it's easier, you can just put it on

11   the screen.  There's no jury over there.  If I exclude it for

12   some reason, I can discount it.

13   BY MS. WRIGHT:

14   Q.    So looking first -- I guess before we look at the first

15   exhibit, were items -- to your knowledge, based on your

16   familiarity with this investigation, were items sent to the

17   Prince George's County drug lab to be tested in this case?

18   **A.    Yes.**

19   Q.    And did that include various of the items that we've been

20   talking about already?

21   **A.    Yes.**

22   Q.    And looking at Exhibit 5.  I'll just flip through those

23   pages.  Do you recognize what we are looking at here?

24   **A.    Yes.**

25   Q.    Can you describe for the --

 1              MS. WRIGHT:  Well, Your Honor, I'd move the admission

 2     of Government's Exhibit 5.

 3              THE COURT:  Very well.

 4     BY MS. WRIGHT:

 5     Q.    Can you describe for the Court, please, what we're

 6     looking at?

 7     **A.    Sure.  So each of these drug analysis documents, the**

 8     **first top one is the laboratory analysis report, as you can**

 9     **see.  This is the result from the lab.  Whereas the second page**

10     **is the request from the officer who submitted the request for**

11     **analysis.  This first one pertains to the glass bowl with the**

12     **handle, which is really more like a pot, we've determined, but**

13     **it was taken from the backpack from Mr. Faison's room.**

14     Q.    Thank you.  And then --

15     **A.    And it had a positive conclusion.**

16     Q.    That's the important question.

17     **A.    Yes.**

18     Q.    I'm sorry, I cut you off though.  What was the --

19     **A.    Yeah, so the conclusion listed here is a positive result**

20     **for cocaine base residue.**

21     Q.    And then turning to page 3, can you describe what the

22     Court is looking at here?

23     **A.    Yes.  This is another analysis report from the drug lab,**

24     **and this was of the two AA batteries that had residue, and this**

25     **was positive conclusion for cocaine.**

1  Q.    And based on your knowledge of this investigation, did

2  you become aware if law enforcement also searched the bedroom

3  in the residence of Larry Newman, Jr.?

4  **A.    Yes.**

5  Q.    And just to be clear for the record, did you personally

6  search that bedroom?

7  **A.    No, ma'am, I never entered that room.**

8  Q.    But is it fair to say you've reviewed photographs, as the

9  case agent, from the search of that bedroom?

10 **A.    Yes, that's correct.**

11 Q.    And based on your familiarity with the investigation, was

12 a firearm found in that bedroom?

13 **A.    Yes.**

14 Q.    And do you know if that firearm had any ammunition with

15 it?

16 **A.    It did, yes.  It had -- I believe it had one round.**

17 Q.    One round loaded?  It was loaded with one round?

18 **A.    I would have to refresh my recollection, but I believe**

19 **so.**

20 Q.    And were there any controlled substance-related findings

21 in that bedroom of Mr. Newman, Jr.?

22 **A.    Yes.**

23          MS. WRIGHT:  And then I will show what I've marked as

24 Government's Exhibit 6, which is a set of photographs, and I'll

25 flip through those and see if Special Agent Rohsner recognizes

1   those and can describe what they have once we know she

2   recognizes them.

3               THE WITNESS:  Sure, this is the photograph of --

4   BY MS. WRIGHT:

5   Q.    I guess, first, Special Agent Rohsner, is it fair to say

6   these are photographs from the search, specifically as to Larry

7   Newman, Jr.'s, room that you've reviewed as part of your work

8   as the case agent in this case?

9   **A.    Yes.**

10              MS. WRIGHT:  And, Your Honor, I do move the admission

11  of Government's Exhibit 6, please.

12              THE COURT:  Very well.

13  BY MS. WRIGHT:

14  Q.    Then looking, first, at the first page of that stack of

15  photographs, can you please describe what we're looking at

16  here?

17  **A.    Sure.  This is the firearm that was recovered from the**

18  **back bedroom.  This is a Colt handgun.**

19  Q.    And when you refer to the back bedroom, is that what law

20  enforcement confirmed as Larry Newman, Jr.'s, bedroom?

21  **A.    That's correct.**

22  Q.    And looking at the second page of the photographs, what

23  are we looking at?

24  **A.    This is the same handgun.  It had, at this point, been**

25  **unloaded, and the one round has been extracted.**

1  Q.    And looking at the third and fourth pages, what are we

2  looking at here?

3  **A.    The first was just the black bag before it was opened.**

4  **The second is the opened bag that I believe the defense has**

5  **already showed a picture similar to this.**

6  Q.    And what, generally, did law enforcement find in this

7  bag?

8  **A.    Drugs.**

9  Q.    And looking at the next page, page 5 of this packet.

10  **A.    So it's my understanding that once that bag was found,**

11  **that these items were retrieved from that bag and placed on**

12  **this bench or whatever that black thing is.**

13  Q.    And then the last page, do you recognize what that was?

14  **A.    Yes, these are glass bottles or vials.  They're commonly**

15  **used to store PCP.**

16  Q.    Special Agent Rohsner, were these items, to your

17  knowledge, also sent to the Prince George's County drug lab for

18  analysis?

19  **A.    Yes, they were.**

20  Q.    And have you reviewed reports received back, reflecting

21  the results of some of that analysis?

22  **A.    Yes.**

23  Q.    And I've marked those as Government Exhibit 7.  Do you

24  recognize the pages that I'm flipping through here?

25  **A.    Yes.**

1          MS. WRIGHT:  Your Honor, we move the admission of

2    Government's Exhibit 7.

3          THE COURT:  Very well.

4          MS. WRIGHT:  I'm sorry, Your Honor?

5          THE COURT:  Very well.

6          MS. WRIGHT:  Thank you.

7    BY MS. WRIGHT:

8    Q.    Turning to the first page, can you describe, basically,

9    as we flip through, what the findings were by the lab, as you

10   understand them, with respect to these items from Mr. Newman,

11   Jr.'s, room?

12   **A.    Sure.  I will note that this is an amended report that**

13   **has been provided by the lab.  However, the first item is a**

14   **sample that was tested and found to contain cocaine.**

15   **       The second item -- I'm not sure what exactly your**

16   **question is, but all of the items were tested.  The final item,**

17   **a portion of which was tested, to be found positively**

18   **containing cocaine or cocaine -- I'm sorry, powder cocaine or**

19   **crack cocaine.**

20   Q.    And I'll ask just briefly, in terms of the amount of

21   cocaine that's listed there, that's approximately 40 grams that

22   was in the first item; is that correct?

23   **A.    That's correct.**

24   Q.    And turning to the cocaine base that's also reflected

25   there, is it fair to say that your understanding is law

1  enforcement found in those bags 547 individual baggies of crack

2  cocaine?

3  **A.     That's correct.**

4  Q.     And those, again, were some of the items depicted in the

5  photograph we were just looking at?

6  **A.     That's my understanding, yes.**

7  Q.     And then turning to page 3, were there additional drug

8  findings that the lab reflected there?

9  **A.     Correct.  This page shows the PCP that was recovered.**

10  **The top part was the glass bottle containing PCP, and there was**

11  **a positive result.  The second one was not analyzed.**

12  Q.     And the second one, is it fair to say that's part of

13  your -- well, your understanding was the individual plastic

14  vials of suspected PCP?

15  **A.     That's correct.  I believe, as Special Agent Szakolczai**

16  **had mentioned prior, these vials were plastic and had been**

17  **basically eaten away by PCP.**

18  Q.     Is it fair to say that's between the time they were

19  seized and when the lab was able to analyze them?

20  **A.     Yes.**

21  Q.     And do you know from your review of -- how many vials of

22  the miniature plastic vials of PCP there were, approximately?

23  **A.     It was approximately 100.**

24  Q.     And then the last lab report there, just reading it, was

25  that an additional finding of an item containing crack cocaine?

1  **A.      That's correct.**

2  Q.      During the course of your involvement in the

3  investigation, did you have occasion to examine reports

4  pertaining to the Kimber firearm and the fact that it was

5  stolen?

6  **A.      Yes.**

7  Q.      And did you come to have an understanding as to the date

8  when it had been stolen?

9  **A.      Yes.  It was stolen on June 13, 2008, and it was actually**

10 **stolen from an FFL.  It was one of 30 some guns that had been**

11 **stolen.**

12 Q.      And where was that FFL located, as best you recall?

13 **A.      I don't recall the name of the FFL, but it was in Glen**

14 **Allen, Virginia.**

15 Q.      Now, Special Agent Rohsner, were there a -- supplementing

16 the ones played at trial, were there a few additional clips

17 from the defendant's jail calls that you reviewed in connection

18 with testifying here today?

19 **A.      Yes, I did.**

20 Q.      Okay.  And is it your understanding those have been

21 copied to the two CDs which I have marked as Government's

22 Exhibit 8 and 9?

23 **A.      I believe so, yes.  I'd recognize them by the sound of**

24 **them.**

25          MS. WRIGHT:  Your Honor, if I may have a few moments

1  to wake up my computer, which had fallen asleep.  I apologize.

2          THE COURT:  Sure.

3          MS. WRIGHT:  May I ask the clerk to not display it

4  yet as I sign in?  Thank you very much.

5  BY MS. WRIGHT:

6  Q.    Special Agent Rohsner, with respect to the first clip, is

7  it fair to say that you reviewed and helped prepare a clip from

8  the first call that the defendant made, upon his arrest, to his

9  family, which was on September 5, 2018?

10 **A.    Yes.**

11 Q.    And the clip prepared that you reviewed reflects the

12 beginning of that call and some initial conversation?

13 **A.    Yes.**

14 Q.    And based on your knowledge and review of this call, who

15 was Mr. Faison speaking to?

16 **A.    If I'm remembering the correct clip, he was speaking to**

17 **Larry Newman, Jr., among other people at the time.**

18 Q.    Okay.  Is it fair to say additional people came on the

19 call at other points in the call?

20 **A.    Yes.**

21 Q.    If I may play the first clip, which is from Government's

22 Exhibit 9.

23         (Audio recording played.)

24         For the record, I'm stopping that at 2:49.

25         And then turning to the second clip, is there a time,

1  based on your review of the jail calls, when you heard the

2  defendant speak about silencers.

3  **A.     He made mention to silencers and flashlights, yes.**

4  Q.     And was that in March of 2019?

5  **A.     Yes.**

6  Q.     And is it your understanding that he was partly, as the

7  preface for this call, explaining an argument being made by the

8  government?

9  **A.     Yes.**

10          MS. WRIGHT:   Your Honor, I'll play clip 2 now, if I

11  may, from Government's Exhibit 9.

12      (Audio recording played.)

13  BY MS. WRIGHT:

14  Q.     And turning to the third clip from Government's Exhibit

15  9, from your review of the jail calls, did you hear at some

16  point commentary by the defendant indicating that he would go

17  to the police if something like the incident happened again?

18  **A.     Yes.**

19  Q.     And is that part of one of the clips that you reviewed

20  before this hearing?

21  **A.     Yes.**

22          MS. WRIGHT:   Your Honor, I'll play clip 3 from

23  Government's Exhibit 9.

24      (Audio recording played.)

25  BY MS. WRIGHT:

1  Q.    And, finally, Special Agent Rohsner, did you also have

2  occasion to review a clip from -- or part of the jail calls and

3  a clip from October 6, 2019?

4  **A.    Could you tell me what the clip --**

5  Q.    Did you review a clip pertaining to -- or part of a jail

6  call, which became a clip, pertaining to an altercation that

7  the defendant nearly got into at the jail?

8  **A.    Yes, I recall listening to that call.**

9          MS. WRIGHT:  Your Honor, if I may, I'll just play

10 that from Government's Exhibit 8.

11         (Audio recording played.)

12 BY MS. WRIGHT:

13 Q.    Just a final topic, Special Agent Rohsner.  During the

14 course of your involvement in the investigation, did you have

15 occasion to review the recorded interview of Larry Newman, Sr.,

16 the defendant's father, on the date of the defendant's arrest?

17 **A.    I've reviewed at least some of it, yes.**

18 Q.    And at least for the parts of it that you have reviewed,

19 did Larry Newman, Sr., ever refer to an intent to go to the

20 police that day?

21 **A.    Not that I can recall.**

22 Q.    And in what you reviewed, did he describe or list the

23 people who were living at the house on September 5, 2018?

24 **A.    Yes.  He identified each bedroom with the individual who**

25 **was staying in that bedroom.**

1    Q.    And how many people, total, did he say were living at the

2    house at that point?

3    **A.    I believe he said that four people were residing at the**

4    **house.**

5    Q.    Do you recall who those four specifically were?

6    **A.    Yes.  It would be Larry Newman, Sr., his wife**

7    **Mrs. Newman, I believe it was Darlene, and Larry Newman, Jr.,**

8    **and Burudi Faison.**

9    Q.    Thank you, ma'am.  I have nothing further at this time.

10              THE COURT:  Cross.

11              MS. WRIGHT:  Oh, I apologize, Your Honor.  To the

12   extent it wasn't apparent, I do move the admission of

13   Government's Exhibit 8 and 9.

14              THE COURT:  Very well.

15              MS. WRIGHT:  Thank you.

16              THE COURT:  Cross-examination, Mr. Faison.

17                    **CROSS-EXAMINATION BY THE DEFENDANT**

18   BY THE DEFENDANT:

19   Q.    Agent, you were there for the search of my room from the

20   initial stop?

21   **A.    Upon execution of the search warrant, I searched your**

22   **room, yes.**

23   Q.    Were you there when this particular item on the screen

24   was found?

25   **A.    I'm sorry, say that again.**

1   Q.     Were you there when this particular item on the screen

2   was found?

3   **A.     Yes.   This is the backpack, I believe, yes.**

4   Q.     Could you tell us where it was actually found at?

5   **A.     Generally speaking, yes, I can tell you.   If you were**

6   **walking into the room, and the bed is in front of you, to your**

7   **left is the large dresser.   It was in the general area of the**

8   **corner to your left.**

9   Q.     Was there anything else in that corner?

10  **A.     There were a lot of things in the entire room, yes.**

11  Q.     No, in the corner where this bag was found.

12  **A.     Yes, there were other things.   I don't recall -- I**

13  **believe there might have been -- yeah, there were several**

14  **things.**

15  Q.     Was this bag found in plain view?

16  **A.     I don't remember.**

17  Q.     The glass that you see, were there any fingerprints taken

18  from this glass?

19  **A.     I'm not aware of any fingerprint analysis taken.**

20  Q.     Were any fingerprint analysis done on any of the glasses

21  that you all found?

22  **A.     Not that I'm aware of.**

23  Q.     In the book bag, was there any other identifying

24  information that you could have tied to me?

25  **A.     Not that I remember.**

1   Q.    In the dresser drawers, other than the drawers, the one

2   drawer that you photographed with the medicine, was there

3   anything in the other drawers that could be identified to me?

4   **A.    Not that was recovered.**

5           THE DEFENDANT:  Your Honor, let the record reflect

6   we're now looking at Government Exhibit 6, page 2.

7           THE COURT:  Very well.

8   BY THE DEFENDANT:

9   Q.    Do you recognize this firearm?

10  **A.    Yes.**

11  Q.    Could you tell the Court what caliber firearm this is?

12  **A.    I believe it was a .45 caliber, but I would have to look**

13  **at paperwork to absolutely confirm that, because, again, I**

14  **didn't search that room.**

15  Q.    And this was found in the other room.

16  **A.    Correct.**

17          THE COURT:  When you're saying the other room, can

18  you be more specific?

19          THE WITNESS:  The other room being the room that was

20  previously identified as belonging to Larry Newman, Jr.

21          THE COURT:  Thank you.

22  BY THE DEFENDANT:

23  Q.    And the bullets found inside of my room, would these

24  bullets fit this firearm also?

25  **A.    I would like to confirm that this is actually a .45**

1   **caliber handgun before I testify to that.**

2   Q.     This is Defense Exhibit BF 1301 -- I'm sorry, BF 0131.

3   Do you recognize this report?

4   **A.     I do, yes.**

5   Q.     Down at AT 14, could you read what it says there?

6   **A.     Yes, it appears that the Colt is, in fact, a .45 caliber**

7   **handgun.**

8   Q.     So the bullets found in my room would also fit this

9   firearm.

10  **A.     A .45 caliber round could fit in a .45 caliber handgun,**

11  **generally speaking, yes.**

12            THE DEFENDANT:  Your Honor, for the record, BF 0131

13  would be Defense 2.

14            THE COURT:  Very well.

15  BY THE DEFENDANT:

16  Q.     Can you describe what the drugs are sitting on?

17  **A.     No.  I mean, I wasn't there in that room, so I can't**

18  **really tell you what that was.**

19  Q.     Inside of my room, was this particular item located in

20  that room?

21  **A.     What particular item?**

22  Q.     The item that the drugs are sitting on?

23  **A.     I don't believe -- I don't know what it is.**

24  Q.     Do you recognize it as being in the room when you did the

25  search of my room?

1    **A.      No.**

2                THE COURT:  What exhibit number are we looking at

3    now?

4                THE DEFENDANT:  Government Exhibit 6, page 5.

5    BY THE DEFENDANT:

6    Q.    If you can look down in the right-hand corner, could you

7    describe what you see there?

8    **A.    The lower right-hand corner or the upper right-hand**

9    **corner?**

10   Q.    The lower left-hand corner.

11   **A.    It appears to be an electronic device.**

12   Q.    Would this be the black Samsung tablet that you all

13   recorded as being found in my room?

14   **A.    I couldn't speculate as to that.  I didn't take the**

15   **picture.**

16   Q.    At AT 10, does that say "Samsung tablet black"?

17   **A.    It does.**

18   Q.    And it's only showing one?

19   **A.    Yes.**

20   Q.    So did either of you who checked my room remove a tablet

21   from that room, or was the tablet taken from another room?

22   **A.    No, a tablet was absolutely recovered from your room.  I**

23   **can't say whether or not there was a tablet in Newman, Jr.'s,**

24   **room or not.  There may have been.**

25                THE DEFENDANT:  Your Honor, I'd like to show

1    Government Exhibit 1, page 12.

2    BY THE DEFENDANT:

3    Q.    The item in the middle of the page, could you describe

4    that to us?

5    **A.    Are you talking about the bag?**

6    Q.    Yes.

7    **A.    Again, I did not find this, but it is my understanding**

8    **that Special Agent Szakolczai found that bag and that it**

9    **contained controlled dangerous substance.**

10   Q.    Do you know which substance was inside the bag?

11   **A.    I believe it was PCP, but that would be a question for**

12   **Mr. Szakolczai.**

13   Q.    Did you see the items that were inside the bag?

14   **A.    I believe so.**

15   Q.    Did they resemble the items that were shown in Government

16   Exhibit 2?

17   **A.    I've been shown a lot of exhibits.  I'm assuming you're**

18   **referring to the --**

19   Q.    The vials.

20   **A.    Found in what room?**

21   Q.    In Larry Newman's room.

22            THE COURT:  My understanding is the six vials in --

23   I'm just trying to move this along.  The six vials found in

24   Mr. Faison's room were similar to the vials found in

25   Mr. Newman's room; is that correct?

1          THE WITNESS:  It appeared to be that way, yes.

2    Similar in packaging, yeah.

3          THE COURT:  But there were more of them found in

4    Mr. Newman's room than Mr. Faison's room.

5          THE WITNESS:  So in Mr. Newman's room, there was an

6    actual glass vial with a large quantity of PCP.  That was not

7    found in Mr. Faison's room.  But if I'm understanding

8    correctly, there were smaller plastic vials found in each room.

9    BY THE DEFENDANT:

10   Q.   As to the phone calls, you stated that the call -- I'm

11   not actually sure which call it comes from, but it mentions

12   silencers, flashlights with no batteries in it.  This

13   particular conversation was referencing what the government was

14   saying about this incident; is that correct?

15   **A.   Yes.  It seemed in that call that you were discussing a**

16   **government argument about silencer parts.**

17   Q.   In the call about the incident in the institution, did

18   you listen to that entire call?

19   **A.   No, I have not.**

20   Q.   So you don't know the gist of the entire conversation.

21   **A.   No.**

22         THE DEFENDANT:  No further questions, Your Honor.

23         THE COURT:  I think I know the answer to this, but I

24   just don't know if anyone has said it.  Based on your

25   experience, would the amount that was found in Mr. Faison's

1  room, just by itself, would you consider that -- and I know you

2  haven't been formally declared as an expert here, but based on

3  your experience, would that, by itself, be enough to be

4  considered distribution quantity in your estimation, the six

5  vials of PCP?

6          THE WITNESS:  The way that they were packaged were

7  indicative of distribution to multiple consumers.

8          THE COURT:  Do you have a sense -- and I actually

9  just don't know the answer to this.  How many doses, if dose is

10  even the right word, would be found in each vial?

11          THE WITNESS:  Sure.  So I don't know that I could

12  really say that; however -- I don't know how familiar you are

13  with the use of PCP, but typically --

14          THE COURT:  Not from personal experience, but.

15          THE WITNESS:  Right.  So PCP is generally --

16  marijuana or a regular cigarette is dipped into PCP and then

17  smoked.  So it takes a very little amount to be considered a

18  dose, dosage unit.  I can definitely say that there was more

19  than one dose in the amount that was in Mr. Faison's room.

20          THE COURT:  But I guess my question is each vial

21  would have -- you could dip multiple cigarettes, whatever it is

22  you're using, into each vial.  And so if you're calling that a

23  dosage unit, you could get more than one dose from each vial.

24  I guess that's what I'm trying to ask.  If you dont know, you

25  don't know.

1        THE WITNESS:  Yeah, I'm not sure I can answer that

2   question because, as special agents, we don't have an actual

3   measurement due to the fact that the stuff just ate it all

4   away.

5        THE COURT:  So you can't say that for sure.

6        THE WITNESS:  Yes, I cannot.

7        THE COURT:  Okay.  Ms. Wright.  Or Mr. Morgan.  I

8   forgot whose witness it was.

9        MS. WRIGHT:  It was mine, Your Honor.  We don't have

10  any redirect.

11       THE COURT:  All right.  You may retake your seat.

12  Thank you.

13       THE WITNESS:  Thank you.

14       THE COURT:  I may have lost count of how many

15  witnesses the government said they have.  Do you have another

16  witness?

17       MS. WRIGHT:  No, that was our final witness, Your

18  Honor.  So we would -- in terms of the evidence, we would rely

19  on that testimony and what we've submitted as the exhibits here

20  and with the sentencing memo.

21       THE COURT:  Very well.  Does Mr. Faison have any

22  witnesses that you want to call as it relates to any of these

23  issues?

24       THE DEFENDANT:  One moment.

25       THE COURT:  Sure.

1          THE DEFENDANT:  Your Honor, if I may, I'd like to

2     call Angela Griffin, the probation officer.

3          THE COURT:  For what purpose do you wish to call the

4     probation officer?

5          THE DEFENDANT:  Well, during the times that she came,

6     she would do walk-thru's, and she can explain to the Court what

7     she saw during those times.

8          THE COURT:  Is that just for the purpose of

9     establishing that during those times, she did not see any

10    illicit activity?

11         THE DEFENDANT:  Yes.

12         THE COURT:  I don't feel the need to call her for

13    that purpose.  The only evidence that is before the Court is

14    what was found on that day.  If you want to argue to me that

15    that's -- the government certainly can't show to me that you

16    had it on other days, so I'm not going to assume that you did

17    or didn't.

18         I don't like to put the probation officer on the stand as

19    it relates to their official duties for the court.  So if

20    that's what you're proffering to me that you're trying to get

21    out of that, I'm not inclined to allow that.  We can

22    certainly -- if you're proffering to me that on the times she

23    came to visit you, there were no illicit substances found, I

24    will accept that as a proffer from you.

25         THE DEFENDANT:  Yes.

1          THE COURT:  All right.  Any other witnesses?

2          THE DEFENDANT:  No.

3          THE COURT:  All right.  Just give me one moment, and

4     then I'll hear argument on some of these issues.  Just give me

5     a moment.  I wanted to look at something I just pulled up.

6          So we have -- having now heard all the evidence, we have

7     a number of issues related to the guidelines to address.

8          I should have said this at the outset, and I apologize

9     for not.  Mr. Patel, I don't know if you were planning on just

10    making argument on your issue and then going about your day.  I

11    apologize.  It didn't occur to me until we were already --

12          MR. PATEL:  Oh, no problem.  That's okay.

13          THE COURT:  Or I would have started the hearing by

14    making that suggestion.  So we can address that issue first,

15    and then we'll hear argument on the remaining issues.

16          I guess since it's -- well, first, though, I should ask

17    Mr. Faison.  As the government indicated in its papers, the

18    federal defender does not represent you in this case.  They're

19    operating as standby counsel in this case.  The federal

20    defender -- because this is an issue that comes up with many of

21    their clients, so they have an interest in how I rule and how

22    other judges rule on this issue -- wants to sort of intervene

23    for the purposes of just making this argument on this issue

24    that relates to whether or not I should consider the attempt

25    drug distribution count -- excuse me, the attempt conviction in

1  your past as something that enhances your guidelines, your

2  offense level from a 20 to a 22.

3      So I guess I should ask you first whether or not you are

4  comfortable with them intervening for that purpose.  It doesn't

5  mean that they represent you.  It just means that they're

6  providing argument, presumably in support of your position.  So

7  they don't become your lawyers.  You're still your own lawyer,

8  but Mr. Patel would be willing to make legal arguments on that

9  one issue for you.

10      THE DEFENDANT:  Well, from my understanding,

11  Mr. Patel was supposed to be coming in as -- how do you

12  pronounce that?  *Amicus cure*?

13      THE COURT:  I have trouble pronouncing that too.

14      THE DEFENDANT:  So for that particular issue, I have

15  no problem with him making the argument.

16      THE COURT:  That's fine.  So, Mr. Patel, I'll hear

17  from you.

18      MR. PATEL:  Thank you.

19      THE COURT:  I guess my first question -- I'm sure

20  you're going to address it, but I just want it to be addressed

21  first -- is why shouldn't I just follow *Dozier*?  It's a Fourth

22  Circuit case.  I know you address it, but I guess that's where

23  we should start.

24          **ARGUMENT BY MR. PATEL FOR THE DEFENDANT**

25      MR. PATEL:  I can start with that, Your Honor.  So

1    *Dozier*, the issue was not briefed or disputed or addressed, so

2    the --

3            THE COURT:  But the core question -- so the argument

4    that you put forward isn't addressed, right?

5            MR. PATEL:  Yes.

6            THE COURT:  But the core question of whether attempt

7    qualifies was answered.  And as a district court, am I only

8    bound by Fourth Circuit cases where the exact argument being

9    made to me was addressed by the Fourth Circuit?  Or if they've

10   answered the question as to whether or not attempt qualifies,

11   look, you can appeal this case and present them with a new

12   argument, but do I get to say, nope, I heard a different

13   argument and so I think you got it wrong --

14           MR. PATEL:  Yes, Your Honor, because it's a very

15   substantive, different argument.  The only argument that was

16   raised in *Dozier* was that there was not a generic attempt.

17       Now, I understand your concern, and that's why I think

18   *U.S. versus Norman* is really, really, really important on what

19   constitutes a holding and what does not, because *Norman* says

20   very clearly that a passing observation on an issue that was

21   neither briefed nor disputed does not constitute a holding, and

22   then it cites to several cases which say that if a court just

23   assumed an issue without actually deciding it, that's not a

24   holding --

25           THE COURT:  But are you suggesting that *Dozier* did

1   not hold that attempt satisfied 4B -- was it 4B1.2?

2        MR. PATEL:  I think what it held was that 4B1.2, that

3   the West Virginia attempt that was at issue was a generic

4   attempt.

5        So it's helpful here to look at what was happening in

6   *Norman*.  So in *Norman*, the actual issue was whether or not an

7   846 conspiracy qualified as a generic conspiracy.  The

8   government, just like they're doing now, kept saying to this

9   Court, and every other court, you cannot hold that an 846

10  conspiracy is not a controlled substance offense because

11  there's this case, *U.S. versus Kennedy*.

12       In *U.S. versus Kennedy*, which came before *Norman*, the

13  Fourth Circuit had held explicitly that an 846 conspiracy was a

14  controlled substance offense, but the Fourth Circuit in *Norman*

15  said we did not decide the generic conspiracy issue, even

16  though we had held previously in *U.S. versus Kennedy* that an

17  846 conspiracy is a controlled substance offense.  There, the

18  issue was different.  The issue was whether or not the

19  commission had any authority at all to ever include conspiracy

20  in the career offender guideline under the enabling statute,

21  and the Fourth Circuit held conclusively that it did and that

22  846 conspiracy was a controlled substance offense.

23       So many times, Your Honor, before *Norman* came out, we

24  would argue this to the district courts, and the government

25  kept saying *U.S. versus Kennedy* does not allow you to find

1    otherwise, even though the actual issue we're raising about

2    generic conspiracy was not disputed or addressed in *Kennedy*.

3    So the Fourth Circuit, in *U.S. versus Norman*, said Kennedy does

4    not control, even though the Fourth Circuit held previously

5    that 846 conspiracy was a controlled substance offense.

6         So if you look at *Norman*, *Norman* has really clarified for

7    us, like, what is controlling and what is not.

8         There's another case, U.S. --

9         THE COURT:  Is there a distinction -- maybe there's

10   not.  Is there a distinction between the Fourth Circuit saying

11   that in *Norman* and you asking me as a district court to say

12   that?

13        MR. PATEL:  No, because I think the Fourth Circuit

14   was commenting on what the law was in the circuit that district

15   courts are to follow, and the Fourth Circuit wasn't saying --

16   because one panel can't overrule another panel either.

17        So I think it's very clear here that *Dozier* has not

18   addressed this issue.  There's a footnote in the case that

19   acknowledges that that issue was not presented to the court, so

20   it wasn't going to decide it.

21        So these assumptions that are made, Your Honor, there's

22   case after case --

23        THE COURT:  But the court in *Dozier* had the same

24   language of 4B1.2 before it, correct?  Presumably, the judges

25   do their job, they looked at the guideline and determined that

1   it was sufficient.

2        MR. PATEL:  No, because, Your Honor, the court said

3   explicitly this is what the -- the defendant had not raised

4   that issue, so it wasn't going to address it.  So it did not

5   address it at all.  So I don't know how you can say that *Dozier*

6   decided the issue when you look at *Norman*, and there was the

7   same analogous situation going on.

8        And there's various parentheticals and cases that *Norman*

9   cites to for this issue.  One of them is *U.S. versus McLeod*.

10  In that case, the Court had previously said that an offense

11  qualifies as a generic burglary, but then said, oh, it was just

12  a passing statement, so the specific issue -- I think it was

13  post-*Mathis* and *Descamps* -- had not been decided.  So the Court

14  here says "expressly rejecting the view that an observation on

15  an issue not briefed and argued to the Court in an earlier case

16  constitute" --

17        THE COURT:  Slow down, please.

18        MR. PATEL:  Pardon me?

19        THE COURT:  Slow down.

20        MR. PATEL:  Oh, I'm sorry.  Okay.  "Constitute a

21  holding on that issue in refusing to follow that passing

22  observation."

23        There's another case the Fourth Circuit cited to, *U.S.*

24  *versus Hemingway*, which says "holding that a previous case

25  which assumed a sentencing enhancement applied did not dictate

1    that outcome because the issue was not contested."

2          These are all in *Norman* itself.

3          The court also cites to *Brecht versus Abrahamson*, a

4    Supreme Court case, which says "since we have never squarely

5    addressed the issue and have, at most, assumed it, we are free

6    to address the issue on the merits."

7          So I think what the Fourth Circuit did in *Dozier* was

8    assume that the commentary was valid because it wasn't raised,

9    but it didn't decide that issue.

10         So if you look at *Norman*, there is no way that we can say

11   *Dozier* has decided the issue, because if that -- it can't be

12   reconciled with *Norman,* because *Norman*, there was also a case

13   previously that had said conspiracy qualifies, and the Fourth

14   Circuit said no, that issue hadn't been decided.  And that

15   applies to district court or the circuit court.  I don't know

16   why it would be any different.  The Court wasn't saying, you

17   know, because it's the Fourth Circuit, we're the only ones that

18   are able to decide what's controlling and what's not.  That's

19   not what the Court said in *Kennedy*, so there isn't that -- or,

20   I'm sorry, in *Norman*.  So there isn't that distinction.

21         So does that answer your question --

22              THE COURT:  It does.

23              MR. PATEL:  Okay.  So, Your Honor, so our argument

24   here is that an attempt is not a controlled substance offense

25   because the text of 4B1.2 only includes completed offenses and

1   leaves no room for inchoate offenses.  There are no words in

2   the statute, Your Honor, which can be interpreted to include

3   inchoate offense.

4       Your Honor, this is very different from the armed career

5   criminal act.  In the armed career criminal act, we have the

6   word "involving."  Involving manufacturing, distributing and

7   possessing with intent to distribute, and courts have said it's

8   because of that word "involving."  That's expansive.  It means

9   related to or connected to.  That means conspiracies and

10  attempts can qualify.

11      But we don't have that here.  Because we don't have that

12  here, then what the commentary is doing is adding to the text.

13  It's not interpreting.  If there's no words to interpret, it

14  can't be interpreting the text.  It's adding to the text.  It's

15  expanding the text, and commentary cannot do that.  The Supreme

16  Court told us that in *Stinson*.  The Fourth Circuit has told us

17  that in *U.S. versus Shell*, the commentary cannot add; it can

18  only interpret.

19      Now, there's only two circuits, Your Honor, that have

20  done a deep dive on this issue, and both of those circuits

21  agree with us on this.  The D.C. Circuit in *Winstead* and this

22  en banc Sixth Circuit in *Havis* unequivocally and forcefully

23  held that attempts cannot qualify under 4B1.2, and that the

24  commentary's inclusion of attempts and inchoate offenses

25  conflicts with the text.

1          So the D.C. Circuit held, quote, there's no question

2     that, as appellant points out, the commentary adds a crime,

3     attempted distribution, that is not included in the guideline.

4     And the court even found counsel ineffective for failing to

5     make the argument, even though there was no decision beforehand

6     where the D.C. Circuit had found that the commentary conflicts

7     with the text.

8          Also, what's compelling here is that the Sixth Circuit --

9     I've never seen this before -- en banc, was so sure of its

10    position -- this means that every judge in the Sixth Circuit,

11    and it has some pretty conservative judges.  It held that

12    attempts can't qualify even without oral argument.  There was

13    no oral argument.  They did it on the briefs.

14         Alternatively, Your Honor, if this Court believes that

15    there is some ambiguity about whether the text includes or

16    lists, includes, encompasses attempts or not, then this Court

17    should follow Judge Bredar's decision in *U.S. versus Lisbon*,

18    where it was the exact issue.  The government keeps saying

19    that, oh, that was different.  It wasn't different.  I made the

20    argument.  It was the same argument.  It wasn't dependent --

21              THE COURT:  Was that conspiracy versus attempt?

22              MR. PATEL:  Yeah, that was the only difference.  But

23    there were two separate arguments there.  Our first argument

24    was that the commentary conflicts with the text because no

25    inchoate offense can qualify.  It wasn't particular to

 1   conspiracy.

 2        Yes, there was a second argument about generic conspiracy

 3   not being generic, a RICO conspiracy, but the judge separately

 4   ruled for that independently of this

 5   commentary-conflicts-with-the-text argument.  There really is

 6   no difference in the arguments.  So Judge Bredar didn't go as

 7   far as *Havis* and *Winstead* but nonetheless said, look, under the

 8   rule of lenity, this is a serious question, and I have

 9   concerns; it's not clear to me; it's ambiguous; I'm going to

10   rule for the defendant under the rule of lenity.

11            THE COURT:  But Bredar's case was after *Dozier*?

12            MR. PATEL:  Judge Bredar's case was after *Dozier*, I

13   believe.

14            THE COURT:  It wouldn't have mattered because it was

15   attempt but, yeah, just looking at the dates.

16            MR. PATEL:  Yeah.

17            THE COURT:  Okay.

18            MR. PATEL:  And one thing to remember is that

19   Judge Bredar's case was also after *U.S. versus Kennedy*, right,

20   which had held that conspiracy qualifies, and the government

21   was arguing the same type of thing there.  That wasn't a RICO

22   conspiracy, but it was an 846 conspiracy, and Judge Bredar

23   still ruled on this issue and held for -- and, actually, that

24   was the very first decision in the country on this issue --

25   recently on this issue.

1          So, Your Honor, I think that it's very clear -- so let me

2     now go into the text itself.  So the text says "the controlled

3     substance offense means an offense under federal or state law,

4     punishable by imprisonment for a term exceeding one year, that

5     prohibits the manufacture, import, export, distribution,

6     dispensing of a controlled substance or possession of a

7     controlled substance with intent to distribute."

8          Now, the government focuses on the word "prohibits" and

9     somehow says that that's an elastic term, but I don't know how

10    prohibit is an elastic term.  It's not.  It's not an expansive

11    term, Your Honor.  It's not like involving.  Involving clearly

12    means connected to.  It means that we can go beyond the list

13    that's in the text, but that's not true with respect to

14    prohibits.

15         This government made the same argument with respect to

16    prohibits in *Havis*, and the court said "the guideline's

17    boilerplate use of the term 'prohibit' simply states the

18    obvious, the criminal statute's prescribed conduct, but

19    prohibit doesn't mean related to or connected to."

20         The Blacks Law Dictionary on prohibit is also to forbid

21    by law, to prevent or hinder.  There's nothing --

22              THE COURT:  There's typically not a separate offense

23    that prohibits an attempt, right?  Like, usually the offense

24    prohibits the manufacture, import, export, distribution, and

25    the attempt is just considered sort of an underlying -- another

1    way to complete that.  And so --

2         MR. PATEL:  Well, that's import -- so, here, Your

3    Honor, I think when you look at the federal code, attempt in

4    conspiracies are separate --

5         THE COURT:  They are separate.  That's fair.

6         MR. PATEL:  They're in a separate statute.  They're

7    in 21 U.S.C. 846.  Now --

8         THE COURT:  So that it's a separate offense.

9         MR. PATEL:  Yes, it is a separate -- if you've been

10   convicted of attempt --

11        THE COURT:  And lesser included was what I was

12   looking for before, but you're saying that's not true.

13        MR. PATEL:  And I'll address that too.  So if you've

14   been convicted of an attempt, you haven't been convicted of an

15   offense that prohibits manufacture -- so the list is referring

16   to completed offenses.  So I think it's important to look at it

17   that way.  You've been convicted of an attempt.  You haven't

18   been convicted of an offense that prohibits the manufacture,

19   distribution, or possession with intent to distribute.

20        Now, of course, there has to be a substantial step toward

21   the underlying offense, right, but that doesn't mean you've

22   completed the underlying and that you're guilty of the

23   underlying offense under 841.  So that's why it is a separate

24   offense.

25        And, also, Your Honor, with respect to attempt, the

1  government's argument is that anytime you have an offense

2  that's listed in the controlled substance offense or in the

3  crime of violence, we can just naturally assume it also

4  includes attempts.  But there are several reasons why we can't

5  do that.  Your Honor, first of all, the commission knows how to

6  include inchoate offenses in the text, and it did that in 4B1.2

7  in the crime of violence definition in the force clause.  It

8  includes attempt there.

9       Also, Your Honor, it's important to look at *U.S. versus*

10 *James*.  This is a Supreme Court case in which the Supreme

11 Court -- it was in the violent felony context, but the Supreme

12 Court said a burglary -- an attempted burglary is not burglary.

13 So as the Court said in *Winstead*, attempted distribution is not

14 distribution any more than attempted burglary is burglary.

15      Also, Your Honor, the government's argument about we can

16 just assume that the lesser included qualifies, it really

17 conflicts with the well-settled principles of the categorical

18 approach.  Under the categorical approach, when a prior offense

19 is broader than the offense listed in the federal crime of

20 violence or controlled substance statute, there's not a match

21 and it doesn't qualify.

22      Here, we have broader offense, right?  The attempt has

23 broader elements.  It requires less than the actual offense

24 that's listed, which is the completed offense of manufacturing,

25 distributing or possessing with intent to distribute.  So under

1  the categorical approach, it doesn't make any sense.  It would

2  turn it upside down if we now started saying that these broader

3  offenses now do qualify.

4      Additionally, Your Honor, it would lead to an absurd

5  result because if that were true, then the extent of the

6  government's argument is that even a possession would qualify.

7  Because if you look at the offenses, one of the offenses listed

8  in the text is possession with intent to distribute, and

9  possession is clearly a lesser-included offense.  But the

10 Supreme Court itself, in *Salinas versus United States*, it's 547

11 U.S. 188, specifically held that possession is not a controlled

12 substance offense.

13     So for those reasons, Your Honor, the lesser included

14 argument that the government makes doesn't work.

15         THE COURT:  Let me ask this.  This is more of a

16 foundational or factual question.  So you're not the lawyer in

17 this actual case.  Maybe this isn't a question for you.  I just

18 want to make sure we're on the same page here.  Paragraph 47 --

19 and I might just be missing something, but paragraph 47 seems

20 to refer to both conspiracy and attempt.

21         MR. PATEL:  The government is not arguing that

22 conspiracy doesn't qualify --

23         THE COURT:  Okay.

24         MR. PATEL:  -- and that's because the Fourth Circuit

25 already held in *Norman* that it's not generic, so they didn't

1    need to address that other argument.

2              THE COURT:  That's fine.  Okay.

3              MR. PATEL:  So I think the only issue here is whether

4    the attempt qualifies.

5              THE COURT:  Okay, that makes sense.

6              MR. PATEL:  Okay.  So, Your Honor, so *Dozier* I've

7    already talked to you about why it doesn't control here.

8         The government also cites to other cases, which some of

9    them involve a different commentary in which there were words

10   that were being interpreted.  It's not the situation we have

11   here.  That was true, I think, in *Allen* and in *Walton*.

12        *Kennedy* doesn't control here because that was a

13   conspiracy case, but it also didn't address the

14   commentary-conflicts-with-the-text issue.

15        *Norman*, the substance of *Norman* doesn't control here

16   because, also in that case, the Court never needed to get to

17   the issue of whether the commentary conflicts with the text

18   because it found that assuming the validity of the commentary

19   conspiracy was not generic.

20        So none of those cases foreclose this Court from making

21   the reasoned decision, and I think the only decision that makes

22   sense, which is that attempted possession with intent to

23   distribute, an inchoate offense, cannot qualify as a controlled

24   substance offense.

25        The last thing I wanted to address is that the government

1 also cites to some cases in which courts, many years ago, with

2 little to no reasoning, found that the commentary does not

3 conflict with the text, but there's very little to no reasoning

4 there.  I think the only courts that have really done a

5 thorough reasoning here are *Winstead* and *Havis*.  No other case

6 has really delved into this issue.

7        There's also one other district court, *U.S. versus Bond*,

8 in the Southern District of West Virginia.  That court also

9 agreed with *Havis* and agreed with *Winstead*.  Your Honor, also,

10 the judge in that case, in *U.S. versus Bond* specifically said

11 that *Dozier* is not controlling.  So the court there agreed with

12 the argument I'm making now, that it's not a controlling

13 offense.

14        Your Honor, if this Court believes that there's still

15 some ambiguity about whether or not an attempt is included

16 under the text, then this Court should follow *U.S. versus*

17 *Lisbon* --

18            THE COURT:  Judge Bredar's case.

19            MR. PATEL:  Yes, under the rule of lenity.

20            THE COURT:  Got it.

21            MR. PATEL:  So if the Court doesn't have any more

22 questions, I'll rest.

23            THE COURT:  That was very helpful.  I appreciate

24 that.

25            MR. PATEL:  Thank you.

1          THE COURT:  Ms. Wright or Mr. Morgan.  Ms. Wright.

2          MS. WRIGHT:  Yes, thank you, Your Honor.

3          THE COURT:  Just for timing purposes, that clock up

4   there must be slow.  I was looking at that.  I have 12:55 here,

5   and so we --

6          MS. WRIGHT:  Yes, I believe that's correct, Your

7   Honor, just reading the time --

8          THE COURT:  Okay.  So I'll hear argument on this

9   issue, and then we'll come back after lunch to deal with the

10  remaining issues.

11         MS. WRIGHT:  Okay, sounds good, Your Honor.  Thank

12  you, Your Honor.

13         THE COURT:  So just on this issue.

14         **ARGUMENT BY MS. WRIGHT FOR THE GOVERNMENT**

15         MS. WRIGHT:  Okay, of course.  And I will not try to

16  add too much to what I put in the brief since we also did file

17  the response brief, but just focussing primarily on the issues

18  that Mr. Patel has argued and that the Court has inquired

19  about.

20      We do think, as a preliminary matter, that the answer

21  here is simple because this Court is not an appellate court and

22  is obligated to follow *Dozier*.  We think, by its terms, the

23  Court really hit the nail on its head that the fact that a

24  particular argument was not raised in *Dozier* does not undermine

25  the unequivocal holding in *Dozier* that attempts qualify under

1    this guideline.

2         As the Court will be well familiar, the Fourth Circuit

3    feels perfectly free to go through other arguments when they

4    support the holding it's making, and they could well have done

5    that in this case too, but they did not.  They were aware of

6    the argument, and they held that the commentary -- I mean that

7    attempts qualify under the guideline and its commentary.

8         Mr. Patel referred --

9         THE COURT:  But did they address the actual language

10   of the statute or the commentary?

11        MS. WRIGHT:  Well, Your Honor, I think they addressed

12   the actual language, but it is correct they did not address the

13   particular argument about the possible discrepancy between the

14   text and the commentary, and I think the key point there is

15   that we do think they are completely consistent.

16        Mr. Patel referred to the cases that the government cites

17   on this point as being older cases, but looking at pages 18 and

18   19 of our original brief, the first three cases we cite on sort

19   of each point are from 2018 and 2017.  So I don't think this is

20   any situation at all where this is a dated set of holdings that

21   we're asking the Court to adhere to.  Notably, *Dozier* itself is

22   in 2017.  So this is a recent case as well.

23        THE COURT:  There are two issues.  There's one, you

24   know, does the defense get past what I'll refer to as the

25   *Dozier* problem for them?  And then if they get past that,

1  then -- I don't know.  Obviously, I think you have a trickier

2  argument with just convincing me that the language includes

3  attempt, unless I just follow *Dozier*.  That's where I am as I

4  sit here.

5       So what is your response to the defense's point that

6  *Norman* -- that reading *Norman* should instruct me that because

7  *Dozier* didn't address the specific issue that's being raised

8  here, it's not binding on the Court?

9            MS. WRIGHT:  Well, Your Honor, I think -- *Norman* was

10  focussing so completely on the element mismatch of conspiracy,

11  and I think even accepting the principles it states about

12  passing observations, we don't have a situation where we are

13  dealing with a passing observation.  We are dealing with a

14  situation where there was an explicit holding by *Dozier* that

15  this particular type of crime that we're dealing with qualifies

16  under this guideline and the --

17            THE COURT:  But they did that without focussing on

18  the language of the actual guideline or the commentary because

19  those issues weren't raised.  So then does that sort of reduce

20  it to a passing observation?  Or why doesn't it?  I assume

21  you're going to say it does, but why --

22            MS. WRIGHT:  Right, because the central question in

23  the case, in *Dozier*, was whether these particular types of

24  crimes qualified, and they said yes.  It is not something that

25  can be read.  It's a passing observation.  We're saying they

1  were addressing whether, without any question or challenge

2  whatsoever to a guideline, a particular set of facts satisfied

3  the guideline or something like that.  I think cases that were

4  just applying the guideline, Fourth Circuit holdings would be

5  ones where we would be accepting that those were passing

6  observations, where the guidelines are just being applied when

7  they weren't challenged.  But in *Dozier* it was fully

8  challenged.

9          THE COURT:  But they never addressed, for example,

10 just what seems like a pretty foundational point of can the

11 language that prohibits the manufacture, import, export,

12 distribution, or dispensing be read to include attempt?  They

13 never answered that question, did they?

14         MS. WRIGHT:  Right, that's correct, Your Honor.  I

15 think that is right.  They did not get into that question, and

16 I think that is at least implied in the holding that they

17 accepted it because they didn't see any issue that they were

18 needing to address.  But that's why I do want to talk, of

19 course, about that.

20      The federal public defender refers to our -- the

21 government focussing on the word "prohibits," and I think that

22 may be a reference to a different type of case, because in our

23 submissions here, we have not focussed at all on the word

24 "prohibits."

25      The textual argument here hinges on the fact that the

1   plain language of the guideline itself refers to these offenses

2   under federal or state law that prohibits.  So in the cases

3   upon which the federal public defender relies generally are

4   doing that same conflation that Mr. Patel does here, that say

5   it was an offense -- read out that entire language of -- that

6   these are offenses under this broad piece of laws, but the

7   guideline does not read that a controlled substance offense

8   means the manufacture, import, export, etc., that was

9   punishable by a term exceeding one year.  The guideline --

10          THE COURT:  I'm not sure I'm following.  Was the

11  offense that he was convicted of an offense that prohibits the

12  manufacture, import, export, distribution, or dispensing if he

13  was convicted of attempt, which is a different offense?

14          MS. WRIGHT:  Well, that's why I think it gets into --

15  the answer is yes, but the question is the particular wording

16  of this guideline and the somewhat unique nature of 21 U.S.C.

17  Sections 841 and 846.  So the question is whether this was an

18  offense under federal law that prohibits the manufacture and

19  distribution.

20          And it is very important here that this wasn't a

21  conspiracy or something like that under 18 U.S.C. Section 371.

22  Mr. Faison was convicted, and it's reflected on the judgment,

23  of violating Sections 846 and 841 both.  So he was explicitly

24  convicted under -- of violating Section 841, which,

25  indisputably, is the federal law that prohibits the manufacture

1 or possession with intent to distribute and everything else in

2 these statutes.  Because of that, there have been explicit

3 holdings that we cite in the response memo that attempt is a

4 lesser-included offense of violations of Section 481.  And this

5 is sort of a unique --

6 　　　　　THE COURT:  We don't happen to have the J&C here.  I

7 am actually curious about that argument that you just made

8 regarding the precise offense.

9 　　　　　MS. WRIGHT:  Your Honor, I did attach the J&C to the

10 response memorandum.  So that should be in the packet that you

11 have, that I handed up earlier today.

12 　　　　　THE COURT:  Give me one moment because I think that's

13 an interesting point.

14 　　　　I do have it here now.  All right, I see it.

15 　　　　　MS. WRIGHT:  Thank you, Your Honor.  I think it is

16 fair that -- I mean, simple possession could also -- in some

17 circumstances in some drug statutes also be a lesser-included

18 offense.  But here in the federal system, in these statutes

19 that we are dealing with, it is its own offense in 844.

20 　　　　So here we do have a unique situation, but I think that

21 unique situation makes very clear that the attempt offense that

22 we're dealing with is an offense under federal laws that

23 prohibit these crimes.  And the case law says that specifically

24 as to 841, it is not an assumption at all that we are getting

25 into here.  It is actually the specific wording of the statutes

1   that we think is decisive and does show that there's no --

2   yeah, that attempt qualifies under these facts.

3          THE COURT:  I guess the question then becomes was he

4   convicted under 846, or was he convicted under 841?

5          MS. WRIGHT:  And I believe he was convicted under

6   both, Your Honor.  They are both listed in the judgment, and

7   the interplay between 846 and 841 is --

8          THE COURT:  But 841 does not include attempt.

9          MS. WRIGHT:  Well, I think legally it does, Your

10  Honor, because attempt is a lesser-included offense of 841.

11         THE COURT:  Well, I'm not sure that's how federal law

12  works.  That's how we tend to think of it because that's how it

13  usually comes up in state law, that it's just a lesser

14  included.

15      Like, if you didn't charge -- I'm not sure I know the

16  answer to this.  If you didn't charge 846 in the indictment,

17  could he be convicted of attempt?  Or do you have to -- I

18  honestly don't know the answer to this as I sit here.  Or do

19  you actually have to charge 846 in order to convict him of

20  attempt or conspiracy?

21         MS. WRIGHT:  I believe there were two cases that I

22  cited, and the names I'm blanking on -- and I handed up my copy

23  of the response memorandum -- but I think there are at least

24  two cases that I found just from a quick search showing that

25  841 -- attempt was treated as a lesser-included offense of 841,

1    and I believe in those two cases --

2              THE COURT:  In federal law.

3              MS. WRIGHT:  In federal law, yes.  And I believe in

4    those two cases, the question was specifically raised that the

5    charge had been for violating 841.  The jury, I believe -- or

6    the jury came back for guilt for attempt, and that was found to

7    be completely appropriate.

8              So I think based on that landscape and under these unique

9    laws, that this certainly is a case where we are dealing with

10   an offense under these statutes.

11             I also think the language of the guidelines itself --

12   that it refers to this offense under is not at all inconsistent

13   with the commentary, and the fact that it didn't -- the

14   guideline was not worded as controlled substance offense means

15   the manufacture, import, export, distribution, or anything else

16   like that is what leaves it open to the appropriate

17   interpretation by the Sentencing Commission through the

18   commentary.

19             So the commentary is playing exactly the role that the

20   commentary is supposed to play here, where the guideline has

21   particular language that can be open to interpretation, and the

22   commentary provides a consistent interpretation of it.  So

23   under *Stinson*, that's perfectly satisfactory.

24             This is a very different situation from *Norman* and the

25   cases that have now taken issue with conspiracy qualifying,

1   because conspiracy, again, it doesn't have the same situation

2   here being a possible lesser-included offense, and the focus of

3   all those cases was on the fact that there was an element

4   mismatch between the generic conspiracy and federal conspiracy.

5   Here, there's not even an argument that there is any issue with

6   the elements of attempt having any kind of mismatch or

7   discrepancy that would cause an actual issue.

8          So *Dozier*, again, was in 2017.  This was a very recent

9   finding Fourth Circuit case here.  But even on the merits, we

10  think the guideline language we've opened to invite in the

11  commentary and combined, they are clear that attempts qualify,

12  and *Havis* and *Winstead* are outliers, with the bulk of cases,

13  the majority of circuits who have found that attempts qualify

14  including in very recent opinions.

15         The other cases that the federal public defender cites

16  are distinguishable.  Judge Bredar's decision, again, was

17  dealing with conspiracy, which is differently situated,

18  definitely, than attempt.

19         And *Shell* was dealing with the guideline terms that had

20  been defined differently by case law under different guidelines

21  when the same term is used interchangeably.  So we don't think

22  that actually provides guidance here.

23         We think *Norman* supports our present argument both on the

24  merits and that the Court is still bound to follow *Dozier* in

25  this circumstance.

1              THE COURT:  Thank you.  Mr. Patel, briefly.

2              MR. PATEL:  Yes, briefly.

3         **REBUTTAL ARGUMENT BY MR. PATEL FOR THE DEFENSE**

4              THE COURT:  One issue I am interested in, as you take

5    your position, is what, in fact -- which offense was Mr. Faison

6    convicted of, under 846 or 841?

7              MR. PATEL:  Right, Your Honor.  So starting with the

8    language of the text, it says "an offense under federal or

9    state law that prohibits the manufacture."  So it's clearly

10   referring to a federal law which is a completed offense, right?

11   So if it's saying an offense under federal law that prohibits

12   the manufacture.

13        So here, we have a federal law, an attempt.  It was an

14   attempt.  It's not the attempted prohibition.  So, yes, there

15   is a federal law --

16             THE COURT:  But if he's convicted under 841, that's

17   an offense under federal law that prohibits, whether or not --

18             MR. PATEL:  But I think it's referring to -- because

19   there's often statutes with alternative elements, right, and

20   you have to look at what -- so it could be one statute.  But

21   then you have to look at the definition.  The definition here

22   requires a completed offense under that statute.  And when you

23   look at 841, it doesn't say anything about attempt.  The

24   only --

25             THE COURT:  I agree with that.  So then my ultimate

1   question is are you saying -- look, sometimes -- you know,

2   maybe the next time I have this kind of case I'll be more

3   careful.  Are you saying, as a technical matter, he was not

4   convicted under 841?

5          MR. PATEL:  No, because I think he was --

6          THE COURT:  So you are saying he was convicted under

7   841.

8          MR. PATEL:  No, I'm agreeing with you.  I'm saying he

9   was convicted under 846.  841 determines the sentence, like,

10  the amount -- it's a penalty section that determines that.

11        But, Your Honor, also, what this statute is saying is

12  that I think the offense has to be a completed offense.  He

13  wasn't convicted of a completed offense under 841.  And when we

14  look at 841, there's only one section that mentions attempt,

15  Your Honor, and that's number 6.  It's -- but attempt is not

16  mentioned anywhere else, Your Honor, in the statute.  I have it

17  before me.  It's talking about completed offenses.

18        THE COURT:  So your position -- I'm confident of what

19  your answer is; I just want to make sure.  Your position is

20  that he's not convicted -- regardless of what the J&C actually

21  says --

22        MR. PATEL:  Yes.

23        THE COURT:  -- he's not convicted of a lesser

24  included of 841.  He's convicted of a separate offense, that

25  being 846.

1          MR. PATEL:  He's convicted of an 846, and one of the

2     elements of 846 is that there has to be a substantial step

3     toward completion of a crime under 841.  But what he's

4     convicted of is an attempt, Your Honor.  Even if attempt is a

5     lesser included, as I said, I've made the four arguments --

6          THE COURT:  So I'm not sure if I agree with that,

7     what you were about to say, because if we say that he's

8     convicted of a lesser included of 841, then he is convicted

9     under 841, and that is an offense, right, that prohibits the

10    manufacture, import, export, blah, blah, blah.

11         MR. PATEL:  But what I think this is referring to is

12    that he himself has to be convicted of an offense that

13    prohibits the manufacture, and he wasn't --

14         THE COURT:  Right, and if we're saying he was

15    convicted of -- if -- I know you have -- it sounds like you

16    have alternative arguments on this, but if I were to determine

17    he was convicted of a lesser included of 841, he was still

18    convicted under 841.

19         MR. PATEL:  Yeah, I don't think that's what the text

20    is saying.  I think what the text is saying is that it has to

21    be a completed offense, like the other --

22         THE COURT:  Why?

23         MR. PATEL:  Because then it would do violence to the

24    words prohibits the -- an offense that requires -- that

25    prohibits the manufacture, import, exportation, or

1  distribution.  So that's not referring to an offense that

2  prohibits the attempt.  It's saying an offense under federal

3  law that prohibits.  It's not saying an offense under federal

4  law that prohibits the attempted manufacture or distribution.

5  So even if it was a lesser included, that's not what this text

6  requires.

7          THE COURT:  I see your argument.  I see your

8  argument.

9          MR. PATEL:  And I think, again, that's consistent

10  with the whole argument I made about possession with intent to

11  distribute too.  I think it's specifically requires a federal

12  or state law that prohibits a completed offense, and Mr. Faison

13  was not convicted of an offense that prohibits the manufacture

14  or -- even if we have the lesser-included offense of attempt,

15  that attempt is not an offense that prohibits the manufacture,

16  import, export, distribution.

17          THE COURT:  All right.

18          MR. PATEL:  Thank you.

19          THE COURT:  Thank you.

20          THE DEFENDANT:  Your Honor, if I may, I just want to

21  address --

22          THE COURT:  Just on this issue.

23          THE DEFENDANT:  Yes, just two points real quick.

24          THE COURT:  I'll hear you.

25          **REBUTTAL ARGUMENT BY THE DEFENDANT**

1          THE DEFENDANT:  Title 21-846, that's actually what I

2     was charged with for the conspiracy and the attempt, and the

3     statute itself reads "any person who attempts or conspires to

4     commit any offense defined in this subchapter shall be

5     subjected to the same penalties."  The reason that they add 481

6     to it is to let the person know this is the drug that we're

7     alleging, and this is the penalty for that.  So it's actually a

8     separate crime in itself, but they have to put in 841 in order

9     to inform you of the drug that they're saying you had and the

10    amount of time that you were facing for that particular one.

11         One second.

12         841(b)(1)(B), which is the statute that they charged me

13    under, it says "in a case of a violation of this subsection,"

14    and it gives you the amount and the particular drug.  So as I

15    said, I was charged with 846; I wasn't charged with 841.  They

16    only added the 841 to give you the language to let you know the

17    drug and the amount.

18         THE COURT:  All right.  You know, Mr. Faison, but for

19    some different choices in life, you could just be sitting there

20    for different reasons.  But that's a conversation, perhaps, for

21    later in the day.

22         I'm actually going to ask that you give me until three

23    o'clock because -- assuming that doesn't -- I should probably

24    check to make sure it doesn't interfere with my own calendar.

25    I don't think it does.  I'm going to ask that you give me until

1    three o'clock.  I want to get something to eat, first of all,

2    and then I do want to look back at some of these issues so that

3    I can resolve them.  The other issues I don't think will take

4    very much time, so I'm still confident we'll get done by the

5    end of the day.

6         For Mr. Patel's purposes, I'm not going to take up

7    additional argument when I come back.  So you can stick around

8    or just leave it for Mr. Miller to tell you how this turns out.

9    I leave that up to you.  You're excused if you want to be

10   excused.

11        But I will ask everyone else to be back at three o'clock,

12   and we'll finish up then.

13        (Recess from 1:15 p.m. to 3:05 p.m.)

14        THE COURT:  Good afternoon now.  You may be seated.

15   Continuing with sentencing.

16        So we have a number of guideline-related issues to

17   address.  We completed argument on one.  I'll hear from the

18   government -- let me just sort of go down the list and then

19   I'll give Mr. Faison --

20        MR. PATEL:  Your Honor, I just sent an e-mail -- I

21   really apologize -- a couple of minutes ago asking for five

22   more minutes of argument to clarify a point.  This is an

23   important issue, and I respectfully request -- and I'm really

24   sorry that I sent -- and, of course, the government can have an

25   opportunity to respond to what I'm about to say.

1          THE COURT:  Sure.

2          **FURTHER ARGUMENT BY MR. PATEL FOR THE DEFENSE**

3          MR. PATEL:  I just wanted to say -- thank you so much

4    for your time.

5          So, Your Honor, we're focussing on the word "offense" in

6    the text, and I thought about it a little bit more, and I want

7    to be succinct about why the government's argument doesn't

8    work, because when we're talking about offense, I think what

9    the government is doing is making it -- they're reading it too

10   broadly.

11         *Descamps* and *Mathis* tell us what the word "offense"

12   means, and the word offense means the elements that are

13   necessary for the conviction.  So, often, there can be a single

14   statutory scheme, for example, like 841, but there's various

15   offenses because the offense, there's alternative elements

16   which determine alternative crimes.

17         So what I wanted to say here, succinctly, is that whether

18   attempted distribution is 846 or 841, it doesn't matter whether

19   it falls under 841 or 846.  It's a different offense because it

20   requires less elements than does what the crime listed in

21   4B1.2, which says there has to be an offense that prohibits the

22   manufacture, import.  So the offense that it's talking about,

23   the elements that this text is talking about is a completed

24   offense.  So the offense that we have here is an attempted

25   distribution.  It is not a completed offense.

1          And that's all I wanted to say, Your Honor.

2          THE COURT:  All right.  Ms. Wright, if you want to

3     just respond to that point.

4          **FURTHER ARGUMENT BY MS. WRIGHT FOR THE GOVERNMENT**

5          MS. WRIGHT:  Yes, Your Honor.  Thank you.  I think

6     just, also, briefly -- since this wasn't something we focussed

7     on before, I think to the extent that Mr. Patel's argument is

8     accurate, that an offense -- we're looking at what the meaning

9     of the term "offense" is.  That renders it ambiguous in the

10    manner that leads precisely to why the guidelines commentary

11    should be able to clarify the meaning consistently with the

12    language in order to specify which things -- which offenses or

13    which crimes it is talking about under the statutes.  Again,

14    the key word to the government's argument at this point is not

15    "offense," it is not "prohibits."  It is "under," where the

16    guideline refers to offenses under this federal and state law.

17         And the only other point I'd mention in reference to

18    that, Your Honor, is that looking at the judgment, again, of

19    Mr. Faison's in his original case, it does list both -- it

20    lists 846, it lists 841(a)(1), which is not a penalty provision

21    at all, and it lists 841(b), which gets into the amount and

22    penalty provisions.  So that court was certainly treating this

23    as an offense under and listed as a conviction under and of

24    841, in addition to 846.

25         And to some extent, the language Mr. Faison quoted on the

1   penalty provision part is that 846 is the penalty provision and

2   merely says how conspiracy and attempts are going to be

3   punished.  So we don't think the definition of offense actually

4   changes anything here for purposes of what his conviction was.

5          THE COURT:  I appreciate the additional comments on

6   both sides being transparent.  Every question that popped into

7   my head as you were going back and forth is a question that

8   I've already resolved in my mind at this point.  So that's why

9   I didn't push back on either side, but I do understand the full

10   arguments of both sides.

11         So I do want to hear argument on these other issues, and

12   then we'll resolve them all.

13         I'll say now I am going to write something on all of this

14   just because I think they're -- I count four that I think at

15   least are worth enough thought that I want to put it in

16   writing.  Obviously, I am going to sentence Mr. Faison today,

17   but in my rulings, I will probably be brief, not just for

18   time's sake but also because, ultimately, I do plan to issue an

19   opinion on all of these issues.

20         So I'll hear from Ms. Wright as to the remaining

21   guideline-related issues.  I'll then turn to Mr. Faison, and

22   we'll see where we are at that point.

23         I list a number of them, including the stolen firearm

24   enhancement, the enhancement for possession in connection with

25   another felony offense.  The obstruction enhancement,

1  obviously, we've already dealt with.  The issue of whether the

2  attempt qualifies under 4B1.2, so I don't need anything more on

3  that.  Then Mr. Faison had requested a couple of 5K departures.

4  So you can address those in any order you wish.

5          MS. WRIGHT:  Thank you, Your Honor.

6          THE COURT:  As well as anything else I might have

7  missed.

8          MS. WRIGHT:  Your Honor, I believe that captures all

9  of the items the government is aware of, and I will reserve, of

10 course, the 3553(a) argument and whatnot until later.

11         THE COURT:  Yes, we're not on 3553 yet.

12         **DETERMINATION OF ADVISORY GUIDELINE RANGE**

13         **ARGUMENT BY MS. WRIGHT FOR THE GOVERNMENT**

14         MS. WRIGHT:  Okay, perfect.  Thank you, Your Honor.

15     With respect to the first question, which is the

16 enhancement for the fact of the firearm being stolen, based on

17 the evidence presented this morning, it is, I think, undisputed

18 that the firearm was stolen.  Two agents testified to that

19 effect and gave the date for when it was stolen.  And for

20 purposes of the --

21         THE COURT:  So let me ask this.  This is an issue I

22 have thought about a lot over -- I mentioned to somebody how

23 long I've been on the bench.  I couldn't believe it had been

24 that long, five and a half years that I've been doing this now.

25 This issue of the stolen firearm enhancement, it applies.  I

1  can't argue -- I don't think there's a real argument that it

2  doesn't apply as written.

3        But in terms of how seriously I should take it, you know

4  i.e., I could apply it because it's correct under the guideline

5  and then immediately vary away from it.  As I understand it --

6  and you might have picked up some of this in my questioning.

7  The reason why we have these enhancements, whether something

8  sends something up two levels, down two levels, is because what

9  we're attempting to do, what we're trying to do is make

10  distinctions between different defendants, right?  I assume we

11  agree that that's what we're trying to do with these

12  enhancements.

13        MS. WRIGHT:  Of course, Your Honor.

14        THE COURT:  Like, defendant A is two levels worse

15  than defendant B because he did this thing that drives the

16  enhancement.

17     I guess where I always get stuck with this particular

18  enhancement is that, by definition, we're dealing with felons

19  in possession.  Those are the only people that are going to be

20  looking at this enhancement.  Felons in possession can never

21  walk into a store and buy a gun.  So any felon who is

22  possessing a gun somehow engaged in the illegal marketplace of

23  firearms.

24        And what I struggle with -- and I'm raising this to give

25  you a chance to respond to my thought process on this.  What I

1   struggle with is is Mr. Faison actually two levels worse than
2   someone who happened to buy a gun that, unbeknownst to him,
3   came from a straw purchase?  Unbeknownst to him, had been
4   manufactured in someone's house?  Or, unbeknownst to him, had
5   been stolen previously?  Why does Mr. Faison deserve two more
6   levels because the gun that he got out of the illegal
7   marketplace happened to be stolen, without his knowledge,
8   presumably -- there's no evidence to the contrary.  He wasn't
9   the one who stole it.  Why is he two levels worse than someone
10  who might have gotten the gun from the illegal marketplace, and
11  it turns out that that gun was a straw purchase?

12          I said a lot there.  I hope some of it made sense.

13          MS. WRIGHT:  It certainly did, Your Honor, and I'll
14  respond to the -- I have a couple of points in response.

15      I think, first, the policy reason and I think why the
16  guideline does adopt, essentially, this strict liability
17  approach to --

18          THE COURT:  That's exactly the word is strict
19  liability.

20          MS. WRIGHT:  Right, it is, Your Honor, and it is
21  different from, say -- I mean a crime -- in order to be
22  convicted of possessing a stolen firearm, for instance, then
23  one would have to know that it was stolen.  But I think the
24  guidelines properly take a broader view in imposing the strict
25  liability, and I think the purpose of that is to send the

1   message that people who have firearms are essentially assuming

2   the risk of their dubious origin if they have not inquired into

3   it and are, therefore, being held accountable for where these

4   firearms came from --

5          THE COURT:  Well, I'm assuming, in saying that,

6   you're not suggesting that Mr. Faison should have asked whoever

7   he got the gun from is this one stolen or did this one come

8   from a straw purchase.

9          MS. WRIGHT:  I don't think it would have been

10  inappropriate for him to ask that, but I do actually disagree

11  with the Court's --

12         THE COURT:  Would it have been realistic?

13         MS. WRIGHT:  I think in Mr. Faison's situation, yes,

14  it is, understandably and correctly, difficult to get firearms,

15  and I think there is varying assumptions sometimes that, oh,

16  yes, probably this one doesn't have the history that one would

17  dream of, but that's also part of why law enforcement wants to

18  recover those firearms and why it is a problem for law

19  enforcement when all these firearms are out there that can't be

20  tracked.

21         But I do disagree with the premise, I guess, that all

22  people who are accountable for being a felon in possession have

23  something dubious in terms of how they got control of the

24  firearms.  I don't think that actually is typically -- I mean,

25  it may be typically true on the way these cases evolve, but I

1   think there are a variety of different ways when this can come

2   to pass.  Sometimes there are firearms that legitimately belong

3   to someone else and are owned, legally, perhaps by the other

4   person, and the person who is accountable for being a felon in

5   possession of them ends up in the house, too close, in the car,

6   other things like that that can bring him into proximity to it.

7           THE COURT:  Sure, but that sounds like something for

8   which maybe a downward departure might be appropriate, right?

9   Like, there are certainly -- if someone is a felon in

10  possession of a gun and goes out and just buys a gun from the

11  guy on the street who sells him a gun illegally, we are saying

12  that if the gun gets traced and it happens to be stolen, that's

13  a two-level increase over someone who the gun gets traced and

14  it happened to have come from another means, without any

15  thought to whether or not that actually is worse behavior on

16  the part of the defendant.  That's what bothers me about it.

17          MS. WRIGHT:  Understood, Your Honor, and it is,

18  again, I guess, a question of their -- if someone is in that

19  position, then they are assuming the risk.  It sort of is

20  analogous to someone taking the victim as they find them.  Some

21  people in -- I mean, violent crime cases and assaults and

22  whatnot, if they happen to have a particularly vulnerable

23  victim, then, through no actual difference in their conduct,

24  could end up accountable for the additional harm that they

25  pose.

1            I think, here, it's a similar analysis that if you're in

2    this area, you are assuming the risk.  If you aren't checking

3    the pedigree of the guns, basically, that your gun will have a

4    history or these characteristics, just like a victim might,

5    that make it more aggravating and more dangerous to society.

6    And it does pose more of a risk to society than a gun that is

7    otherwise perfectly well traced but happens to end up near

8    where a felon is.  I think that's a choice that the law has

9    made that they're -- even if it's not --

10            THE COURT:  Well, the guidelines have made that

11    choice.

12            MS. WRIGHT:  Well, yes, the guidelines, but that the

13    law makes in other areas, that you sort of take the victim as

14    you find them, so you take the gun.

15            And I will note here there was -- there was a shotgun in

16    a closet in that residence that belonged to Mr. Newman, Sr.,

17    had inherited it.  So there are, again, sort of legitimate ways

18    that people might have these guns that they could theoretically

19    be accountable for possessing, but that kind of gun is not the

20    concern of law enforcement.  That wasn't charged.  That wasn't

21    an issue here at all.  It was secured.  It wasn't being used in

22    the way that these guns were.  So it's definitely a different

23    concern, and there are these -- what I believe really are sort

24    of innocent guns that can end up in the hands of felons who end

25    up possessing them, and that's a problem, but it is a different

1    problem here, where the facts really highlight how -- the law

2    and the regulation of guns is trying to prevent, which is

3    people who are not supposed to have guns ending up with guns

4    that law enforcement can't trace.  So one of them was stolen;

5    one of them was homemade.  So there is no way to be aware of

6    what's happening with the guns, and I do think it's a fair

7    choice by the guidelines, as in other areas of the law, to hold

8    the defendants, who are engaged in this obviously illegal

9    activity, accountable for what the actual facts are.  And that

10   can be true, too, if someone knows they possess a controlled

11   substance, it turns out to be something different or they don't

12   know the weight, they can be accountable for that too.

13        So that is why we do support the enhancement here,

14   because it is more aggravated, more dangerous, and more of

15   concern to the government than the average case, even a felon

16   in possession.

17             THE COURT:  All right.  I appreciate your response.

18             MS. WRIGHT:  The second point, I believe, is the

19   four-level enhancement for possessing the firearm or firearms

20   in connection with another felony offense --

21             THE COURT:  I guess you have two arguments on this

22   one.  I think your stronger argument is the one that I -- I

23   can't remember when I read it, but your argument that he had

24   the firearm, and he was going out to commit a felony, right,

25   because intent is captured by that provision.  So, yeah, I

1   think you have a strong argument there.

2        I am wondering -- not that you -- you don't need to win

3   on both, but in terms of the ammunition in the bedroom, as I

4   understand it, in order -- and I'm putting my thoughts out

5   there so you can tell me if I'm wrong here.

6            MS. WRIGHT:  Yes, thank you, Your Honor.

7            THE COURT:  As I understand it, the ammunition in the

8   bedroom he's acquitted of by the jury.  That doesn't mean I

9   don't still consider it.  The additional felony would be the

10  drugs that weren't charged.  I know I can still consider it.

11  And those drugs seem to have come, likely, from Mr. Newman in

12  some way, who, just based on the difference in quantities,

13  seemed to have been the one with more of it.

14       I just wonder if that is really a forceful argument for

15  saying he should receive a four-level enhancement for that

16  reason.  Putting aside whether or not he was going to go hunt

17  these guys with that firearm.  I actually do think you have a

18  strong argument there.  But on the first one, I guess I'm

19  trying to understand the government's argument.

20           MS. WRIGHT:  Of course, Your Honor.  Thank you very

21  much for outlining that.

22       And I do think -- yes, turning specifically to possessing

23  it in connection with the drugs, I think there are several

24  factors here that make the enhancement appropriate on that

25  basis as well.

1          First, I'd note that while the -- yes, the vast quantity

2    of these drugs were in Larry Newman, Jr's room, so we aren't --

3    I mean, Mr. Faison, as you see, was not charged ultimately with

4    the possession with intent to distribute, but I think the facts

5    that we have here, certainly for the standard that we're

6    looking at for sentencing, make it very appropriate to apply

7    the enhancement that these guns were in connection with, which

8    includes that they could have had a role as to the drugs.

9          Notably, the tools for the --

10          THE COURT:  But the felony offense we're referring

11    to, just to be clear, that that would be in furtherance of or

12    supporting or whatever, what have you, would be PWID PCP.  Or

13    is there something else that I'm missing?

14          MS. WRIGHT:  Well, I think from the -- I guess there

15    are two.  It's PWID, the PCP, the cocaine, and the crack

16    cocaine.

17          THE COURT:  Well, the cocaine is just in residue

18    amounts.  You certainly would never charge that, but I guess

19    your point is it's indicative that there's ongoing drug

20    distribution he's involved in.

21          MS. WRIGHT:  Yes, Your Honor, and on the cocaine, I

22    can refer back to the specific lab report, but the amount of

23    cocaine in Larry Newman, Jr.'s, room was approximately 40 grams

24    in one bag.

25          THE COURT:  In Larry Newman, Jr's, room.

1          MS. WRIGHT:  Yes.  And the amount of crack cocaine,

2   so the cocaine base in Larry Newman, Jr.'s, room, was, I guess,

3   a bit more than 28 grams in 547 individual bitty, bitty

4   baggies, which is certainly for distribution.  And so the --

5          THE COURT:  Sounds like a great charge against

6   Mr. Newman, Jr.

7          MS. WRIGHT:  Thank you, Your Honor.  In Mr. Faison's

8   room though -- and I'm sorry.  And also in Larry Newman, Jr.'s,

9   room, there were approximately 100 of these individual packets

10  of PCP.

11      Now, Mr. Faison had around approximately less than 10 --

12  I think that was the testimony -- of these matching little

13  packets of PCP.

14         THE COURT:  I think there were six.

15         MS. WRIGHT:  Six?  Thank you, Your Honor.  But there

16  were also all of the tools in that backpack for the manufacture

17  of crack cocaine from cocaine base, and there was residue both

18  of cocaine base and cocaine on these items in the backpack,

19  which included the frother -- or the whisk, these different

20  items.  There also was the additional Pyrex, sort of matching

21  glass container in the drawer that also had the pill bottle

22  with Mr. Faison's information on it that was talked about even

23  more at trial.

24      So all of this evidence is very suggestive of a joint

25  enterprise, and certainly by the preponderance of the evidence

1   standard here, where the manufacturing tools are in

2   Mr. Faison's room, the actual drugs packaged and ready for

3   manufacture are in Mr. Newman, Jr.'s, room, and the

4   conversation that we played in the clip I think also is part of

5   what we're relying on here, because when Mr. Faison calls home,

6   it's the first call after he's been arrested.  Larry Newman,

7   Jr., gets on the phone.  They're asking -- Mr. Faison asks if

8   they came in the house, and Mr. Newman, Jr., says affirmatively

9   and "they took everything."  And he also says later in the

10  conversation -- and there's sort of a double negative right at

11  the end, so it's a little hard to understand exactly what he's

12  saying, but by the government's reading, it amounts to that

13  there was nothing left to protect and that the guns have also

14  been taken, so there may be less to protect things with.

15       But those are not statements by people who aren't

16  complicit and at least knowing, and Mr. Faison apparently -- I

17  mean probably doing -- the evidence shows sort of possibly,

18  quite likely doing the manufacturing, at least sort of aiding

19  and abetting this possession with intent to distribute of these

20  drugs that are in the basement, with a bit in Faison's room and

21  then more in Mr. Newman's.

22            THE COURT:  So to summarize your argument, what's

23  found in Faison's room is sufficient to connect him to the drug

24  operation clearly coming out of Mr. Newman, Jr.'s, room.

25            MS. WRIGHT:  Right, yes.  I think that's exactly

1  right.  With the manufacturing and then -- and that relates --

2  so the felony for him could be manufacturing the controlled

3  substances, since there's evidence of that from his room

4  directly, but that's also very closely tied to the possession

5  with intent to distribute those controlled substances,

6  including these baggies of what was manufactured to the tune of

7  547.

8      It is also appropriate to take into consideration for

9  this guideline Mr. Faison's criminal history, that he has

10 previous convictions, a variety of previous controlled

11 substance arrests, but also convictions, including the attempt

12 to possess with intent to distribute 500 grams or more of

13 cocaine that came out of the Eastern District of New York, and

14 that that also can inform the Court as to the likely lay of the

15 land here in terms of all those drugs.

16      People certainly don't keep these things in another

17 person's room unless that person is complicit with the criminal

18 activity.  Mr. Faison's questions pertained to whether there

19 were fingerprints, other things relating to the backpack.  But

20 even without those things, the fact that it was -- everyone was

21 perfectly comfortable having this in his room we think shows,

22 as with the ammunition, that this was plainly his stuff.  It's

23 his room.  According to even his father at the time, there's no

24 one else living there except the parents and the two sons in

25 their respective rooms.  We think it's his.

1          And I think the fact that he had the ammunition in the

2     room, and the guns on his person that corresponded exactly to

3     that ammunition, also supports the finding that the guns had

4     some relationship to the drugs where the manufacturing items

5     were there in that room.

6          Mr. Newman, Jr., had his own gun and, notably, his

7     firearm, whether they're both .45 caliber for one firearm, it

8     had its own single bullet, but the number of bullets that were

9     missing from the box of ammunition in Mr. Faison's room were

10    eight, and that's exactly how many were in the firearm that was

11    in his waistband when he was pulled over.  So he had control

12    over that.  The fact that Larry Newman, Jr., may also have been

13    choosing to protect the stash there doesn't affect what the

14    evidence does show as to Mr. Faison.

15         And that's why we think that for the felon -- yes,

16    possession with intent to distribute, which we think is at

17    least aiding and abetting and complicit with, based on their

18    conversation immediately post arrest.  So that's what they were

19    choosing to talk about, was that everything is gone.  I think

20    the inference is certainly that refers to the drugs, the main

21    things that were otherwise seized from the house.

22         Also, I should mention Mr. Faison had the digital scale

23    in his room, which is another key tool for the manufacture and

24    then the distribution of these controlled substances.

25         So we do think -- I mean, absolutely -- and I can talk

1    more about the first grounds for applying the enhancement, but

2    it sounds like the Court doesn't necessarily need to hear more

3    about that in terms of the first degree assault, which we think

4    is plainly established by Mr. Faison's jail calls and

5    otherwise.  But we think, also, the drug crimes PWID and

6    manufacturing of the controlled substances, with the sentencing

7    standard, is enough to justify the enhancement.

8              THE COURT:  Understood.

9              MS. WRIGHT:  With respect to the obstruction of

10   justice, there were the two particular examples, and we think

11   there are many more of these, that showcase Mr. Faison's lying

12   at trial and attempting to mislead the Court and the jury,

13   which we think is very plain on the record here.

14             THE COURT:  Let me ask, because this is another one

15   of those where I have some philosophical issues, so you have to

16   bear with those thoughts.

17        Is it the government's position that any time an

18   individual goes to trial and chooses to take the stand, and the

19   jury rejects his or her testimony by virtue of their verdict of

20   guilty, that the two-level enhancement for obstruction of

21   justice should be applied?  Is that the government's position?

22             MS. WRIGHT:  No, Your Honor, it is not in the

23   position of this counsel, and that's what I can --

24             THE COURT:  You are the United States as you stand

25   there now.

1          MS. WRIGHT:  Yes, I am speaking for the United

2     States.  So, no, that is not the position.  I think certainly

3     here, for example, if Mr. Faison had --

4          THE COURT:  But what's the -- I'm sorry, you were

5     about to answer the question I asked.  Go ahead.

6          MS. WRIGHT:  Yes, I was trying to answer the

7     question.  But if Mr. Faison had testified to what the

8     government believes are the facts --

9          THE COURT:  If he got on the stand and confessed, you

10    wouldn't --

11         MS. WRIGHT:  Well, no, not at all, Your Honor.  I

12    think part of the issue that we have with the story that we

13    believe Mr. Faison patently made up for trial is that it shows

14    that he believes he was not justified, because he is making up

15    additional facts, like the fact that he was going to the police

16    and this supposed claim that the counterparty to the road-rage

17    incident had this weapon, that if he were actually justified --

18    I mean, they're sort of fabricated to meet the defense,

19    unfortunately.

20         Whereas, if he had gotten up and said the story of this

21    guy came -- did follow us to the house, independently of

22    whether he was led there, the guy was definitely a bad actor in

23    following to the house, and he said "I know where you live at;

24    I'll be back," and then Mr. Faison was going after him with the

25    guns, maybe just if he hadn't said he was trying to kill him,

1  but perhaps if the truth had been that he was just going after

2  to try to really scare him off, then that kind of testimony --

3        THE COURT:  That would be a confession.  So what you

4  just said -- that's my exact point I just made, right?  What

5  you just said would be enough to convict him.

6        MS. WRIGHT:  Well, if it didn't meet the elements of

7  the justification defense.  The problem for Mr. Faison is that

8  the true facts did not meet those elements, and so --

9        THE COURT:  So the jury determined.  So the jury

10  determined, and so he stands convicted of the charge.  But

11  you're not actually disagreeing with my original point, which

12  is that because he took the stand in his defense and the jury

13  didn't buy it, he gets an extra two levels.

14        MS. WRIGHT:  Not at all, Your Honor.  If he had

15  gotten on the stand and he had given the true facts, the jury

16  could have rejected it --

17        THE COURT:  What you see as the true facts.

18        MS. WRIGHT:  Yes, what we understand as the true

19  facts based on the statements he made in the jail calls, when

20  we don't believe he had any incentive to lie, if he had just

21  told that story, yes, he would have been convicted because it

22  would not meet the elements, but he would not get an

23  obstruction enhancement.

24        The point that I'm trying to make is that the reason for

25  the obstruction enhancement is because what he said at trial

1    directly contradicts what he said in the jail call recordings

2    and sort of everything else circumstantial as to how he was

3    behaving.  Someone who is on their way to turn in guns to the

4    police would in no circumstance, the government submits,

5    conceal those guns in his clothing, especially if he had just

6    happened to find these guns, miraculously, in a shockingly

7    unlocked trailer belonging to his brother in the circumstances

8    he described.  He would not put one vertically in his shirt and

9    the other one in his waistband, without even knowing if they

10   were loaded, and then jump in that car.  I think that is

11   absurd.  The fact that Mr. Faison, again, in the government's

12   view, fabricated that kind of argument is why we think the

13   obstruction enhancement is appropriate.

14        If he had told the truth, yes, he might have been

15   convicted, but there would be --

16        THE COURT:  If he had confessed.  If he had

17   confessed, you wouldn't seek the enhancement.

18        MS. WRIGHT:  Right.  And again, Your Honor, that's

19   not really what we're trying to say.  We're trying to say that

20   because there are all these contradictions in the story that he

21   told, and also because -- we believe, also, that his father was

22   enlisted to support this story and to claim that Mr. Faison had

23   said that they were going to go to the police, when that is

24   contradicted by all the facts of what they said once they were

25   stopped, and --

1          THE COURT:  To be clear, the position you're taking

2     is the position the office has been taking for generations.  So

3     this isn't, like, about this case.  It's a philosophical issue

4     that I've had for a long time.  And so it just is what it is.

5          MS. WRIGHT:  And I certainly understand the issue,

6     Your Honor, and I'm sorry I'm not -- I don't think I'm managing

7     to articulate my response exactly well --

8          THE COURT:  You're articulating it fine.

9          MS. WRIGHT:  There have been previous cases where

10    defendants have testified, in my personal experience, where I

11    don't -- I would have to look back since some of them are

12    multiple years ago, but it certainly is not an automatic rule

13    that then they are charged with obstruction of justice.  I

14    think the unfortunate fact may be often when this happens, the

15    government does end up of the view, with the additional

16    information that we have, that the defendant is lying.  But if

17    that weren't true, then there certainly would be no basis for

18    the obstruction enhancement.

19          That's also true and sort of analogous if someone goes to

20    trial to preserve a defense.  So, say, if Mr. Faison had done

21    that to try to preserve the interstate commerce legal

22    disagreement appeal or something to that effect, then there

23    would be situations where you could still receive the point for

24    acceptance of responsibility.  The guidelines do carve out the

25    types of behavior that do or don't warrant the enhancement.

1  And unfortunately, for better or worse in this case, the

2  government believes that Mr. Faison demonstrably lied at trial,

3  because what he says contradicts not only what he said

4  previously, with no incentive to lie, and the actual facts of

5  his conduct, and that's the basis on which we think the

6  obstruction enhancement has to apply.

7          THE COURT:  All right, understood.

8          MS. WRIGHT:  And I was starting to add briefly on

9  that, that, again, from the government's point of view,

10  Mr. Faison's father also adopted this story and was actively

11  misleading, in that his demeanor while answering the questions

12  between Mr. Faison and the government, where he talked a mile a

13  minute when Mr. Faison was having him tell the story, including

14  the points that were supportive of him, and then said, when the

15  government was cross-examining him, that he couldn't remember

16  what happened 10 minutes ago, and he was very resistant to

17  saying anything, shows that he was sort of enlisted in support

18  of the story that Mr. Faison was waiting for trial.

19      And we think that also, separately -- even if one were

20  choosing not to hold it against, specifically, the defendant,

21  their testimony, we think that other testimony, where

22  Mr. Newman, Sr., what he said was opposed to his original

23  interview and all the grand jury testimony, that that's a

24  separate additional step and could be a separate basis for

25  application of the enhancement if the Court is uncomfortable

1    with it as to Mr. Faison himself.

2        So we think, certainly, it applies as to Mr. Faison, but

3    also the fact that he was enlisting additional witness

4    testimony in support of --

5        THE COURT:  I apologize.  I might have missed this.

6    Other than another witness testifying consistently with him, is

7    there evidence that -- is there a jail call?  Is there

8    something -- and if you just said it and I missed it, I

9    apologize -- something that indicates he made some effort to

10   get another witness to testify falsely?  As opposed to just the

11   fact that another witness testified and wasn't believed by the

12   jury.

13       MS. WRIGHT:  We are relying on the fact, Your

14   Honor -- with the jail calls, I don't have them prepared to

15   play, so if I may proffer.

16       The government has listened to Mr. Faison's jail calls

17   during the course of the trial.  There were repeated references

18   where he was referring to his father sticking to the story and

19   not wanting him to talk about other things and referring to a

20   list of questions he had given him and that he didn't want him

21   to talk about other things, but none of it was sort of clear

22   enough in context that we thought that we would sort of be in

23   the position of charging obstruction or anything else like

24   that.  So there certainly were highly suspicious comments in

25   the jail calls.

1        Mr. Faison was also communicating with his family via

2   three-way calls and other ways that we wouldn't have full

3   access to.  We don't know if he was using other people's --

4   another person's account, which I would expect -- since he knew

5   well that the jail calls were being used against him, I would

6   think that was perfectly possible too.

7        But in the recordings that we have listened to from his

8   account, he was definitely saying things that are suspicious

9   but not some things that, yeah, we're prepared to submit as,

10  like, this shows that this was fabricated from that

11  perspective.

12       We're relying on the fact that the story --

13  Mr. Newman, Sr.'s story being completely new for trial, versus

14  what he had said in the two previous conversations, including

15  under oath before the grand jury.  And then when he was being

16  cross-examined, he basically said he hadn't understood anything

17  about the oath and he couldn't remember anything, which

18  undermined all of what he had just testified to.

19       Excuse me.  Let me get some water --

20            THE COURT:  Take your time, please.

21            MS. WRIGHT:  Thank you, Your Honor.

22            THE COURT:  Sure.

23            MS. WRIGHT:  Turning to the victim conduct

24  adjustment, so the downward departure -- unless there's

25  anything else --

1          THE COURT:  Nope.

2          MS. WRIGHT:  Okay.  So with respect to 5K2.10, for

3    the victim conduct, I think we did reply to this in our

4    response memorandum.  I think it does not apply here, partly

5    because, based on the statement that Mr. Faison made that he

6    was going home to get to them guns, we do know that Mr. Faison

7    knew the guns were there and had them before he went back to

8    his house and before anything with respect to the road-rage

9    incident happened.  So in terms of his accountability for

10   having these firearms, he was fully accountable for it

11   independently of any victim conduct or anything to do with the

12   road-rage incident.

13         We also would say, again, that we take the fact that

14   Mr. Faison, in the government's view, embellished the story,

15   with the idea of going to the police and with this supposed

16   weapon that the victim in the road-rage incident had, shows

17   that he was not justified, that even he thinks that he did not

18   have the reason to do what he did, in retrospect, so that he

19   had to fabricate these additional facts to make it appear

20   justified.  We think that also undermines any applicability of

21   this adjustment.

22         We do refer the Court to -- and I hope the Court had the

23   opportunity to view the statements by the victim and the

24   other -- and the lady in the vehicle right after the incident

25   that we submitted as exhibit C to the sentencing memorandum,

1  because I think those are very telling, and the Court was able

2  to, I mean, read their body language.  I'd note that exhibits A

3  and B to the sentencing memo, where they gave those statements,

4  were completely consistent with each other in what happened.

5  There was no suggestion, as the government reads it, that there

6  was an attempt to get their stories straight or exaggerate

7  anything.  They were both clear that they didn't -- or at least

8  the gentleman who was the one who was more involved in that

9  didn't see the gun.  He was not -- it's not like they were

10  throwing out any idle accusations.  They were describing what

11  happened.

12       And, again, certainly what they did, in the gentleman

13  following Mr. Faison to the house, no one would want that, but

14  the fact that Mr. Faison, again, is a bigger gentleman, the

15  factors listed in the guideline don't count in his favor, and

16  he could at any point have done a number of things, the

17  government thinks, to defuse the situation, which he refused to

18  do.  He could have gone directly to the police station, since

19  he knew they were going followed.  He could have haled a

20  passerby.

21       At least Mr. Newman, Sr., had his phone, and if there had

22  been a threat that he perceived, they could have used the

23  phone.  There was -- Mr. Faison's mother testified that there

24  was a security system at the house.  So they could have taken

25  other steps once they got back to the house as well.

1          So we think all of those things render that downward

2     departure inapplicable.

3          And the same arguments basically go for the coercion or

4     duress departure similarly.

5          Again, we think that if -- the fact that Mr. Faison is

6     embellishing the story, and we think that is established by the

7     contradictions between what he said when he didn't have an

8     incentive to lie and what he said at his trial, shows that he

9     did not feel threatened in the manner that he was trying to

10    lead the Court and the jury to believe.

11         Even if he had in that situation, that would not provide

12    him any defense for the fact that he had the guns.  The

13    ammunition in his room, we submit, is established by the

14    evidence, and he had the guns -- he was aware of the guns

15    before he went back, before anything had happened with the

16    road-rage incident at all.  So neither of these two adjustments

17    actually insulates him from accountability for the guns that he

18    knew were there and before anything at all happened, because he

19    had armed himself with them.

20         THE COURT:  All right.  Thank you.

21         Mr. Faison, you can address any or all of the issues that

22    are on the table, which includes the stolen firearm

23    enhancement, the enhancement for possession of the firearm or

24    ammunition in connection with another felony offense, the

25    two-level obstruction enhancement, and the 5K departures that

1   you have requested.  So I'll hear from you on as many of those

2   as you wish to address.  I, obviously, did review what you

3   submitted in writing.

4                    **ARGUMENT BY THE DEFENDANT**

5            THE DEFENDANT:  Okay, I'll start with the two-level

6   enhancement for the stolen, since that's where the government

7   started at.  I'm taking a look at 2K -- what did I do with

8   that?

9            THE COURT:  2K2.1(b)(4).

10           THE DEFENDANT:  So if you look under note 8, it tells

11  you how to apply Section (b)(4), and it goes into several other

12  sections of 922 and 924, but they're specific offenses dealing

13  with the firearm being charged that's stolen, as in actually

14  being charged in the count.  When you read them, it tells you

15  that the offense level for these two -- or these four, rather,

16  would start at 12.

17           So, basically, the only reason that I would receive a

18  higher number is because I'm a felon at the time.  Those four

19  actually don't require the felon holding.  And I kind of agree

20  with the Court that this two-level enhancement is an increase

21  for a firearm that there's no way I can actually know that it's

22  stolen.  I mean, being a felon, I wouldn't get it through any

23  means other than outside of purchasing through the store.  So

24  even if I bought it from an individual and lied to them about

25  my status, I still can't know whether or not the firearm I'm

1  purchasing is stolen.

2       That being a factor, I would ask the Court to consider

3  that you have a section that deals with the actual charge of a

4  stolen firearm, which is less.  In those four statutes, they

5  actually require that it be proven, and now you have a

6  situation where I'm being added two points, and they don't even

7  have to prove that I had knowledge of the stolen firearm.

8       As to the in connection with --

9            THE COURT:  Connection with another felony offense.

10  And I think -- as I indicated to the government, I think the

11  tougher of the two arguments for you to overcome, so you may

12  want to address this first, the government makes the point that

13  if I accept what you said in the jail calls, that you were

14  going after these individuals with the intent to do them

15  serious bodily harm, and so that would be sufficient to show

16  that you possessed that firearm with the intent to commit at

17  least first degree assault.  So I'd be most interested in

18  hearing your argument as it relates to that.

19            THE DEFENDANT:  Well, I believe the actual calls

20  they're dealing with, it doesn't specifically say that I was

21  going after them.  I think the statement I made was "God saved

22  him and he saved me because I was going to kill him."  And in

23  reference to that it was dealing with what was taking place

24  right at that moment, as in if you come at me trying to harm

25  me, I'm going to defend myself because I don't know what you're

1  trying to do to me.

2       THE COURT:  But don't the calls -- if you listen to

3  the calls, don't -- and we're talking about a preponderance

4  standard here -- are you saying that one does not come away

5  with a pretty clear belief that you were going after them with

6  those firearms?  You're saying that's not what I should take

7  from those calls?

8       THE DEFENDANT:  Well, I would rather you re-listen to

9  them because there's a difference in, oh, yeah, I was going to

10 get him and, oh, I'm going to kill him if he tries to harm me.

11 And the problem with semantics is I may communicate with you

12 one way; I may communicate with this individual a different

13 way.

14       In addressing that, there's, like, the conversation

15 between me and my brother.  My brother is asking me the

16 question why would you do that.  I know what he's asking, but

17 an outside person wouldn't understand that he's saying if this

18 man didn't have a gun in his hand, why would you pick up one,

19 and that's why I'm saying to him what would you do; you don't

20 know what's going on.

21       And then you have the portion dealing with me saying I

22 didn't see anything in his hand.  It wasn't in reference to not

23 seeing the metal.  It was in reference to, okay, I don't see a

24 gun, but that doesn't mean he doesn't have one.  I have to be

25 ready for that type of situation.

1      And, once again, in semantics, my brother understands

2  what I'm saying to him; I understand what he's saying to me.

3  But if I speak to my mother, my mother isn't going to

4  understand that.  She wouldn't know that, in reference to

5  having that conversation, I'm talking about he already saying

6  why would you pick up a gun if it ain't necessary.  I'm saying

7  to myself, regardless if I see a gun or not, to me it's

8  necessary.  I don't know what you're going to do.  I have to

9  think about the circumstances.  We're in a --

10          THE COURT:  Here's a quote from you, sir.  "I was

11  getting ready to go kill him, and I got caught with the guns."

12  How do I not find that there's a preponderance of the evidence

13  that you had those firearms, and you were on the way to go do

14  those individuals harm?

15          THE DEFENDANT:  Well, there's two ways to look at

16  that.  Once again, it's the individuals that I'm talking with,

17  and when I'm talking with them, I'm talking with them inside my

18  head, as in this is the frustration.  Like, you saying that

19  you're going to do something to me, you're going to do

20  something to my family, I'm going to come kill you for that;

21  you're not going to come back here.  But it's not my intent.

22  It's taken as I intended to do that, but it's not my intent.

23      The trial testimony and Mr. White's affidavit that he

24  wrote for Ms. Eidell all shows clearly that he says the man

25  didn't threaten me.  As a matter of fact, he didn't say

1    anything to me.  He was just standing there.  So if I intended

2    to go do something to him, I could have did it then.

3         Now, you have one report that says, oh, they ran into the

4    house.  Now, it's conflicting, which I understand, and because

5    we didn't have him to clarify exactly what he said and what was

6    true, we have to go on which one actually I'm willing to

7    believe.  And as I said, when I stepped out of the trailer, I

8    see him, he's getting out his car, he's standing at his door,

9    he has the bar in his hand.  So all I did was step back in and

10   look for something to protect myself.  When I found those

11   firearms, the question of whether or not I knew my brother had

12   firearms or that I knew there were firearms in the house does

13   not make a difference.  The crime is felon in possession.

14   These are factors that when the Court consider it, they have to

15   consider what actually took place.  There was no following of

16   him.

17        My father testified he didn't get in his vehicle to try

18   to chase anyone.  He came out the house.  He was going to work.

19   I hopped in the vehicle.  He didn't even know I had the guns.

20   I didn't say come on, dad, let's go do this to this person.  My

21   father is 70 years old, just had two knee surgeries.  All it

22   was was, dad, we need to go to the police department.  My

23   father doesn't need to know any specifics because I know how my

24   father is.  It would have been an issue because the first thing

25   he would have said was I done told this boy.

1          And like I said, my frustration, the first calls are

2     coming from anger, frustration, loss of common sense.  As I

3     told you in my letter, my mother told me don't let these young

4     guys trick you into anything.

5          And it was a perfect example of how me feeling a certain

6     way made me speak a certain way, but it wasn't an intent.  It

7     was just what I'm thinking, what I'm going through in my head.

8     And a lot of people that I'm speaking to, you'll see that I

9     might have had that conversation one time.  So you're hearing

10    partials, and you're not hearing when they ask me questions.

11    The whole 15-minute call, their questions, well, why did you;

12    well, why didn't you, and I'm -- so I'm frustrated about being

13    in prison because, to me, even though I accept responsibility

14    for what I did, I don't feel that I should be punished in this

15    type of way just for me trying to say, please, I don't want to

16    hurt you, I don't want you to hurt me, but I'm going to stop

17    you from doing anything to me and my family.  And that's what

18    was going on in these conversations, is what's going on in my

19    head.

20         So in addressing the statements, all I can say is this is

21    what they came from.  There was no intent behind it, and

22    there's nothing to show, other than me making the statement,

23    that there was intent.  Mr. White's affidavit showed I never

24    did anything threatening.  I never tried to approach him.  He

25    even says that I just stood there and looked at him as he went

1    through whatever he went through.

2         So the enhancement itself, in connection with -- I mean,

3    there's three or four other things that they go through.  The

4    possession of the drugs in the room.  I think there was another

5    one that I don't quite remember.  But the commentary dealing

6    with "in connection with" actually has it to where the offense

7    of conviction has to have some connection with the part that

8    the enhancement coming from, and I didn't -- the way I printed

9    this out, I didn't get the actual case --

10        THE COURT:  But even if I accept that as a guiding

11   legal principle, in this case, the firearm you have in your

12   hand, isn't it connected to the ammunition in your room?

13   Understanding you were acquitted of that conduct, but I'm sure

14   you understand I can still consider it.  Isn't the firearm

15   connected to the ammunition?

16        THE DEFENDANT:  Well, the connection is only in the

17   caliber of ammunition.  Because the firearms were found outside

18   the home, and they were found in possession, and they were

19   found as we were driving, I don't see how there can be a direct

20   connection with the drugs found in the home.  It's more or less

21   that you're taking the ammunition and saying, okay, the

22   ammunition fits the firearm, so it's in connection with the

23   drugs.  But the offense of conviction is possession of

24   firearms, and that means if you're trying to give the

25   enhancement, then the enhancement needs to connect to the

1   offense of conviction, not something from another part of the

2   offense.  The actual offense is possession, and there's no

3   connection to those drugs in the home except in the

4   government's perceived connection, oh, he had to have these

5   guns to protect the drugs.

6          Once again, they're asking me to infer that my brother

7   did or did not, whatever the case may be.  Once again, I didn't

8   have nothing to do with his case.  His case is his situation.

9   I've been asking that that not be implied in mine, but it seems

10  to keep falling that way.

11         In order for me to put forth an argument against all of

12  this, it basically -- I have to tow the line on, well, Your

13  Honor, as you can see, this is what's going on.  Does it have

14  anything to do with me?  No.  But the implication is it's in my

15  room, you must know about it.  But then I would have to say,

16  well, Your Honor, I'm not rarely there.  It's my room.  I have

17  to be in principle of being on supervised release, but most of

18  my time is spent at my baby mother's house.  The transference

19  of those things, if my brother goes in here and does things and

20  get absent minded, I don't be in the room enough to say, oh,

21  where the heck this come from.  When you see the drawer, the

22  drawer just has miscellaneous stuff.  He put something in

23  there.

24         Once again, I don't want to focus on that because, like I

25  say, he has a situation, and I don't want it to seem as if I'm

1   saying, oh, yeah, I know about this; he did this; this was the

2   situation.  The enhancement itself has to deal with the

3   possession outside the home because it says the offense of

4   conviction.

5          THE COURT:  All right, I understand your argument on

6   that.

7          5K, your argument.

8          THE DEFENDANT:  Obstruction of justice.

9          THE COURT:  I'm not going to apply the obstruction of

10  justice enhancement, so we don't have to spend more time on

11  that.

12         5K2.10

13         THE DEFENDANT:  Victim conduct.  It's clear, Your

14  Honor, what we've never addressed is why or how did this man

15  even get to being in this situation with me.  Without him, it's

16  left to me to argue that, well, this is what this man is doing.

17  Anyone can see that it's plain.  The gentleman followed us for

18  several minutes.  And, yes, we could have did this; yes, we

19  could have did that.

20         In one of the phone calls you hear me say I told my

21  father, dad, just go home; if he follows us home, I'll deal

22  with it.  There was an implication that that meant, oh, he

23  knows he's going to get behind.  What I'm saying is, hopefully,

24  this man will go about his business, but if he does, I'm the

25  one with you; I'll deal with it.  It had nothing to do with the

1   guns itself.  It's any situation.  If I was going to a store

2   and someone tried to harm my father, I would be the one to step

3   forward.  You try to harm my mother, I would be the one to step

4   forward.

5        We still, to this day, don't understand.  Okay, somebody

6   cuts in front of you.  What makes you chase them throughout the

7   street and consistently try to stop and impede them from moving

8   and then try to get out your vehicle?  What are you intending

9   to do?  What's in your mind?

10       I need the Court to understand my mindset.  I'm coming

11  from being in prison, where everything is reactive.  You can't

12  let a person say they're going to do something because it will

13  actually cause you harm or cause you death.

14       And then all of these situations that we read in the

15  newspaper and see on the news.  Just the other day I sat there

16  and watched the news report.  A young guy shot somebody's

17  mother through their house because the son sold him a car that

18  broke down.  These are the type of things that put me in the

19  state of mind that I was in.  And it wasn't that I intended to

20  harm this guy, because if I wanted to harm him, I could have

21  harmed him.

22            THE COURT:  But you do understand, though,

23  ultimately -- because we can sort of get almost sidetracked --

24  and I've been thinking about this point as I prepared for

25  sentencing, right?  The conviction here isn't for you going

1   after them with the firearms.  The conviction is for possession

2   of the firearms.  The fact that you put them in your hand that

3   day, I think maybe you might have an argument that the victim's

4   conduct compelled that.

5        But to the extent that there seems to at least be a

6   pretty strong argument that, at the very least, you jointly --

7   like, you knew where to go for these firearms.  I don't accept,

8   I never have accepted the argument that you just happened to go

9   looking for something to fight them back with and stumbled into

10  these firearms.  I know that was your position.  I don't accept

11  that.  You knew where those firearms were because you and your

12  brother, perhaps, jointly possessed them.

13       And so how is that -- and you might not accept what I

14  just said, and that's fine, but I'm giving you the benefit,

15  just like I did for the government, of where my thoughts are to

16  see if you want to push back on that.  How is the fact that you

17  possessed those firearms with your brother, you knew exactly

18  where to go and get them, how is that justified at all by the

19  road-rage incident?

20       THE DEFENDANT:  Well, first of all, I've never not

21  said that I didn't know that my family members owned weapons.

22  Where exactly they were, I never knew specifically.  But the

23  point is at the time that I took possession of the firearms,

24  it's because of the perceived threat that I feel, and we

25  wouldn't have never got to that point if this man had just went

1   on about his business.

2          THE COURT:  You would have never put them in your

3   hands --

4          THE DEFENDANT:  Yes.

5          THE COURT:  -- if that never happened.  But they

6   would have still been possessed by you and your family members

7   jointly.  That's my view.  I'm giving you the opportunity to

8   tell me where I'm wrong.

9          THE DEFENDANT:  Actually, I've never possessed a

10  firearm -- I haven't picked a firearm up since 1999, which is

11  my first federal conviction for possession of a firearm during

12  a drug trafficking offense.  Because of the penalties for that,

13  I chose not to ever pick up a gun.

14         And once again, like I said, I'm not saying that I didn't

15  know that there were firearms, but I did not know --

16         THE COURT:  And you were able to exercise control

17  when you felt necessary.

18         THE DEFENDANT:  Actually, no, I never knew where the

19  firearms was.  As I said, I can make assumptions and I can make

20  beliefs, but the 52K -- the 52K.10 and 12, basically, it's

21  coming from my reaction to him, and because of his conduct,

22  this is why I took possession of firearms.  Otherwise, I would

23  have never taken possession of the firearms.

24         As I said, the question that my brother is asking me, why

25  would you do that, it came from look at the circumstances; you

1   would have done the same thing.  Not that, oh, yeah, I'm going

2   to go get the firearms, and I'm making this statement to my

3   aunt, and I'm saying, oh, well, I'm trying to get next to these

4   guns.  I'm saying to her that I want to protect my family, not

5   that intended to go get guns to do anything.

6           THE COURT:  I understand your argument on these

7   points.  Anything else?  You'll still get an opportunity to

8   address me in a more general sense on what your sentence should

9   be.  Anything else in terms of guideline issues?  I think we've

10  covered everything but --

11          THE DEFENDANT:  I just have one point which is

12  dealing with the extended clip, because that's out there.  It's

13  a part of the two-level enhancement for the base offense,

14  taking it from 20 to 22.

15          THE COURT:  I didn't realize that was something you

16  were challenging.  Okay.

17          THE DEFENDANT:  I know the argument was about the

18  drug conviction but --

19          THE COURT:  You're challenging that this was a

20  semiautomatic firearm?  Is that --

21          THE DEFENDANT:  Right, I'm challenging the

22  large-capacity magazine portion of it, because without that, it

23  goes to 20.

24          THE COURT:  I see that.  Okay.

25          THE DEFENDANT:  And I had always made the argument

1   about that particular gun anyway, which is, under the law,

2   following the Constitution, there must be a commerce nexus in

3   order for the federal government to have any regulation over

4   it.  And even though I know the Court is considering whether

5   you had it in your possession, I can consider it --

6            THE COURT:  I'm sorry.  You're not arguing that it

7   wasn't a large -- you're not arguing that it wasn't capable of

8   accepting a large-capacity magazine.  You're arguing that that

9   item, because there's question about where it was manufactured,

10   is not covered by the commerce clause.

11            THE DEFENDANT:  Well, I'm arguing both points.  I'm

12   just addressing the commerce point right this moment.

13            THE COURT:  Okay.

14            THE DEFENDANT:  As the gentleman testified, there was

15   no commerce nexus for that particular firearm.

16        As to the extended magazine, it was never established

17   that it was able to hold more than 15 bullets inside of the

18   magazine, and because that wasn't established, that's another

19   point where the enhancement -- rather -- using 22 rather than

20   20 would come into play.  Without one of these two things, it's

21   virtually impossible -- we're making the assumption that

22   because of the type of firearm, that it was a magazine that

23   holds 15 bullets, but they make firearms with the same length

24   magazine, but it wouldn't shoot more than 10 at a time.

25   Without these, I'm saying that I should be at 20 rather than

1  starting at 22.

2      THE COURT:  All right.  What's the government's

3  response to that last point?

4      MS. WRIGHT:  Your Honor, two points.  Special Agent

5  Leonard testified clearly this morning that the magazine would

6  hold 30 rounds.  So I think that fully answers the question of

7  its capacity for this purpose.

8      In terms of the interstate nexus, the government's

9  position is that that doesn't apply separately from its merits.

10  It doesn't apply with respect to the enhancement because the

11  question here is just whether the events involved this type of

12  firearm.  This was the second firearm on his person at the time

13  of the offense, and while interstate commerce is an element for

14  the actual charge under 922(g), or purposes of whether this was

15  a firearm involved in the offense, which was also on his

16  person, interstate nexus just doesn't come into play under the

17  guideline.

18                    **THE COURT'S RULING**

19      THE COURT:  All right, so there are a number of

20  guideline-related issues that we have spent all day addressing.

21  For those in the audience, there are two stages to a sentencing

22  in federal court.  We've spent all of our time thus far on

23  stage one, which is where the Court has to determine what the

24  advisory guideline range is for the offense of conviction, and

25  then after that, in just a moment we'll go on to what the

1    appropriate sentence would be.

2         As to the very first issue, the issue we addressed or

3    dealt with this morning, which is whether the conviction -- I

4    just want to get it in front of me -- whether the defendant's

5    conviction for attempt to possess with intent to distribute 500

6    grams or more of cocaine qualifies under the guidelines as a

7    controlled substance offense, I find that it does not.  I find

8    that -- my first question, as I had indicated during argument,

9    I broke the argument down into two pieces.

10        Let me also say, as I indicated before, I am going to

11   write something on all this, so I'm not going to go through

12   chapter and verse here.  I'll just give some quick highlights.

13        But as I looked at this issue, I broke it down into sort

14   of two questions that the Court had to answer.  The first one

15   was *Dozier* binding on the Court in this case, and I determined,

16   upon review of the case itself, that it's not.  Footnote two

17   explicitly says that it's not addressing the issue before the

18   Court here, which I think gives the Court the opportunity to

19   address that without feeling bound by the holding in *Dozier*.

20        So then once I get past that, then I have to decide

21   whether or not it's applicable or not.  Simply reading the

22   language of 4B1.2(b), the definition, I find that the guideline

23   just doesn't cover attempt for the reasons stated by the D.C.

24   Circuit Court.

25        The other issue that I then spent some time considering

1    is, in looking at the 4B1.2(b), the term "controlled substance

2    offense" means an offense under federal or state law punishable

3    by imprisonment for a term exceeding one year that prohibits,

4    and it goes on to list specific things.  One of the questions

5    was, well, is attempt, in effect, a lesser included of an 841

6    conviction.  Because, clearly, 21 U.S.C. 841 would be covered

7    by 4B1.2(b), whereas 846, the attempt statute, would clearly

8    not be.

9         We've done some initial research, and I'll do some more

10   before I put this into writing, but as I look at it as I sit

11   here now, it would seem, if nothing else, superfluous for there

12   to be an entirely separate statute for attempt, which is 21

13   U.S.C. 846, and then to also say that attempt is a lesser

14   included of 841.  There's no language in 841 that deals with

15   attempt.  846 is its own separate offense, and I find that he

16   was convicted under 846, which is not covered by 4B1.2(b).

17        As a practical matter -- and maybe I'll be more careful

18   about this in the future -- I do think we frequently just list

19   841 there, but when you really hash it out and look at it, I

20   think the conviction falls under 846.  That's what he was

21   convicted of.  I don't find that that qualifies as a controlled

22   substances offense for the purposes of 4B1.2.

23        Next, we turn to the two-level enhancement for -- oh, I

24   should also say briefly -- I didn't put this in my notes until

25   just now.  I do, however, find that it was a large capacity --

1  or capable of holding a large-capacity magazine, that is, that

2  it was able to hold more than 15 bullets based on the testimony

3  that was received earlier.  I don't think the interstate

4  commerce clause -- although it obviously applies to the count

5  of conviction.  Once the government has gotten past that

6  hurdle, I don't think I then have to apply it to whether or not

7  I consider that additional conduct, the possession of that

8  additional firearm, for purposes of guideline calculations.  So

9  I do reject that argument of the defense.

10       So we start out with a base offense level of 20.

11       Then in terms of the two-level enhancement for stolen

12  firearm -- and I'm flipping back and forth, so you'll have to

13  bear with me a little bit because we have a number of things we

14  are considering.  I have discussed sort of my distaste, I

15  guess, for this particular enhancement in a circumstance such

16  as the one we have here.  Certainly, in a case where the

17  defendant himself stole the gun, in a case where the defendant

18  himself is aware that the gun was stolen, I have no concerns at

19  all -- and I've seen cases where those things were true, and in

20  those cases I have no concern about applying it.

21       It does give me pause, significant pause in situations

22  like this one, where there is no evidence of those things.  So

23  it is -- and Ms. Wright put it well -- sort of just being

24  applied in a strict liability sort of way, which, frankly, I

25  think goes against the nature of individualized sentencing and

1    the idea that I'm trying to determine how this defendant

2    compares to other defendants convicted of the same crime.

3         Now, having said all that, the language of the actual

4    guideline is such that there's really no wiggle room for the

5    Court to say it doesn't apply as a technical matter.  It simply

6    says "if any firearm was stolen, increase by two levels."

7    There's no argument that that's not met here.

8         So for the record, I find that that enhancement applies,

9    but I'm also saying that, you know, whether we call it a

10   variance or just in terms of how I am processing it for 3553

11   purposes, I'm not considering it in terms of the ultimate

12   sentence.  So in calculating the guidelines, just to make the

13   record clear, it applies, but I ultimately will vary away from

14   actual use of that.

15        Regarding the four level -- so anyway, because I am

16   finding it applies, it does move the offense level to a 22.

17        A four-level enhancement related to possession of the

18   firearm in connection with another felony offense -- I'll

19   address both issues in writing, but I am going to find -- in

20   the interest of time, I'll just say that I am going to find it

21   does apply because I do find that he possessed the firearm with

22   the intent to commit first degree assault, and I find that

23   based on the jail calls indicating as such and the fact that

24   he, in fact, had them in his position.  So I do find that that

25   four-level enhancement applies.

1          I have other thoughts on the drug offense for the

2     ammunition in his bedroom, but I'll deal with that in writing.

3          This enhancement does apply for the reasons I just

4     stated.  So that brings us to a 26.

5          As I've already indicated, I'm not going to apply the

6     obstruction-of-justice enhancement.  Simply looking at the text

7     of 3C1.1, I don't think it should be applied to a situation

8     where a defendant testifies in his own defense and is just

9     disbelieved by the jury.  I don't think that's what it's

10    intended for.  I think obstruction of justice -- if this were a

11    situation where he had done something to try to get his father

12    or someone else to testify falsely, if there was evidence of

13    that, I would certainly consider that obstruction of justice.

14    I do not find that in this scenario, under these facts, that

15    that should be applied.  If necessary, I'll also flag it as a

16    policy disagreement, which is another basis for the Court to

17    reject that enhancement.

18         So that brings him to an offense level of 26.  Although,

19    if I were not to consider the two-level enhancement for the

20    stolen firearm, that would make him a 24.

21         He has six criminal history points, plus he gets two

22    additional points because he was under a criminal justice

23    sentence at the time of this crime, which gives him a total of

24    eight points.  He is a criminal history category four.

25         So I calculate his guidelines as offense level 26,

1  criminal history category of four, which means his advisory

2  guideline range would be 92 to 115 months.

3      I'll note for the record, again, my concern with the

4  two-level enhancement for stolen firearms.  So if I were to

5  sentence him as a 24, his guideline range would be 77 to 96

6  months.

7          THE DEFENDANT:  Your Honor, if I may --

8          THE COURT:  Just give me one second, because I did

9  forget to also address the defendant's arguments -- there's a

10 lot to work through here, so you'll have to be patient.  And

11 then anything I got wrong, you'll have a moment to tell me.

12     As to his arguments under 5K2.10, which go to issues

13 related to the victim's conduct, as well as the issue of

14 coercion, I do not find that those apply here for primarily the

15 point that I made in my discussions with Mr. Faison, which is

16 that given the evidence as it came in, it is certainly clear to

17 this Court he knew where those firearms were; he had the

18 ability to exercise power and control over them; he

19 effectively -- not effectively.  The Court would find that that

20 would be sufficient for joint possession.

21     So even if one assumes that he was coerced or the

22 victim's conduct pushed him to put the guns in his hand, those

23 factors do not apply to his actual possession of the gun, which

24 I find that, under the facts, he possessed the gun before he

25 actually touched them that day.  So I find that those downward

1   departures do not apply.

2        Certainly, the nature of the events in total will be

3   considered in the Court determining his ultimate sentence, but

4   that is how I determine the guidelines.

5        Mr. Faison, you wanted to be heard on something.

6        THE DEFENDANT:  Yes, sir.  There were two arguments

7   that I made that I forgot to address for the Court, if we can,

8   before you go further --

9        THE COURT:  Very briefly.

10       THE DEFENDANT:  The one is dealing with the prior

11  conviction on the three points for the 1997 conviction.

12       THE COURT:  After I've already ruled -- I'll let you

13  be heard.  Go ahead.

14       THE DEFENDANT:  The problem is this was one of the

15  main issues that I believe that I made the argument that the

16  three points shouldn't apply to that particular conviction

17  because of the time period, and for purposes of appeal, I

18  believe I would need to address it.

19       THE COURT:  I'll give you two minutes, if you need

20  that long.

21       THE DEFENDANT:  Just if you take a look at it, the

22  PSI gives it three points, stating that 4A1.2(k), which

23  4A1.2(k) says if you have a revocation and you have the

24  original prior, they should be added together to give you one

25  sentence, which, the way that it's been applied, it would give

1  you three points.

2  My argument is if you look at it, the original sentence

3  stems from 1988.  That would put that original sentence at 25

4  years.  The next violation which I received a sentence from

5  would be 2003.  That would put that in 15 year.  The sentence I

6  received from it was a six-month sentence.

7  Applying 4A1.2(e), if you count it correctly, 4A1.2(e)

8  would put this at the 10 year mark, which means it's out of

9  time.  The way they're applying it, they're taking it and

10 saying, okay, we're going back 25 years, coming forward 15

11 years, adding them together to make them count to make it a

12 three point.

13 If you look at my prior PSR from New York City, and this

14 was in 2009, when the sentence was 11 years old, they only give

15 me two points for that particular charge.  Now, whether this

16 was a mistake or incorrect, I don't think that really makes a

17 difference, but it would be strange to find me at two 11 years

18 after the conviction, and then now, almost 25 -- well, 15 years

19 after the conviction you're giving me three?

20 I believe if the Court applies it the way it's supposed

21 to be applied, which 4A1.2(e) requires that the applicable time

22 period be counted first, not go to 4A1.2(k) and take a 15-year

23 sentence and a 25-year sentence, add them together and make

24 them accountable.

25 As to the other issue, it was the enhancements for the

1    stolen firearm --

2              THE COURT:  Well, that's been addressed.

3              THE DEFENDANT:  Right, but the issue that I wanted to

4    bring up was an *Alleyne* issue as to those three, which is the

5    stolen firearm, the large capacity magazine, and the criminal

6    justice sentence.  Because I think the Court may take issue

7    with it if I bring it to them and never had addressed it in the

8    lower court, I just wanted to address that, which is *Alleyne*

9    says that any facts that raises the floor of my applicable

10   guideline range has to be alleged before the jury.  So just for

11   argument sake and for preservation, those three issues I would

12   like to be placed under *Alleyne*.

13             THE COURT:  I'll hear from the government,

14   particularly on the first issue that was raised, but you can

15   address both.

16             MS. WRIGHT:  Thank you, Your Honor.  With respect to

17   the calculation of the criminal history category, the

18   government reads the guidelines sort of on their plain language

19   the same way that Probation did.  This had been brought to

20   Probation's attention and they --

21             THE COURT:  I see that.

22             MS. WRIGHT:  -- and they did the calculation, and I

23   think that is a fair reading of the guidelines.  I don't think

24   we can account for why the previous PSR calculated it

25   differently.  I think based on the way the guidelines read,

1  this calculation is correct.  So we do support the PSR's

2  conclusion on the criminal history point.  And, yes, like the

3  Court, we had assumed that was no longer being disputed at this

4  time.

5       With respect to the *Alleyne* issue, it's well established

6  the relevant conduct and the other facts can be taken into

7  account for purposes of sentencing.  These aren't any facts

8  that need to be alleged and proven to the jury, so we'd

9  certainly take issue with that position as well.

10      THE COURT:  So I had reviewed the presentencing

11 report and the fact that the objection had been raised to the

12 presentencing report writer, and the presentencing report

13 writer detailed the response to that on page 29, the third -- I

14 guess second full paragraph.

15      So for the reasons articulated, I'm going to deny

16 defendant's request on that issue, although he has now

17 preserved it for the record.

18      And likewise, for the reason the government just

19 articulated, I deny his argument as to the manner of proof,

20 whether or not it needs to be in the indictment or not.  I

21 reject that argument for the reasons articulated by the

22 government.  That is also now preserved for the record.

23      Anything else as to the guidelines that we have not

24 addressed?

25           THE DEFENDANT:  No, Your Honor.

1            THE COURT:  Anything else from the government?

2            MS. WRIGHT:  No.  Thank you, Your Honor.

3            THE COURT:  So now we are finally prepared to move to

4    the 3553(a) factors.  Obviously, I did already have an

5    opportunity to review the victim impact statements.  I don't

6    know if any are here presently that you wish to present to the

7    Court.  If not, I'll hear from you, Ms. Wright.

8            MS. WRIGHT:  No, none are present, Your Honor.  Thank

9    you.

10           THE COURT:  I should also note while we're -- it

11   would seem to make sense that we address the violations of

12   supervised release.  I'll hear argument from you on both of

13   those issues.  It seems like given that -- well, one, I'm also

14   looking at the time, and so I'm not going to go back through it

15   twice.  But it seems like given that the violation stems

16   entirely from this offense, I'll hear your recommendation as to

17   sentencing on this case, and I'll also hear from you at the

18   same time as to your recommendation for how I handle the

19   violation of supervised release.  If you need a minute, now

20   that I've perhaps thrown you off, you can take a minute, but

21   you can address both at the same time.

22           MS. WRIGHT:  Thank you, Your Honor.

23           THE COURT:  Just for the record, the violation of

24   supervised release is docketed at GJH-18-607.

25           **ALLOCUTION BY MS. WRIGHT FOR THE GOVERNMENT**

1            MS. WRIGHT:  Thank you, Your Honor.  So looking first

2    at the 3553(a) factors here, the government does continue to

3    recommend its sentence of imprisonment of 10 years for the

4    defendant, and that is for the reasons subscribed in our

5    filings leading up to the hearing and based on the evidence at

6    trial and presented this morning.  We understand that with the

7    Court's calculation of the guidelines, this would be a slight

8    upward departure for the guideline range for offense level 26.

9            THE COURT:  That's correct.

10           MS. WRIGHT:  Thank you, Your Honor.  And then a

11   somewhat more substantial upward departure with respect to the

12   offense level 24 that the Court is otherwise considering.  But

13   we do think, based on the other aggravating factors here -- or

14   upward variance, excuse me -- that based on the various factors

15   here, a 10-year sentence is the appropriate sentence in this

16   case, considering all of the other factors.

17           So the defendant seeks to cast himself as a protector,

18   but the evidence in this case shows that he is not.  The

19   evidence shows truly that this defendant is a danger to the

20   community.

21           The government does not belittle favorable things that

22   the defendant has done in providing care for some members of

23   his family on particular occasions, which he mentions, and the

24   government does not condone that the counterparty to the

25   road-range incident was the initial aggressor at the time of

1  this offense, but we are very concerned about the fact that the

2  defendant did nothing, despite things that were in his power to

3  do, to deflect the situation or defuse it once that road-rage

4  incident came about.  He made no choice to apologize or reduce

5  tension or to go straight to the police department at that

6  point.

7        The evidence to the contrary shows that he exacerbated

8  situation at every turn.  The evidence showed that he led the

9  counterparty home in order to get the guns, in order to harm

10  himself.  Those guns were already at his house, and he knew it.

11  We think there is no other reading of the statements that he

12  has made in this case.  He possessed them, whether himself or

13  jointly with his brother, before anything with respect to the

14  road-rage incident occurred, and the evidence showed that the

15  92 remaining rounds of matching ammunition were in his bedroom.

16        We think the defendant's claims that he never knew where

17  the guns were, that he hadn't, quote, unquote, possessed any

18  firearm since 1999, are just plainly contradicted by the record

19  here and by the history of the statements that he has made in

20  this case.

21        As the Court has found, the evidence shows that he left

22  that house to find the counterparty, after this altercation had

23  occurred, in order to kill him, and, fortunately, the police

24  found him, and he was caught in the act.  But as he himself

25  noted, if the police had not been there to intervene, then we

1    could be here for a much different kind of case, and that's

2    only due to factors beyond the defendant's control, since he

3    lost control in undertaking the actions that he did on that

4    morning of September 5, 2018.  And we're basing this, again, on

5    his own words when he did not have an incentive to lie.

6         The evidence shows that the defendant is a manipulator.

7    The government referred in its closing argument at trial to

8    there being two stories.  As the defendant has continued to

9    speak, additional versions of the story continue to appear.  I

10   brought a version of the slide that the government had referred

11   to, with respect to the two stories, that showed that what the

12   defendant was saying at trial just did not match his previous

13   statements or what the true facts showed.  Certainly, it was

14   undisputed that there was a road-rage incident, and that was

15   unfortunate.  But at each further point, the defendant, as the

16   government views it, was trying to alter the facts, to

17   manipulate the facts, and change the story in order to make it

18   appear like he was justified and in order to conceal what

19   actually was happening.

20        In the evidence leading up to the sentencing hearing too,

21   there were even additional stories on various points.  In

22   exhibit G to the sentencing memorandum, the government enclosed

23   additional clips of body camera coverage of the defendant at

24   the time of the arrest.  In those statements, he claimed that

25   the firearms had been -- he found them under his house 15 years

1   prior.  Now, we know that can't be true because one of the

2   firearms was stolen only 10 years prior to that point, but it

3   goes to show that at each stage when he's being asked these

4   questions by the police, he is making up different accounts of

5   the events because the truth is not on his side.  The truth

6   shows that he was a danger to the community.  He knew exactly

7   where those guns were, and he went to get them in order to then

8   be armed for the attack that he set off to accomplish against

9   the counterparty.

10       So the government is very concerned, as we've gotten to

11  this point, that the defendant has continued in what we

12  consider this fantastical story about what happened this

13  morning, rather than accepting responsibility for what he did

14  and the consequences of his actions.

15       The other evidence this morning that showed the

16  additional stories that he's telling was the story -- his

17  statement that he would have -- the next time -- I mean, he's

18  learned his lesson; next time he'll call the police.  That

19  contradicts his claim that he was on his way to see the police,

20  and it acknowledges that he was not intending to seek any

21  intervention or diminish the situation at all on September 5,

22  2018.  The true facts are that he was even going to run from

23  the police, as he said in his jail calls, but he couldn't

24  because one of the guns was too big to try to run with.

25       So the stories he is telling are not true.  They are

1  fabricated for purposes of reducing his culpability in this

2  case.

3       We also think that the fact of the defendant's lack of

4  credibility on other points supports the finding that the

5  ammunition was plainly his.  This was his bedroom.  If he

6  weren't generally there, certainly, his father, who had reason

7  to try to help out his son at the time of the arrest, would

8  have mentioned that.  He would have said to the police my son

9  doesn't really stay here.  He wouldn't have listed the four of

10 them, the parents and the two sons, as those that lived in that

11 residence.  But the defendant's father didn't describe meeting

12 the defendant out somewhere that morning.  He described the

13 defendant living there, and only himself, his wife, and the two

14 sons living there, and he said that this was the defendant's

15 room.

16      It's really important also that the defendant's brother,

17 Larry Newman, Jr., had his own room.  As the Court learned from

18 the evidence this morning, he had significant quantities of

19 drugs in his room.  He had his own firearm in that room.  So

20 there was no need for him to be keeping his other drug

21 paraphernalia in the defendant's room.  Certainly, as we noted

22 earlier in connection with one of the arguments, that is not

23 something anyone does.  You don't put this type of thing in

24 someone else's room who is not fully complicit, if not

25 participating, in the criminal conduct that those things show.

It was also central to the defendant's argument and to his defense that the victim had a weapon, and he testified that that was a key fact to supposedly understanding what he did that day.  But the evidence showed that the defendant never told this to his family and friends.  And if there had been a weapon, it is ridiculous to think that the defendant would not have mentioned that in explaining what had happened.

I'd also note that of interest now, given the defendant's story, is that in the body camera footage submitted as exhibit C to the sentencing memorandum, the officer who is talking to the two individuals who were the victims in the road rage -- well, initial aggressor and then became the victims of Mr. Faison's threats upon the road-rage incident, looks through the vehicle, and it does not appear to the government to show that there was any vehicle security device, such as the defendant claimed for the first time and only at trial, had been -- or for the first time at trial, had been somehow wielded by the driver.  Instead, we point to the statements at that moment, right after the incident had occurred, where the two victims of Mr. Faison's threat were describing what had happened and that they were scared off by the defendant.  That was plain in the interview, and their accounts matched in terms of the story that they were telling about what had just happened to them at the defendant's hands.

So the defendant was not a victim, and his stories only

1    go to show how well he understands that he was not justified in

2    this case.

3          So his lack of acknowledgment of the seriousness of his

4    conduct or his responsibility for it is part of what greatly

5    troubles the government, and that factors into our concerns

6    both for the guidelines and with respect to Section 3553(a).

7          As the defendant's criminal history shows, he has been

8    undeterred in the pursuit of illegal activity and,

9    specifically, the illegal possession of firearms, for his

10   entire adult life.  And even though he was on supervised

11   release in this case, he proceeded, knowingly, to, at the

12   least, have access to these guns at his house, such that he

13   could go get them, as he himself said on the date was his

14   purpose, and then he chose to set out to make use of them by

15   pursuing the counterparties after the road-rage incident.

16         We do understand the sympathy expressed in a letter from

17   one of the jurors to the defendant, and, certainly, the

18   defendant sought to be -- I mean, certainly, it's unfortunate

19   what happened to him in the initial part of the road-rage

20   incident, but the facts show that his reaction was not

21   proportionate, it was not appropriate, and he should not have

22   been previously armed so as to be able to take those actions

23   when it happened.  That's the key to the government's concern.

24         The jury did not get to hear additional things about the

25   defendant such as the Court heard in the evidence today.  And

1  the defendant also wanted the jurors' sympathy.  He went out of

2  his way at trial to try to cultivate that sympathy.  He opened,

3  in fact, his closing argument stating that he had a new son,

4  which is, obviously, not related at all to the evidence in the

5  case.  That was, again --

6          THE COURT:  That's what a lawyer would have done on

7  his behalf though.

8          MS. WRIGHT:  Well, I think the lawyer would have had

9  more trouble saying various things on behalf, but, certainly,

10  it's a persuasive point since we are human beings, and we have

11  natural human sympathy, but in terms of -- and the government

12  does mention this in its response memorandum too, but in terms

13  of the defendant's culpability, we think that counts against

14  him.  He has all this additional to lose, and he made the

15  choices on that date.

16          One of the -- the fourth clip that the government played

17  this morning from the jail calls, that was on the eve of trial,

18  and the defendant refers to the fact that he had been going to

19  hurt someone that day because, again, he was angry, and he had

20  to have -- and someone else had to intercede and refocus him

21  on, no, this is -- you got to focus on your trial; you've got

22  to go to the library.  But the fact that even while he's locked

23  up and knows that the stakes are that high, that he was not

24  exercising control, that he wanted to hurt someone, he said

25  even though he knew it would get him another charge, he was

1    prepared to do that.  That is of significant concern for his

2    dangerousness and his willingness to comply with the rules of

3    society if even in jail, on the eve of trial, he's not acting

4    or choosing to act in a manner to protect other people's safety

5    absent intervention by an outside source.

6         And I do want to be clear pertaining to one of the other

7    points of the Court.  Certainly, the defendant is entitled to

8    put on any defense, evidence, no evidence at all, and all that

9    the government is taking issue with here is the fact that we

10   think he lied.  He was actively attempting to mislead the jury

11   in order to avoid responsibility for what he did.

12             THE COURT:  I don't want to go back down this road --

13             MS. WRIGHT:  Of course, Your Honor, I was pausing

14   to --

15             THE COURT:  Well, no, no, no, I know, but -- I don't

16   know.  Now I can't help myself.  Isn't that just what trial is

17   though, two competing notions?  One is always going to be

18   accurate, and one is always not, and the jury is here to try to

19   figure out.  Whether he takes the stand or not, this side is

20   trying to say that this set of facts happened; this side is

21   trying to say that that set of facts didn't happen, and the

22   jury decides.  I can't wrap my mind around punishing him

23   because, as part of that, he takes the stand.  I just can't

24   wrap my mind around that.

25             MS. WRIGHT:  And that part is totally understood,

1   Your Honor, and that's not what we're trying to punish him for.

2   It is for, as we think is shown by the evidence here, lying on

3   the stand and clouding the facts, rather than explaining what

4   actually happened and seeking the jurors' concurrence,

5   essentially, in what actually happened.

6          So based on what sort of actually happened and the

7   violence in the defendant's conduct, we do think that this

8   sentence is necessary for deterrence and to protect the public,

9   and also to reflect the defendant's very alarming history of

10  concerning conduct with firearms and continuous attempts to get

11  firearms, even when it had been in violation of the law.  The

12  fact that he engaged in this activity and had these firearms

13  and other items in his room, which I'll talk about momentarily,

14  despite the previous terms in prison, including, first, a

15  five-year federal term, then at least an 11 year, as it turned

16  out, federal term and still chose to have all the tools there,

17  in terms of the firearms, to undertake violent activity is a

18  major concern.

19         The drug paraphernalia and other items in the defendant's

20  room are also of major concern to the government because it

21  shows, again, an utter disregard for the fact of being on

22  supervised release.  Even if he was not the one that was

23  actively manufacturing this paraphernalia -- excuse me,

24  manufacturing these drugs, despite the paraphernalia being

25  stored in his room, then he was at least complicit in it and

1  trusted enough in that enterprise that there was no concern,

2  evidently, whatsoever of leaving all those items in his room.

3  That is not the behavior of someone who has changed his ways

4  and wants to demonstrate his compliance on supervised release

5  and his ability to show his reform when he has reentered

6  society.

7         Having the guns and ammunition and the drug items also

8  being in his room is also not the only alarming activity.  The

9  government doesn't want to ignore the fact that he was very

10  close to having silencers, along with the guns, in his room.

11  The point of the clip that the government played with respect

12  to the silencers was the fact that, yes, Mr. Faison was

13  describing a claim that the government had been making, that he

14  had the silencers, but what he said in response to that was

15  that the basis for the government's argument was because "I had

16  flashlight parts in the room."  He did not say that it was

17  because there were flashlight parts in the room.  He was

18  acknowledging and slipped up there, in the government's view,

19  to acknowledge that these were his items, again, in the room.

20         The main piece of -- the main personal item that the

21  defendant asked about in his room, as was reflected in the

22  evidence at trial, was that Samsung tablet, and on the tablet,

23  in the months from April through August 17th, the testimony was

24  today there were searches for getting silencer parts.  And

25  there was a drill in the room, and the testimony was that the

1    only thing that separated these items from being silencers were

2    the fact that they had not yet been drilled.  Everything else,

3    in terms of the baffles, fit in.

4        This was on the bed, right next to this pack of papers

5    that had additional notes that, obviously, were at least

6    trusted to be in the defendant's room, in the defendant's

7    personal paperwork.  There's employment paperwork.  There's

8    this paperwork from his 2007 case.  We don't think there can be

9    any credible argument or truly argument at all that these were

10   not items that he was, at the least, perfectly comfortable

11   having all around him.

12       We think the suggestion to the contrary is that these

13   were all things that he was preparing to use for additional

14   nefarious purposes, likely connected with the distribution of

15   the controlled substances.  There is no legitimate purpose,

16   and, certainly, there would be additional enhancements, both in

17   terms of the VOSR and other charges, had these actually become

18   silencers.  But the fact that they were so close to being

19   silencers is a major problem.  Again, these are contraband

20   items that one would not leave in someone else's room,

21   especially if, based on the testimony at trial, there were

22   children all over, in and out of that room, if that person was

23   not fully complicit in the activity.  That fully defies common

24   sense.  And the fact that these items were his in his room is

25   the only reasonable conclusion we think here.

1          So, Your Honor, I will leave that as the argument with

2    respect to the 3553(a) factors and our recommendation.

3          In terms of the VOSR evidence, we do think the violations

4    listed here with respect to both the PWID, which he was at

5    least aiding and abetting and was accountable for at least

6    illegal possession of the firearm, the use or possession of a

7    controlled substance, based on what was in his room, and there

8    was the PCP itself in his room, again, as well as --

9          THE COURT:  On the petition I have, I just see a

10   violation three and four.  I literally just noticed this.  Is

11   there no violation one and two?  Have those been dealt with?

12         MS. WRIGHT:  I believe those are on their way to you

13   as we speak.  Yes, there are violations one and two, and I will

14   note that they are essentially, in parallel, all based on the

15   state charges at time --

16         THE COURT:  But they're all related to the same set

17   of charges.

18         MS. WRIGHT:  Yes, Your Honor, they're all related to

19   the same set of charges, and the key differences are what

20   conditions of supervised release were violated.  Numbers 3 and

21   4 were adding the violations with respect to committing another

22   state, federal, or local crime, and the first two were sort of

23   the substantive violations, where Mr. Faison was prohibited

24   from possessing a firearm or ammunition, and then when he was

25   prohibited from possessing a controlled substance.

1          THE COURT:  Got it.

2          MS. WRIGHT:  So we think all of these violations have

3    been established by the evidence that has been put forth.  The

4    evidence shows, based on the preponderance, which is all the

5    current standard that is, was that he had all the tools for the

6    manufacture and residue for cocaine and cocaine base in his

7    room, in his own room, along with PCP.

8          The fact that it corresponded to the drugs in Larry

9    Newman, Jr's, room we think strengthens the case for the

10   violations, rather than in any way diminishing it, in showing

11   that they were partnered in this activity, even though one

12   happened to have the drugs in his room.  And the fact that,

13   again, Larry Newman, Jr., had his first reaction, when they got

14   to the house, that they took everything and that that was what

15   he wanted to convey to his brother shows the complicity of them

16   in this activity.

17         A grade A violation could also be established here in

18   terms of the violation of federal, state, or local law by

19   virtue of the first degree assault, which we think has been

20   plainly established.

21         So on any of those bases, we think each of those

22   violations has been proven up here based on the defendant's

23   conduct.

24         The silencers presence would also provide an independent

25   basis for a grade A violation for the possession of silencers.

1    So that's something that also informs a recommended sentence,

2    which is at the high end of the guideline range for the VOSR as

3    well because there were just so many aggravating factors in

4    terms of his conduct here.

5        And this was very concerning to the government also by

6    virtue of the fact that this was federal supervised release.

7    Mr. Faison knew the system.  He had previous federal

8    convictions, both involving a gun out of D.C. and this drug

9    crime out of EDNY, and then he had both guns and the drugs

10   right here, which shows a full disregard for the purpose of

11   supervised release and the trust that the Court had placed in

12   him by releasing him to supervision at that time.  He had only

13   been on supervision for approximately a year at the time all of

14   these things happened, and the research on the silencer parts,

15   that were on the tablet that Mr. Faison asked about and that

16   was on his bed at the time, started within six months,

17   approximately, of when he was released on supervision.

18       Mr. Newman, Sr., testified at trial that he also had

19   prohibited his son from bringing guns into the house.  So

20   Mr. Faison was disregarding that directive too, as well as the

21   law here, and that highlights also that there was no legitimate

22   reason whatsoever for him to have these guns.  That gives the

23   plain implication, too, that they were processed in connection

24   with, again, the drug trafficking by both sons, that Mr. Faison

25   was at least partially complicit with, and we think that does

1   justify revocation of the terms of supervision and imposition

2   of the recommended sentence.

3        We would request that the sentence run consecutively to

4   the sentence on the underlying offense, at least in part.  We'd

5   note that -- we understand that Mr. Faison does receive an

6   increase in the offense level of -- I think it's between 14 and

7   17 months by virtue of the fact that he was on supervision, and

8   we would propose to deduct that out of the term of a revocation

9   sentence that he receives, to avoid double counting on that

10  front.  But, otherwise, we do think that a significant penalty

11  for the independent violation of trust that's shown here by the

12  criminal conduct needs to be imposed, and that combined, those

13  two create the appropriate sentence in this case.

14       THE COURT:  Mr. Faison, typically I advise the

15  defendant -- and, for the record, I am advising you -- that you

16  have an absolute right to address the Court before I impose

17  sentence.  I also say that you're not required to speak, but

18  I'm eager to hear anything you have to say if you wish to

19  speak.  Since you have been representing yourself this entire

20  time, I presume that you do wish to speak both as counsel and

21  as defendant, and so I will hear from you as to what you wish

22  to say.

23                  **ALLOCUTION BY THE DEFENDANT**

24       THE DEFENDANT:  Yes.  The government is very good at

25  mischaracterization.  Dealing with -- and I know you have

1   already set your mind to your position on this, but dealing

2   with the chasing of the individual, one of the guns were

3   unloaded.  I mean, how can I harm somebody with an unloaded

4   firearm?  If you consider this, it shows my intent.  I didn't

5   even know that the firearm was loaded or unloaded.  It just so

6   happened that one was and one wasn't.

7               THE COURT:  To state the obvious, it only takes one

8   to be loaded to do the harm.

9               THE DEFENDANT:  Right.  But this goes to my intent

10  once again.  If I intended to harm somebody, I wouldn't carry

11  an unloaded firearm.  That makes so sense.  That means I choose

12  one or the other to do something that I had the intent to do.

13        But as to the running from the police, there was a

14  conversation.  And as I said, we are listening to partials.

15  The question was asked of me, "why didn't you get out and run?"

16  I said, "how can I get out and run with a big old gun?"  Not

17  that I intended to run.  It was just an answering of the

18  question.

19        As far as the conversation about me saying, oh, from here

20  on out I will call the police.  As I said, my initial

21  conversations were being made in anger, being made in

22  frustration.  The later conversations, when I had time to

23  settle my mind, these are the type of things that I'm

24  communicating to people.  Like, you know, I don't -- this is

25  not something I want to be a part of.  I've been a part of

1   criminality all my life, where you don't call the police, where
2   you don't deal with the police.  But now I'm saying in order to
3   become a regular citizen, to become valuable to society, I have
4   to make that better choice, to be able to say I'm willing to
5   call the police when I need their assistance.
6        Now, the government addressed a portion of when, in the
7   video, Mr. White, in the vehicle, was checked by the officer.
8   But what they did not convey was Mr. White was left several
9   minutes alone by hisself.  So anything could have happened from
10   the time that the first officers left to when the second
11   officer pulled up.
12        Once again, my possession was not in criminal intent.  It
13   wasn't intended for criminal purposes.  I have not touched a
14   firearm in 25 years.  This particular charge was based on
15   reaction to this individual.
16        As far as whether or not I accepted responsibility, once
17   again, Your Honor, this is my family.  I am never going to say,
18   oh, I apologize for protecting my family; oh, I apologize for
19   reacting to a threat to my family.  Do I regret the situation?
20   Most of my conversations that were not played here, you'll hear
21   that I say this.
22        You'll hear me say I'm being taken away from a brand new
23   child, the same issue I put before the jury.  This is why we
24   have a lot of children growing up, and they become adults with
25   no common sense.  I had one son that I had a chance to spend

1  time with and raise in a manner, and today he is 24 years old

2  and has never had any issues with the police, the courts or

3  anything.  He graduated from high school.  These are the type

4  of things I want for the new one.

5       In trial, I admitted to the jury, in opening and closing

6  and all through, yes, I possessed the firearm; yes, I am a

7  felon; yes, I know I was a felon.  My purpose in trial was

8  reserving my issue of the 922(g) not being under the commerce

9  clause and being able to put forth the defense of

10 justification.

11      As far as the conversation about the flashlights in the

12 room, once again, the government is admitting I'm having this

13 conversation about what they brought out.  The way I

14 communicate it does not mean I'm saying, oh, they belong to me.

15 I'm saying what the government is saying, I had flashlights,

16 and that's why they're trying to give me this enhancement and

17 say that they're silencers.

18      The government continuously says that I am complacent in

19 the activities of another family member.  They once before

20 mentioned that my mother and father, how can they not know

21 about things taking place right up under their nose.  We're

22 adults.  I don't get into my brother's business; he doesn't get

23 into mine.  My parents don't come and get into our business.

24      As I've said before and in my other letter, the things

25 that take place with my brother, my brother and my father clash

1  over those things, but, once again, your children are your

2  children.  You don't exercise them for things that you feel

3  that, as adult, they do that don't make sense to you, even when

4  it's against everything that you request.  But at the same

5  time, complacency is not acquiescence.  Just because I may

6  understand what he does does not mean I agree with it.  Just

7  because my father may have issues with him about what he does

8  doesn't mean he says, oh, it's okay.

9      People can't force an adult to do things correctly.

10  People can't get adults to see the frame of mind that when you

11  do something, it affects everyone.  My actions affected me and

12  my family.  When I first was arrested, my mother was upset, but

13  when my father explained the situation, my mother said, son, I

14  understand, but I told you, I told you do not let these guys

15  trick you into anything.  You come from a different generation;

16  you come from a different attitude.

17      Now, I asked about the tablet in the room because I had

18  money under it to pay my phone bill, and the conversation

19  reflects that.  I'm not the only person that used that tablet

20  in there.

21      The questions about creating silencers and drug

22  paraphernalia and we both are taking part in this, once again,

23  Your Honor, knowing is not accepting.  You can talk until your

24  head falls off about what a person does and try to explain to

25  them and try to tell them.  As my father said, I tell my

1   children don't bring it in my house, don't do this, don't do

2   that, but it doesn't change if you're an adult and you make

3   your choices.

4        But once again, that wasn't a part of me.  That wasn't a

5   part of the life that I was coming home to.  My day was spent

6   dealing with my grandmother, dealing with my aunt.  Both of

7   them wanted to come and speak, but my grandmother has

8   Alzheimer's.  My mother said she would never let her get up

9   there and make herself look crazy.  My aunt is 92 years old.  I

10  didn't want to put the pressure on her.  Ms. Eidell said she

11  (would go get her.  I thought about it.  That's too much stress

12  just to come and say this is what this man does for us; this is

13  the type of individual we have.

14       I've never said that I don't get upset, but I don't have

15  a history of any violence.  If that's the type of individual I

16  am, I would be like other people that have assaults, this,

17  that, violence, violence.  I don't have these things.  Not to

18  say that my attitude doesn't reflect a certain way that I am,

19  but it comes from, as I told you, the way I was raised, the

20  people I was raised around.

21       Being in prison most of my life, I have to adapt to

22  society again, but at the same time, this is what I was raised

23  under.  This is what I'm dealing with.  This is what I'm coming

24  from.  I'm coming from people who don't have an understanding

25  of being a normal citizen anymore.  They've adapted to a whole

1   different way of life, and I had to do the same thing.  It's

2   only been a year.  I hadn't had the chance to really change my

3   way of thinking, even though I tried and I wanted to.  But as

4   you can see, I reacted because that's what I was used to doing,

5   reacting to a threat.

6           I want to ask that Ms. Griffin be able to speak as to

7   just my general inner workings with her during the time period

8   that I was on probation.  You'll hear from her that she never

9   had a problem out of me.  All my urines were clean.  Whenever I

10  was told to report, I reported.  Anything that was required of

11  me that she needed, I provided.  When she told me she had to

12  come past the house, I was there for her.  I wasn't being a

13  person who was trying to go back to a life that I didn't want

14  anymore.

15          Once again, what my brother does, he's an adult.  That

16  man is 34 years old.  His choices are his, regardless if I know

17  about it, regardless if I see it.  That's not for me to say he

18  doing this; officer, come get him.  It's not for me to say you

19  got to leave your parents house when they won't even put you

20  out.  But none of that should reflect on me in a manner that

21  makes it seem as if I'm doing this and I know about it; I'm

22  taking part in it.

23          At no point during my one year at home could it be

24  pointed to that I did anything or had anything that can show

25  that I'm dealing drugs.  I had to borrow money from my parents

1   on a regular occasion until I got money from the food that I

2   would sell and the cars that I sold.  And in turn, as my mother

3   testified, I gave her money from that to pay bills.

4          3553 says that it should be a necessary for the sentence.

5   I'm 50 years old.  Is it really necessary to give me several,

6   eight years of a situation of simple possession of a firearm?

7   From day one I've said yes, I possessed this firearm; yes, I

8   wasn't supposed to possess it.  But it was in reaction.

9          And I understand your thought process on you believing

10  that I knew about these firearms and I was in possession of

11  these firearms with my brother, but this isn't how it was.  But

12  I'm not going to say that I didn't know about firearms.  Once

13  again, I knew about the firearms, but it was never my intention

14  to possess them.  But in understanding the life that I come

15  from, you have a person chasing you.  I don't know how this man

16  is going to harm me.  When I saw what I saw, I reacted to him.

17         It is never my intent to harm anybody.  That's why I

18  don't have such things on my record.  My largest crime is

19  drugs.  That's what I've done all my life.  With the last

20  sentence, I chose a different way.  Once again, the only people

21  that can say it, I didn't want them to say it.  I don't want to

22  bring my mother and have my mother say what she knows my son

23  does.  I don't want my father to say I know my son does this,

24  because that has nothing to do with why we're here.  We're here

25  because I possessed a firearm.  The case has turned into now

1   I'm a drug dealer again; I'm making silencers; I'm violent.

2   And nothing reflects that other than something they found in

3   the home.

4        As for my rambling, I'm done with that, but I would like

5   to address the violation.  I believe there's an issue as far as

6   my criminal history score, which they have it as a category 5

7   on the --

8            THE COURT:  I have it as a four here.  Am I looking

9   at the wrong --

10           MS. WRIGHT:  You have the correct one, Your Honor.

11  Probation subsequently amended that in response to the

12  defendant's concern.

13           THE COURT:  I have you as a criminal history category

14  4.

15           THE DEFENDANT:  Okay.  And they have it listed as a

16  class A felony.  I'm assuming that the class A is just based on

17  the understanding of how the violation occurs, but it says here

18  in the commentary notes that where the defendant is under

19  supervision in connection with a felony conviction or has a

20  prior felony conviction, possession of a firearm, other than

21  the firearm described in 5845, would generally constitute a B

22  violation because 922(g) prohibits a convicted felon of

23  possessing a firearm.  The term generally is used in proceeding

24  sentence; however, because there are certain limited exceptions

25  to the applicability of 922(g), which is under 925, and 925 is

1    essentially when you use it for hunting purposes or something
2    like that.
3        But I believe I shouldn't have a class B violation based
4    on this, because the -- I believe at the time that the arrest
5    was done, it was essentially just the firearm charges, and then
6    the drug charges were later added.  Yeah, I think if you look
7    at page 2 of the -- I'm not even sure if you have -- Your
8    Honor, which copy are you looking at of the violation report?
9        THE COURT:  I have a number of documents here in
10   front of me.  I have petition number 1 and petition number 2,
11   and then I also have a violation report.
12       THE DEFENDANT:  I believe it's the violation report
13   dated December 13th.
14       THE COURT:  I have one more recent than that.  Then I
15   have a document dated December 14th, a document dated March
16   6th, and then the violation report of January 8th.
17       THE DEFENDANT:  Okay, well, we'll --
18       THE COURT:  If there's a document you have, you can
19   ask Mr. Miller to bring it up to me if there's something you
20   have that you want to make sure I have.
21       THE DEFENDANT:  Yeah, I just want to make sure we
22   have the same one that --
23       MR. MILLER:  Your Honor, the violation report that
24   I'm holding here is dated December 13, 2018.
25       THE COURT:  I don't have anything in front of me

1 dated December 13th, so.

2 THE DEFENDANT:  And I don't have the new one that you

3 obviously have.

4 THE COURT:  If you show me that, I'll let you whether

5 or not it has the same information.  It might just be stamped

6 differently.

7 (Document handed to the Court.)

8 THE COURT:  That page 2 looks the same as my page 2.

9 Mine is dated January 8th though.

10 THE DEFENDANT:  Okay.  So what I was addressing is on

11 the date of the arrest, as you can see, the first part of it,

12 nothing was there except the firearms.  The drugs were added in

13 November.  That would make the violation a B class violation

14 because it only applied to the firearms at the initial arrest.

15 Now, once again, I don't know where the class A is coming

16 from, but I'm assuming that's what it was, because the drugs

17 were added in November of 2018.

18 I believe that's all I have to address.

19 Oh, okay.  He just brought something to my attention

20 which I did have wrote down.

21 THE COURT:  Your very active standby counsel is

22 making one last point.

23 THE DEFENDANT:  When you read the commentary dealing

24 with 922(g), it says grade A violations are conduct

25 constituting a federal, state or local offense punishable by a

1    term of imprisonment --

2             THE COURT:  Slow down a little.

3             THE DEFENDANT:  -- Exceeding one year, that is, a

4    crime of violence, or a controlled substance, or involves

5    possession of a firearm or destructive device described in

6    5845, or any other federal, state or local offense punishable

7    by a term of imprisonment exceeding 20 years.

8         And the grade B violations involves conduct constituting

9    a federal, state or local offense punishable by a term of

10   imprisonment exceeding one year.  That would be the 922(g)

11   because it carries a mandatory maximum of 10.  It falls under

12   the 20 year that's listed in A.

13            THE COURT:  Anything else, sir?

14            THE DEFENDANT:  That's it.

15                            **SENTENCE**

16            THE COURT:  Just give me one moment to look over my

17   notes, and then I'll issue my ruling.

18        So after calculating the guidelines and departures and

19   hearing argument, I must now consider the relevant factors set

20   out by Congress at 18 U.S.C. 3553(a) and ensure I impose a

21   sentence sufficient but not greater than necessary to comply

22   with the purposes of sentencing.  These purposes include the

23   need for the sentence to reflect the seriousness of the crime,

24   to promote respect for the law, and provide just punishment for

25   the offense.  The sentence should also deter criminal conduct,

1    protect the public from future crime by the defendant, and

2    promote rehabilitation.

3         In that regard, I've considered the nature and

4    circumstances of the offense, the history and characteristics

5    of the defendant, the need to avoid unwarranted sentencing

6    disparities among similarly-situated defendants, and the types

7    of sentences available.

8         The defendant was born in 1972 in Washington, D.C.  Both

9    of his parents were involved in his upbringing.  He now has a

10   number of children of his own.  He has no prior history of

11   mental health treatment or substance abuse.

12        I apologize.  Mr. Faison specifically asked that I hear

13   from Ms. Griffin, who is here on the violation, and I just -- I

14   had written a note to myself that said "Griffin," and I looked

15   up and saw that as I was going through my notes.  So I will

16   hear from you, hopefully, relatively briefly, but I will hear

17   from you as to Mr. Faison's conduct since he's been on release.

18   And then I will restart my comments.

19              **COMMENTS BY PROBATION OFFICER GRIFFIN**

20        PROBATION OFFICER GRIFFIN:  Your Honor, Mr. Faison

21   began his supervision in September 2017.  I supervised

22   Mr. Faison the entire time.  When he first started supervision,

23   he enrolled in Prince George's County Community College.  He

24   was enrolled in an emergency medical technician course.  He was

25   doing fairly well.

1        I would go out to see him at the residence.  There were

2   several times that I saw him, he was working on cars.  He told

3   me that he purchased cars from an auction, and that's how he

4   made his living.

5        Whenever we asked him to report, he would report in to

6   the office.  He would provide us with whatever documents we

7   asked.

8        Overall we had no problems with him.  It wasn't until he

9   was arrested for these charges that are currently pending.

10        THE COURT:  Okay.  Thank you.

11        PROBATION OFFICER GRIFFIN:  Thank you.

12                    **SENTENCE (continued)**

13        THE COURT:  So continuing, he had no history of

14   mental health treatment or substance abuse.  It was right there

15   that I had placed a note saying that I wanted to hear from

16   Ms. Griffin, who corroborates what I had read earlier in her

17   report and what Mr. Faison has indicated, which is that he was

18   doing well on probation, hadn't been giving anyone any problems

19   until this offense.

20        I note that I received a number of letters on his behalf

21   that speak glowingly of him.  I particularly highlight the fact

22   that he is described as being protective of his family, which

23   is certainly consistent, perhaps fortunately or unfortunately,

24   with his actions in this case.

25        He didn't complete high school, but he does have his GED.

1    He took some college courses.  He has been self-employed buying

2    and selling cars.

3         He does have a prior record that involves both firearms

4    and drug distribution.

5         I do note, because I think it's worth noting, because

6    Mr. Faison represented himself, we all got to know him better

7    than we typically do get to know a defendant in trial, and I'll

8    note -- and, obviously, just like the lawyers, he's on his sort

9    of best behavior when he's in trial in front of a jury and a

10   judge, but I will note that I was impressed with Mr. Faison

11   from beginning to end, from, you know, behavior during jury

12   instructions, his presentations to the Court, his presentations

13   to the jury.  I found him to be intelligent, charming at times,

14   and he certainly -- I still would advise or have advised him to

15   allow Mr. Miller to represent him, but, you know, all things

16   considered, he handled his role well.

17        I note in that regard, because this is unusual, as I

18   indicated before, at the end of every trial, I go back and

19   speak to the jury.  I usually don't bring any comments that I

20   hear from them into a sentencing.  Here I will because the

21   juror brought those comments into the sentencing by submitting

22   a letter.  You know, it was clear from my conversations with

23   them, and it's clear from the e-mail that I received, that the

24   juror -- the jurors struggled with this, and I think, in part,

25   because they, for lack of a bitter word, found him likable,

1  found him sympathetic given the situation that he was placed

2  in, and I just -- I find that remarkable considering, again,

3  they got more opportunity than usual to get to know him.

4       I also note the presence of, I think, a different juror

5  than the one who sent the note in the courtroom.  And so I find

6  that worth noting.

7       Regarding this offense, however, the defendant was in a

8  road-rage incident, which we all agree was unfortunate.  But

9  what happened next was that, along with his father, they drove

10  back to the house as the car followed him, and he retrieved a

11  firearm.  He was then pulled over by the police, and the

12  firearm -- and I should say plural, firearms were recovered.

13  One was loaded; one was not.

14       At trial there was some indication that he went into a

15  shed, or some similar apparatus, looking for something and

16  happened to stumble upon the firearms.  I simply don't believe

17  that to be true.  I believe he knew where the firearms were, he

18  recovered them, and, you know, had them in his possession with

19  at least the possibility of doing harm to these individuals he

20  had been in the road-rage incident with.

21       A search warrant of the house revealed a number of items.

22  I won't list them all.  They've all been made a part of the

23  record here.  It includes ammunition, for which the jury

24  acquitted him; PCP found in his room; a larger amount of drugs

25  found in his brother's room; some silencer parts, which does

180

1  concern the Court because silencers, for the most part, are

2  used to -- I don't know if making firearms more lethal would be

3  the way to say it but, certainly, often used as part of

4  additional criminal conduct.  So his what seems like interest

5  in and creation of silencer parts is something that concerned

6  the Court.

7        Also, the jail calls the Court listened to give the Court

8  grave concerns for his intentions towards the individuals who

9  he had been in the road-rage incident with.

10       Regarding the seriousness of the offense, I think anytime

11 somebody with his record is in possession of firearms, it's a

12 serious offense.  We'll never know.  Only Mr. Faison knows for

13 sure what he was intending to do with those firearms.  But,

14 again, I do believe he left the house with an intent to do them

15 harm, which makes this a very serious offense.  Even accepting

16 what he says, that maybe he was going to scare them away or

17 maybe it was purely for protection, those really aren't

18 justifications.

19       I don't want to sound naive or unrealistic, but if we are

20 placed in harm's way, that is why we rely on the police.  We

21 don't arm ourselves and go out looking for people.  This is not

22 the wild west.  And so, under any circumstances, I don't

23 believe his actions here were remotely justified.  And so I do

24 find that it's a serious offense.

25       There is a need for deterrence.  He certainly needs to

1   know, if he does not know already, that similar behavior in the

2   future is not tolerated.

3       Although, looking at his history, there is not a

4   significant amount of violence.  There are other charges.  So

5   in determining the need to protect the public, I do see some

6   need to protect the public, because, certainly, as I've said

7   over and over again, and so I'll try not to be overly

8   repetitive here, but given what I believe he had in mind, I do

9   see some need to protect the public.  Although his history does

10  not indicate a lengthy history of violence, so I am also

11  considering that.

12      Regarding the advice of the sentencing guidelines, as I

13  indicated, he is properly calculated as an offense level 26,

14  with a guideline range of 92 to 115 months.

15      I am going to vary downward from that guideline range and

16  sentence him as if he was offense level 24 because of -- again,

17  I find the stolen firearm enhancement does not in any way bear

18  on his culpability, and I see the purposes of enhancements to

19  be reflective of the defendant's culpability, and I just --

20  that enhancement, in my view, does not go to that in any way.

21  And so I am going to vary downward from that enhancement, which

22  means that he is an offense level -- for purposes of me

23  sentencing him -- an offense level of 24 with a category 4,

24  which means his guideline range is 77 to 96 months.

25      After determining all these factors, after reviewing all

1  these factors, I do find that as to GJH-19-27 -- did I get the

2  year right?  Yes, 19-27.  The sentence that is sufficient, but

3  not greater than necessary, to comply with the purposes set out

4  at 18 U.S.C. 3553(a)(2), is a sentence of 77 months, supervised

5  release period of three years.

6       As to special conditions, I noted there weren't any

7  recommended conditions.  I don't know if that's just because

8  we're assuming that the conditions he's already under will be

9  applied again or if there's just no recommendation of

10  conditions of supervision.

11       PROBATION OFFICER DASOVIC:  Your Honor, there were no

12  special conditions.  Because the defendant doesn't have any

13  mental health history or substance abuse history or anything

14  else like that, we didn't fine that any other conditions were

15  necessary.

16       THE COURT:  That's fine.

17       I will order that he pay $100.

18       If I didn't already say this, three years supervised

19  release.

20       The general conditions, obviously, do apply.  There are

21  no special conditions.

22       Special assessment of $100.

23       As to GJH-18-607, I am going to revoke his supervised

24  release.  I do believe he's properly classified as a grade A

25  with a criminal history category of 4.  That would be a

1  guideline range of 37 to 46 months.  However, given that the

2  conduct for which he's being revoked is the conduct for which I

3  just provided an additional relatively lengthy sentence, I was

4  intending already, even before hearing his argument, to

5  sentence him within the range that would be a grade B.  So I am

6  not going to further go into that argument other than to say I

7  find that grade A is appropriate.  But even if I were to have

8  found him as a grade B, the sentence would end up being the

9  same.

10      So I am going to revoke his supervised release as to

11  those counts.  I will sentence him on those counts to a term of

12  imprisonment of 14 months.  That 14 months does run consecutive

13  to the 77 months that he's been sentenced to in the new case,

14  for a total of 91 months.

15      As to the prior case, he was previously on supervised

16  release in that case for a period of eight years.  I'm going to

17  simply put him back on supervised release as to that case for

18  three years, to run concurrent with the three years that he'll

19  be on supervised release in the new case, with the same

20  conditions of release that may already exist in that case.

21      Is there a recommendation for where I place him within

22  the Bureau of Prisons?

23      I'm sorry, I'm used to directing that question toward

24  counsel.  Is there a recommendation that you would like me to

25  make as to where the Bureau of Prisons places you?

1          THE DEFENDANT:  Yes, sir, Fort Dix.  Before I left, I

2    believe they were trying to implement being able to access

3    college through the computers they have in the library, and

4    because of my present correspondence with Ashland University in

5    Ohio, it doesn't start again until February.  But I've already

6    wrote the director to find out if I can get the tablet, if I

7    can't get to somewhere that has it.  But as far as the

8    recommendation, I would ask to go back to Fort Dix.

9          THE COURT:  The Court recommends that provided the

10   Bureau of Prisons otherwise determines the appropriateness of

11   the security level, the place of incarceration be Fort Dix.

12         The sentence that I have imposed on the 19-27 case is

13   within the guideline range as I established it.  Obviously, the

14   government had a number of objections that are preserved for

15   the record if they choose to pursue that.  But, ultimately, the

16   sentence that I imposed is within the guideline range as I

17   established it, and I think that it's appropriate in light of

18   my findings under 3553(a) factors and purposes.

19         Are there any counts that the government needs to move to

20   dismiss?  We went to trial on two counts.  He was acquitted on

21   one, so I don't think there is.

22         MS. WRIGHT:  No, there are not, Your Honor, not that

23   I know of.

24         THE COURT:  I think this was a superseding

25   indictment; is that right?

1          MS. WRIGHT:  Yes, it was, Your Honor.

2          THE COURT:  So the original indictment will be

3    dismissed.

4          MS. WRIGHT:  Yes, thank you, Your Honor.

5          THE COURT:  I will note for the record that I did

6    attach the juror letter as a court exhibit.  However, it will

7    be a redacted version.  So make sure that the version that goes

8    in does not have the juror's name or address, which were both

9    in the original.

10         Sir, because you went to trial, you can appeal your

11   conviction, you can appeal any pretrial rulings I have made, as

12   well as your ultimate sentence if you believe that the sentence

13   I just gave you was unlawful.  You need to file your notice of

14   appeal within 14 days of the judgment and commitment order.

15         Now, I will say -- and I might talk to a colleague about

16   the best way to structure this.  I am going to write something

17   to address the various legal issues.  I'm not sure if I need to

18   do that before or at the same time I issue the judgment and

19   commitment order, but I will check that.  But in any event, you

20   have 14 days, from the date that I issue the judgment and

21   commitment order, to file your notice of appeal.  So we will do

22   that, as well as a statement of reasons.

23         Is there anything else that I'm forgetting to address?

24         THE DEFENDANT:  There is one point I'd like to bring

25   up.  It's in reference to the discovery.  At this point I'm

1   still left without being in possession of the discovery.  So

2   once I go and I'm transferred to BOP, I don't know what the

3   Court is going to determine as far as my discovery issue.

4            THE COURT:  You mean the ability to have the

5   discovery with you to work on your appeal after you've been

6   transferred to BOP?

7            THE DEFENDANT:  Yes.

8            THE COURT:  I leave that to BOP to determine what you

9   are allowed to bring with you.

10            THE DEFENDANT:  Well, the problem is, as it stands,

11   you made the determination that I will go through Mr. Miller to

12   still look at the discovery.  Once I'm gone -- so I'm asking

13   that everything be given to me before I leave.  That way I can

14   take the discovery with me.

15            THE COURT:  I'll hear if any counsel has a view on

16   that.

17            MS. WRIGHT:  Your Honor, we do oppose that.  The

18   concerns about Mr. Faison having the direct access to discovery

19   while incarcerated apply equally in terms of BOP custody.  I

20   don't know if there would be a situation where standby counsel

21   could be appointed in connection with the appeal or there could

22   be specific documents he's interested in, but we certainly do

23   object to any change of the status quo at this point in

24   connection with how the discover would be handled and it going

25   somehow wholesale into BOP at all.

1          THE COURT:  Yeah, I tend to agree with that.  I'll

2    give some thought to whether or not -- this wouldn't be within

3    my jurisdiction at this point.  I guess what I'll say is it

4    would be up to the Fourth Circuit.  If you're appointed standby

5    counsel for the purposes of your appeal, that needs to have

6    access somehow to your discovery materials, I don't know if

7    current standby counsel has any practical thoughts on that, but

8    my view on your access to discovery has not changed.  I do

9    understand your position on that.

10          THE DEFENDANT:  I just have one question.  For the

11   record, I would like it to be clear from the government as to

12   why they feel that I shouldn't have access to the discovery --

13          THE COURT:  I believe it's the same safety issues

14   that are at play with you having discovery during pretrial.

15          THE DEFENDANT:  Right, and that was actually just the

16   information about the witness -- that information can be

17   removed because I already have it.  The police reports with his

18   name, any other reports that have his name on it that I don't

19   need.  Some of the reports are redacted.  But, like, the police

20   reports, his signed statement, I don't need any of those; I

21   have them.

22       My thing is I want to be able to go through the entire

23   discovery to make sure there isn't anything that I missed

24   because I wasn't in possession of it.  So I'm asking, like,

25   what is it specifically that is preventing them from giving me

1  that access if all the main issue is just having the guy's name

2  floating through the prison?

3       THE COURT:  I think at this point that's an issue for

4  you to take up with the Fourth Circuit.

5       THE DEFENDANT:  Okay.

6       THE COURT:  I don't know if you want to put something

7  on the record on that point, since you're standing.

8       MS. WRIGHT:  No, Your Honor.  I could if the Court so

9  desired, but, otherwise, I had a separate issue to raise before

10  we broke.

11       THE COURT:  Go right ahead.

12       MS. WRIGHT:  Your Honor, my only question was with

13  respect to the term of supervised release imposed for

14  GJH-18-607.  My understanding -- and I guess I have to lodge an

15  objection, and that was that because the original term of

16  imprisonment was eight years, and under the relevant statute

17  there, the term of supervised release had to be at least eight

18  years.  My understanding is that the appropriate term of

19  supervised release there -- and we certainly think the longer

20  term is appropriate anyway, but I think it would have to be

21  eight years, less the term of imprisonment imposed, rather than

22  being able to be reduced to three years.

23       I don't know if Probation has a view on that as well, but

24  we would lodge that as an objection because I think the term of

25  supervised release on 18-607 particularly has to be longer.

1          THE COURT:  I do think you're right about that.  Does

2  probation agree with that.

3          PROBATION OFFICER GRIFFIN:  Yes, sir, I do.

4          THE COURT:  I do think that's correct.  I hadn't

5  heard a recommendation, which is why I went with that.  But

6  having had that pointed out, I think that's right.

7       So it would be eight years, minus the 14 months.  And so

8  that would be six years and -- I'm bad at math at this time of

9  day -- 10 months.  Six years and 10 months?

10          MS. WRIGHT:  I'm also bad at math, Your Honor, but I

11  believe it would be six years and eight months.  Am I correct

12  on that?

13          THE COURT:  I sentenced him to 14 months.

14          MS. WRIGHT:  Yes, six years and 10 months.  Yes,

15  you're correct, Your Honor.

16          THE COURT:  Okay.  So six years and 10 months will be

17  the term of supervision on 18-607; that is correct.

18       Oh, was there a request for an order of forfeiture?

19          MS. WRIGHT:  There was not, Your Honor.  The items in

20  question have been administratively forfeited.  Thank you, Your

21  Honor.

22          THE COURT:  Anything else that we need to address?

23          THE DEFENDANT:  Yes, Your Honor.  I believe that the

24  way that the statute is reading for supervised release

25  following revocation, it doesn't require the term the way that

1    the government is asking.  It says that the defendant --

2    "requirement that the defendant be placed on a term of

3    supervised release after imprisonment, then, therefore, such

4    term of supervised release shall not exceed the term of

5    supervised release authorized by statute for the offense that

6    resulted in the original term of supervised release, less any

7    term of imprisonment that was imposed upon revocation of

8    supervised release."

9             THE COURT:  Yeah, is there a minimum term as opposed

10   to a maximum?

11            MS. WRIGHT:  Yes, there is a minimum term.

12            THE COURT:  What's the statute?  What are we

13   referring to?  Or I can ask this side.  What are you reading

14   from?

15            MS. WRIGHT:  Yes, 841.

16            THE DEFENDANT:  I think it's 3583.

17            THE COURT:  I'm sorry, 18 or 21?

18            THE DEFENDANT:  18 U.S.C. 3583.

19            THE COURT:  One at a time.  18 U.S.C.

20            THE DEFENDANT:  3583(h).

21            MS. WRIGHT:  Your Honor, the government's position is

22   that that is the default term, in that 21 U.S.C. Section 841

23   supersedes that and the relevant provision there --

24            THE COURT:  It says "shall not exceed."  It doesn't

25   say it has to be that.  It says it shall not exceed.

1          MS. WRIGHT:  Your Honor, and then in 21 U.S.C.

2     Section 841(b)(1)(B) --

3          THE COURT:  I'm sorry, what was the cite?

4          MS. WRIGHT:  21 U.S.C. Section 841(b)(1)(B), the

5     last -- I guess towards the end.  It says "notwithstanding

6     Section 3583 of Title 18, any sentence imposed under this

7     subparagraph shall," and then there's a part that's not

8     relevant, "include a term of supervised" --

9          THE COURT:  841(b) --

10          MS. WRIGHT:  (1)(B).  And he had a prior qualifying

11     conviction, if I'm reading the document correctly.  So the term

12     of supervised release would be at least eight years in addition

13     to the term of imprisonment.

14          THE COURT:  Mr. Faison, given the hour, I'll briefly

15     let you respond if you want to respond to that point.

16          THE DEFENDANT:  Right.  I believe she's reading it as

17     if I'm receiving this charge.  35(a)(3)(H) governs receiving

18     supervised release after revocation, and I think that's the

19     statute that the Court would be actually required to go by and

20     not the reading of 841.  841 is applied as if you were

21     receiving that particular conviction.

22          THE COURT:  I understand both arguments.  I do think,

23     having looked at it, the government is right.  So it will be

24     six years and 10 months.

25          Anything else we need to address today?

1          THE DEFENDANT:  That's it.

2          THE COURT:  Anything else?

3          MS. WRIGHT:  Not for the government.  Thank you, Your

4   Honor.

5          THE COURT:  Mr. Faison, I do wish you well.  I do

6   wish you well in the future.

7          THE DEFENDANT:  Thank you.

8        (The hearing concluded at 5:40 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3         I, Cindy S. Davis, Federal Official Court Reporter in and

4    for the United States District Court for the Southern District

5    of Maryland, do hereby certify that I reported, by machine

6    shorthand and computer-aided transcription, in my official

7    capacity the proceedings had in the case of United States of

8    America versus Burudi Jarade Faison, case numbers

9    8:19-cr-00027-GJH and 8:18-cr-00607-GJH, in said court on

10   January 10, 2020.

11        I further certify that the foregoing 192 pages constitute

12   the official transcript of said proceedings as taken from my

13   electronic notes to the best of my ability.

14        In witness whereof, I have hereto subscribed my name this

15   10th day of February 2020.

16

17

18

19

20              *Cindy S. Davis*

21        _____

22        **CINDY S. DAVIS, RPR**
          **FEDERAL OFFICIAL COURT REPORTER**

23

24

25